**UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

---

PEDRO LOPEZ, et al.,

        Plaintiffs-Appellees,

     v.

COMMONWEALTH OF MASSACHUSETTS, et al.,

        Defendants-Appellants.

Appeal No. 09-1664

---

**STATE DEFENDANTS-APPELLANTS' OPPOSITION TO**
**PLAINTIFFS-APPELLEES' MOTION TO DISMISS APPEAL**

The state defendants-appellants—Commonwealth of Massachusetts and Paul Dietl, in his capacity as Chief Human Resources Officer of the Human Resources Division ("HRD")—hereby oppose plaintiffs-appellees' motion to dismiss this appeal. Plaintiffs' motion should be denied because the district court has already determined that this appeal is non-frivolous and has therefore stayed all proceedings below. In addition, this Court should reject all of plaintiffs' arguments on their merits because they do not come close to demonstrating that the appeal is frivolous. This case presents the important question of whether the Eleventh Amendment bars the extension of Title VII liability to a non-employer state agency, such as HRD, that is engaging in regulatory activities that may affect an individual's employment with a third party, such as a

municipality.  In similar circumstances this Court has held that liability cannot be extended to such regulatory activities, and nearly every other circuit court to have addressed the issue agrees.  Plaintiffs cannot therefore reasonably contend that the merits of this appeal are frivolous.  Moreover, contrary to plaintiffs' assertions, were the state defendants to prevail on appeal, trial could not go forward on any of the claims against them, even if plaintiffs are seeking injunctive relief in addition to monetary damages.  Accordingly, plaintiffs' motion to dismiss the appeal should be denied.

## BACKGROUND

In September 2007 the plaintiffs, Hispanic and African-American police officers employed by various municipalities across the Commonwealth, brought this action under Title VII, 42 U.S.C. § 2000e, claiming that sergeant promotional exams administered by HRD in 2005, 2006 and 2007 had a disparate impact on minorities.  See 6th Amended Compl. (attached as Exh. A to Pls.' Mot. to Dismiss Appeal ("Pls.' Mot.")).  In January 2009 the state defendants filed a motion to dismiss for lack of jurisdiction or in the alternative for summary judgment.  See State Defs.' Mem. of Law in Support of Motion to Dismiss (attached as Exh. A).  Contrary to plaintiffs' representation,

Pls.' Mot. at 1, this was the only dispositive motion filed by the state defendants.  See Docket (D. Mass.) No. 07-11693-JLT.

In their motion the state defendants argued in part that the claims against them are barred by the Eleventh Amendment because Congress did not unequivocally state its intent to extend Title VII's reach to a non-employer state agency, such as HRD, that is acting solely in a regulatory capacity.  See Exh. A at 7-19.  In February 2009 the plaintiffs filed a lengthy memorandum in opposition.  See Pls.' Mem. of Law in Opp. to Mot. to Dismiss (attached as Exh. B).  Notably, plaintiffs' opposition did not dispute the critical facts that (1) plaintiffs "obtain no financial benefit from HRD"; (2) HRD does not "exercise any day-to-day control over plaintiffs' work activities"; and (3) "HRD does not train, transfer, assign work to, set work schedules for, supervise, discipline, or fire municipal police officers, [or] pay them . . . [any] benefits." State Defs.' Statement of Undisputed Material Facts (attached as Exh. C) ¶¶ 28-29; Pls.' Statement of Undisputed Material Facts (attached as Exh. D) at 19.

On April 7, 2009, the district court (Tauro, J.) denied the state defendants' motion without hearing or comment.  See April 7, 2009 Order (attached as Exh. E).  The court thereafter issued a pre-trial order setting the case for trial as early as June

3

15, 2009.  See Docket (D. Mass.) No. 07-11693-JLT (Entry No. 172).

On May 4, 2009, the state defendants filed a notice of appeal from that part of the court's order that denied their motion to dismiss under the Eleventh Amendment.  See id. (Entry No. 174).  The state defendants then moved the district court to stay all proceedings until the immunity question was resolved on appeal, arguing that the filing of the notice of appeal divested the court of jurisdiction to proceed to trial.  See State Defs.' Mot. to Stay (attached as Exh. C to Pls.' Mot.).  Plaintiffs opposed the stay on the same grounds that they now assert in their motion to dismiss.  See Pls.' Opp. to State Defs.' Mot. to Stay (attached as Exh. F).  On May 13, 2009, the district court granted the state defendants' motion and ordered that all proceedings be stayed until 30 days after this Court issues the mandate in this appeal.  See Docket, (D. Mass.) No. 07-11693-JLT (Entry No. 181).

## ARGUMENT

**I.    THIS COURT SHOULD DENY PLAINTIFFS' MOTION TO DISMISS BECAUSE THE DISTRICT COURT HAS ALREADY DETERMINED THAT THIS APPEAL IS NON-FRIVOLOUS AND, CONSEQUENTLY, HAS STAYED ALL PROCEEDINGS BELOW.**

In Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 142-45 (1993), the Court held that States

4

and state entities may take immediate appeals from a district court order denying a claim of Eleventh Amendment immunity.  To safeguard against "sham" appeals from immunity rulings, the Seventh Circuit has developed a "certification" process, which has been adopted by several other circuits, whereby "a district court may certify to the court of appeals that the appeal is frivolous and [retrieve jurisdiction to] get on with the trial." Apostol v. Gallion, 870 F.2d 1335, 1339 (7th Cir. 1989); see Rivera-Torres v. Ortiz Velez, 341 F.3d 86, 94 (1st Cir. 2003). The Seventh Circuit cautioned that this "power must be used with restraint, just as the [district court's] power to dismiss a complaint for lack of jurisdiction because it is frivolous is anomalous and must be used with restraint."  Apostol, 870 F.2d at 1339.

Here, relying on Rivera-Torres, plaintiffs maintain that "because the District Court was required to make a preliminary analysis as to whether or not the interlocutory appeal was 'patently meritless,' this Court should dismiss the appeal." Pls.' Mot. at 2.  Putting aside that this Court declined in Rivera-Torres to adopt the Seventh Circuit's certification procedure, 341 F.3d at 96, plaintiffs' argument fails because the district court in fact determined that this appeal is non-frivolous when it granted the state defendants' motion to stay.

5

In opposing the stay, plaintiffs argued that the appeal is "patently meritless" for all the same reasons they assert in their current motion to dismiss. See Exh. E. Nevertheless, the district court ordered that all proceedings be stayed until the mandate issues from this Court, thus implicitly concluding that this is a non-frivolous appeal.

Furthermore, plaintiffs misunderstand the "primary innovation" of the certification procedure, which is to "permit[] the district court to reclaim jurisdiction from the court of appeals" in order to continue with the trial. Rivera-Torres, 341 F.3d at 96 (emphasis added). It does not permit a plaintiff to argue for dismissal to the court of appeals where, as here, the district court has already determined that the appeal is non-frivolous and that trial should not go forward until the immunity question is resolved. See generally id. 94-98. Plaintiffs' motion should be denied for this reason alone.

**II.  IN THE ALTERNATIVE, THIS COURT SHOULD REJECT PLAINTIFFS' ARGUMENTS ON THEIR MERITS BECAUSE THEY DO NOT COME CLOSE TO SHOWING THAT THIS APPEAL IS FRIVOLOUS.**

**A.  A Ruling from this Court that the Commonwealth is Immune from Title VII Liability Would Dispose of All Claims, Including Those for Injunctive Relief, Against Both State Defendants.**

Plaintiffs' primary argument in support of dismissal is that, because their complaint seeks injunctive relief, the state

defendants are not entitled to Eleventh Amendment immunity. Pls.' Mot. at 2-5.  Regardless of how this Court rules on the immunity question, plaintiffs argue, "there is still going to be a trial in District Court on whether or not the examinations at issue here are discriminatory, and whether the Commonwealth must remedy those unlawful acts."  Id. at 5.  This is incorrect.  If the state defendants prevail in this appeal, none of plaintiffs' claims against them can go forward to trial——a point that the district court recognized when it stayed all proceedings below.

As an initial matter, absent a valid abrogation or waiver of immunity, the Commonwealth, specifically named as a defendant in this action, cannot be sued "regardless of the relief sought."  Puerto Rico Aqueduct, 506 U.S. at 146.  Thus, were this Court to find that Title VII does not extend to non-employer States acting in a regulatory capacity, this action could not proceed to trial against the Commonwealth, despite plaintiffs' assertion that injunctive relief is the primary focus of their case.

Nor could this action proceed to trial against the other state defendant, HRD's Chief Human Resources Officer Paul Dietl, in the event this Court rules that the claims against the Commonwealth are barred by the Eleventh Amendment.  In an effort to identify a claim that could survive such a ruling, plaintiffs

7

apparently seek to rely on the doctrine of Ex parte Young, 209
U.S. 123 (1908), which carves out a "narrow" exception to
Eleventh Amendment immunity.  Puerto Rico Aqueduct, 506 U.S. at
146; see Pls.' Mot. at 3-5.  Specifically, Ex parte Young
renders the Eleventh Amendment inapplicable to suits seeking to
enjoin a state official from committing an "ongoing" "violation
of federal law."  Whalen v. Mass. Trial Court, 397 F.3d 19, 29
(1st Cir. 2005).  This narrow exception would not preserve
plaintiffs' Title VII claims against Dietl for two principal
reasons.

     First, Ex parte Young does not allow plaintiffs to avoid
the Eleventh Amendment bar by suing a state official under a
federal statute that imposes no obligations on him.  Rather,
common sense dictates that, to successfully invoke the
exception, the "law under which [the plaintiff] seeks injunctive
relief must apply substantively to the agency" that the official
represents.  Garcia v. Akwesasne Housing Auth., 268 F.3d 76, 88
(2d Cir. 2001) (plaintiff "would not be permitted to pursue
injunctive relief" against officer of tribal housing authority
"if she had sued the [authority] under Title VII of the Civil
Rights Act, because that law specifically exempts 'an Indian
tribe' from its prohibitions").  Here, if the Court rules that
HRD is not plaintiffs' "employer" under Title VII, neither it

8

nor Dietl would have any obligations under that statute.  And in such a case, Ex parte Young would not preserve any of plaintiffs' claims for injunctive relief because there simply would be no "violation of federal law" for the district court to enjoin.  Whalen, 397 F.3d at 29.  Thus, contrary to plaintiffs' assertions, a favorable ruling for the state defendants on the Eleventh Amendment issue would bar all claims in this case from proceeding to trial against Dietl.[1]

Second, the Ex parte Young exception applies only where "the relief 'serves directly to bring an end to a present violation of federal law.'"  Whalen, 397 F.3d at 29 (quoting Papasan v. Allain, 478 U.S. 265, 278 (1986)) (emphasis added).  The exception "does not permit judgments against state officers declaring that they violated federal law in the past."  Puerto Rico Aqueduct, 506 U.S. at 146.  This is precisely the type of judgment that plaintiffs are asking the district court to enter in this case.  Their complaint only challenges the exams that

---

[1]  The cases cited on pages 3-4 of plaintiffs' motion are all distinguishable because there was no dispute in those cases that the State was the actual, direct employer of the respective plaintiffs.  See Garrett v. Univ. of Ala., 531 U.S. 356, 362 (2001); Kimel v. Fla. Bd. of Regents, 408 U.S. 62, 69 (2000); Mullins v. Dep't of Labor, 2009 WL 1059208, at *1 (D. Puerto Rico Mar. 9, 2009); Neal v. East Tenn. State Univ., 2008 WL 4065933, at *1 (E.D. Tenn. 2008).  Hegarty v. Somerset County, 25 F.3d 17 (1st Cir. 1994), is also distinguishable on this point because that case was brought under 42 U.S.C. § 1983, not Title VII.  Thus, unlike here, the existence of an employment relationship was not a threshold requirement for liability.

HRD administered in 2005, 2006 and 2007; it does not challenge the 2008 exam or any future HRD exam. See generally 6th Amended Compl. Further, in their request for relief, plaintiffs expressly state that they are seeking relief to "remedy[] Defendants' past acts of discrimination." Id. at 13 (emphasis added). Thus, despite plaintiffs' current assertions that this action is primarily one for prospective relief, their own complaint plainly establishes that what they are really seeking is to be compensated for alleged past injuries. See Negron-Almeda v. Santiago, 528 F.3d 15, 24 (1st Cir. 2008) (plaintiffs were barred from arguing that their complaint "impliedly" pleaded a cause of action under Ex parte Young; "a litigant cannot freely reinvent his case as he goes along"). Their claims against Dietl therefore do not fall within the Ex parte Young exception to Eleventh Amendment immunity. See Whalen, 397 F.3d at 29-30 (despite "forward-looking nature" of plaintiff's request for seniority credit, Ex parte Young did not apply and Eleventh Amendment barred plaintiff's claims because seniority credit would "'in essence serve[] to compensate' him for past injury") (quoting Papasan, 478 U.S. at 278); cf. Mills v. State of Maine, 118 F.3d 37, 54 (1st Cir. 1997) (no declaratory or injunctive relief could issue under Ex parte Young where

plaintiffs agreed that there was no continuing violation of federal law).

## B.  This Appeal Does Not Turn on any Disputed Issues of Material Fact.

Plaintiffs next claim that this appeal is frivolous because the question of immunity turns on unresolved issues of material fact.  See Pls.' Mot. at 7-10.  In opposing the state defendants' dispositive motion, however, plaintiffs did not dispute the critical facts that (1) plaintiffs "obtain no financial benefit from HRD"; (2) HRD does not "exercise any day-to-day control over plaintiffs' work activities"; and (3) "HRD does not train, transfer, assign work to, set work schedules for, supervise, discipline, or fire municipal police officers, [or] pay them . . . [any] benefits."  Exh. C ¶¶ 28-29; Exh. D at 19.[2]  Instead, plaintiffs turned to the Massachusetts General Laws in an attempt to show that the Commonwealth as a whole exercises "pervasive control over the employment of police officers."  Exh. B at 6-11.  The state defendants are prepared to demonstrate to this Court that, as a matter of law, plaintiffs' statutory characterizations establish only that the Commonwealth regulates certain functions relating to police

---

[2] Plaintiffs also concede that, unlike the entry-level hiring process at issue in Bradley v. City of Lynn, 403 F.Supp.2d 161 (D. Mass. 2005), municipalities are free to conduct their own examinations at the promotional stage.  6th Amended Compl. ¶ 82.

officers, either to further the purposes of the civil-service system or to protect public safety.  The state defendants will further demonstrate that, as a matter of law, Title VII does not reach these regulatory activities because Congress did not unequivocally declare its intent to extend the statute's scope to sovereign states in such a manner.

Thus, contrary to plaintiffs' assertions, no further factual findings are necessary for the Court to resolve this appeal.  Indeed, the district court recognized as much when it stayed all proceedings pending resolution of the appeal.  The immunity question is therefore properly subject to immediate review by this Court.

### C.    Plaintiffs' Claim that the Merits of this Appeal are Frivolous is Belied by Numerous Decisions Supporting the State Defendants' Position.

Finally, plaintiffs assert that this appeal is frivolous because "it is simply beyond dispute that acting pursuant to Section 5 of the 14th Amendment, Congress specifically intended to waive a state's sovereign immunity when it is sued for race discrimination under Title VII."  Pls.' Mot. at 6.  This argument is disingenuous.  The state defendants do not dispute for purposes of this appeal that Title VII subjects States to liability for prohibited discrimination against their own employees.  The pertinent question—as briefed extensively in

12

plaintiffs' own submission to the district court, see Exh. B at 16-26——is whether Congress intended to extend Title VII's reach to non-employer state agencies that are acting in a purely regulatory capacity.[3]

Here again, there is no dispute that the Commonwealth does not pay plaintiffs' salaries or exercise any day-to-day control over their work activities.  In similar circumstances this Court has held that a state agency cannot be subjected to liability as an "employer" of those individuals "whom it neither hires, compensates, nor supervises day-to-day even though it licenses and regulates them."  Camacho v. Puerto Rico Ports Auth., 369 F.3d 570, 578 (1st Cir. 2004).[4]  Otherwise, this Court reasoned, it would be "rewrit[ing] the ADEA despite the utter absence of any hint that Congress intended to extend liability to state agencies that merely exercise licensing and regulatory authority pursuant to a state's police power."  Id.  With one exception,

---

[3]  The Eleventh Circuit case cited on page 7 of plaintiffs' motion is therefore irrelevant because it involved Title VII claims brought by minorities "who are employed, have been employed, or who may in the future be employed by" the State. In re Employment Discrimination Litigation Against the State of Alabama, 198 F.3d 1305, 1309 (11th Cir. 1999).

[4]  Camacho involved a claim under the Age Discrimination in Employment Act (ADEA), which is an analogous statute to Title VII.  369 F.3d at 578 n.5.  Thus, "judicial precedents interpreting one such statute [are] instructive in decisions involving [the other]."  Id. (quotation marks omitted).

every other circuit court that has addressed the issue has held

likewise.[5] The exception is the Ninth Circuit's fractured en

banc decision in Association of Mexican-American Educators v.

California, 231 F.3d 572 (9th Cir. 2000), which is not only

factually distinguishable (because, there, the State's

involvement affected the "day-to-day" activities of the

plaintiffs, id. at 581), it "created a circuit split on a

national issue of great importance," as "all the other circuits

to have ruled on whether Title VII . . . applies to non-

---

[5]  E.g., Gulino v. N.Y. State Educ. Dep't, 460 F.3d 361, 370-79
(2d Cir. 2006), cert. denied 128 S.Ct. 2986 (2008) (city school
teachers could not sue State under Title VII for administering
allegedly discriminatory certification exam where State did not
hire or compensate the teachers or exercise any workday
supervision over them); EEOC v. Illinois, 69 F.3d 167, 171 (7th
Cir. 1995) (State was not "employer" of local school teachers
where powers of "hiring and firing" were in hands of school
district); Fields v. Hallsville Indep. Sch. Dist., 906 F.2d
1017, 1020 (5th Cir. 1990) (State's administration of teachers'
certification exam did not create employment relationship where
State "played [no] role in the general hiring or firing of
teachers" and was not "involved in the daily supervision of
[t]eachers"); Haddock v. Bd. of Dental Examiners of Cal., 777
F.2d 462, 464 (9th Cir. 1985) (state dentistry board's
administration of dental exam did not create employment
relationship where board "neither pa[id] the wages nor engage[d]
the services of the examinees"); George v. N.J. Bd. of
Veterinary Med. Examiners, 635 F. Supp. 953, 955-56 (D.N.J.
1985), aff'd 794 F.2d 113 (3d Cir. 1986) (state veterinary board
was not "employer" of license applicant where board did not pay
wages or "control the day-to-day operations of veterinarians");
see also, e.g., Conroy v. City of Phila., 421 F.Supp.2d 879,
888-90 (E.D. Pa. 2006) (state was not "employer" of city police
officers despite its control over hiring and certification
process, where it did not tell city when to hire or fire
officers or how much to pay them).

employers such as state licensing boards have gone the other way." Id. at 602 (Kleinfield, J., concurring in part & dissenting in part).

In light of this authority, plaintiffs' claim that this appeal is frivolous is itself frivolous. The state defendants have the right to brief and orally present their views on this "national issue of great importance." Id. Plaintiffs' motion to dismiss should therefore be denied.

Respectfully submitted,

COMMONWEALTH OF MASSACHUSETTS and PAUL DIETL, in his capacity as Chief Human Resources Officer of the Human Resources Division,

By their attorney,

MARTHA COAKLEY
ATTORNEY GENERAL

Sookyoung Shin
Assistant Attorney General
Court of Appeals Bar No. 108199
One Ashburton Place
Boston, MA 02108-1698
(617) 963-2052 (direct)
(617) 727-5785 (fax)
sookyoung.shin@state.ma.us

Dated: May 28, 2009

EXHIBIT A

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PEDRO LOPEZ, et al.,<br><br>                  Plaintiffs,<br><br>     v.<br><br>CITY OF LAWRENCE, et al.,<br><br>                Defendants. | CIVIL ACTION<br>NO. 07-11693-JLT |

## STATE DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF MOTION TO DISMISS
## OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT

The State defendants, the Commonwealth of Massachusetts and Paul Dietl, in his capacity as Chief Human Resources Officer of its Human Resources Division (together, "HRD"), submit this memorandum of law in support of their motion to dismiss or, in the alternative, for summary judgment. As explained below, judgment should enter for HRD on Count I of the complaint—alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e—because (i) plaintiffs and HRD are not in an employment relationship, as is required to state a claim under that statute, and (ii) no provision of Title VII explicitly governs HRD's conduct here as a non-employer, rendering plaintiffs' claims subject to dismissal under the Eleventh Amendment of the United States Constitution. Should the Eleventh Amendment shield fail, all claims challenging examinations administered in 2005 should still be dismissed on account of being barred by the statute of limitations. Finally, Count II, alleging violations of Mass. Gen. Laws ch. 151B, § 4, should be dismissed because the Eleventh Amendment bars federal courts from instructing states on how to conform their conduct to state law. For these reasons the Court should enter judgment for HRD on all counts of the complaint.

## BACKGROUND

I.  **THE PROMOTIONAL PROCESS UNDER THE MASSACHUSETTS CIVIL-SERVICE SYSTEM**

   A.  **HRD's Role is Mainly One of Oversight and Regulation.**

HRD is charged by statute with certain responsibilities in implementing the civil-service system, including the preparation and administration of civil-service examinations.  See Mass. Gen. Laws ch. 31, § 5.  In addition, HRD is empowered to "make and amend rules which shall regulate recruitment, selection, training and employment of persons for civil service positions." Id. § 3 (emphasis added).

The Civil Service Commission ("Commission"), not named as a defendant in this action, is a distinct state agency from HRD that has different responsibilities within the civil-service system, primarily involving adjudicating disputes between employees and their employers.  See id. § 2.  Indeed, the Commission has previously adjudicated disputes regarding the content or administration of police promotional examinations.  See, e.g., Boston Police Superior Officers Fed'n v. Boston Police Dep't & HRD, Civil Serv. Comm'n case nos. G-02-143 (2002) and I-02-606 (2008) (copies attached).  The Commission also has the right to disapprove rules proposed, or other actions taken, by HRD.  See Mass. Gen. Laws ch. 31, § 3.

The "fundamental purposes" of the civil-service system are "to guard against political considerations, favoritism, and bias in governmental employment decisions." Town of Falmouth v. Civil Service Comm'n, 814 N.E.2d 735, 739 (Mass. App. Ct. 2004).  By focusing on "basic merit principles" as defined in Mass. Gen. Laws ch. 31, § 1,[1] the system encourages employers—

---

[1]  Section 1 defines "basic merit principles" to include "assuring fair treatment of all applicants and employees in all aspects of personnel administration without regard to political affiliation, race, color, age, national origin, sex, marital status, handicap, or religion and with proper regard for privacy, basic rights outlined in this chapter and constitutional rights as citizens."

2

referred to as "appointing authorities," id.—to make personnel decisions free of "overtones of political control or objectives unrelated to merit standards or neutrally applied public policy." Town of Falmouth, 814 N.E.2d at 739. It is not within the authority of HRD or the Commission to "substitute [their] judgment about a valid exercise of discretion based on merit or policy considerations by an appointing authority." Id. Thus, both agencies' role in the system is one of oversight and regulation, not of personnel decision-making in the first instance. See id.

**B.     Although HRD Administers a Police Sergeant's Promotional Examination, Municipal Appointing Authorities May Use Other Testing Components in Addition to, or in Lieu of, that Examination.**

Municipal police officers, such as plaintiffs in this case, are hired and paid wages not by HRD, but by the various municipal appointing authorities across the Commonwealth. Affidavit of Sally McNeely ("McNeely Aff."), ¶ 18.[2] These officers hold "civil service position[s]" if their municipal employer has accepted the applicability of the civil-service law and rules. Mass. Gen. Laws ch. 31, § 1; see id. §§ 53-55. Promotional appointments of police officers "shall be made only after competitive examination," with some exceptions not applicable here. Id. § 59.

HRD prepares, administers, and scores a written promotional examination for police sergeants every year and then releases rank-ordered eligible lists of all passing candidates. McNeely Aff. ¶ 2. Municipalities may elect to use HRD's exam or, as plaintiffs concede, may "conduct [their] own alternative police sergeant promotional examination." 6th Am. Compl. (Paper No. 110-2) ¶ 82; see Mass. Gen. Laws ch. 31, §§ 9-11; McNeely Aff. ¶ 3. In fact, several municipalities (including defendant Springfield) have entered into delegation agreements with

---

[2]  This motion is being filed principally under Fed. R. Civ. P. 12(b)(1) because the Eleventh Amendment is a jurisdictional bar depriving federal courts of subject matter jurisdiction. Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 98-100 (1984). Affidavits and public documents may be considered in connection with a motion to dismiss grounded in the Eleventh Amendment. Savage v. Glendale Union High Sch., 343 F.3d 1036, 1039 & n.2 (9th Cir. 2003).

HRD, allowing them to use other testing components in addition to, or in lieu of, HRD's written exam, and/or their own promotional processes.  McNeely Aff. ¶ 5.  For example, in 2007, Leominster and Salem supplemented the written exam with "assessment centers," in which candidates are evaluated based on their performance in job simulations.  Id. ¶ 6.  Further, in 2002 Boston hired a testing consultant and prepared and administered its own promotional exam.  Id. ¶ 8.  And in 2005, Boston, in conjunction with HRD, prepared and administered an exam that differed from the one given to all other participating municipalities in that year.  Id. ¶ 9.  HRD has long encouraged the municipalities to use these types of supplementary or alternative testing components in the promotional process.  Id. ¶ 6.

### C.    HRD Does Not Make Promotional Decisions or Otherwise Control Any Aspect of Municipal Police Officers' Employment.

When a municipality wishes to make a promotional appointment, it will submit a requisition to HRD, which will in turn issue a certification list ranking the persons eligible for promotion.  Mass. Gen. Laws ch. 31, § 7; McNeely Aff. ¶ 10.[3]  For municipalities that have entered into full delegation agreements, technical assistance and oversight might be HRD's only role with regard to the promotional process.  McNeely Aff. ¶ 11.  Typically, HRD does not receive any information from delegated communities with respect to promotions that those communities ultimately choose to make.  Id.

Even absent a delegation agreement, it is the municipality's responsibility, not HRD's, to make the actual promotion decisions.  Id. ¶ 13.  In making such decisions, the municipality may consider not only an individual's standing on a certification list but also his/her job performance, interview performance, education, specialized skills, criminal history, and disciplinary history.

---

[3]  HRD does not ever take the race, color, or national origin of candidates into account when scoring exams and, with respect to the exams being challenged here, race, color, and national origin played no role in the establishment or certification of eligible lists.  McNeely Aff. ¶ 10.

4

Id. Further, under Mass. Gen. Laws ch. 31, § 27, an appointing authority may bypass a person on the list and select someone with a lower score, so long as it submits a written statement of reasons for the bypass to HRD. Id. ¶ 14. HRD will review the statement but will not "substitute its judgment about a valid exercise of discretion based on merit or policy considerations by an appointing authority." Town of Falmouth, 814 N.E.2d at 739; see McNeely Aff. ¶ 15. Thus, for example, HRD generally will approve as sound and sufficient any request by a municipality to bypass a candidate based on a legitimate arrest or pending criminal charges. McNeely Aff. ¶ 16.

In addition to promotion decisions, municipalities control all other relevant aspects of their police officers' employment. Id. ¶ 19. As mentioned, the municipality, not HRD, hires and pays its officers. Id. ¶ 18. HRD also does not train, transfer, assign work to, set work schedules for, supervise, discipline, or fire municipal police officers, and does not pay them fringe benefits, worker's compensation insurance, or ERISA benefits. Id. ¶ 21. Moreover, disputes between officers and their municipal employers relating to application of the civil-service laws are adjudicated by the Commission, not by HRD. See Mass. Gen. Laws ch. 31, §§ 2, 6C, 24, 35, 41-43; McNeely Aff. ¶ 23.

## II.    THE PLAINTIFFS

### A.    As Confirmed by the Allegations in the Complaint, Plaintiffs Are Employed by the Municipal Defendants, Not HRD.

Plaintiffs are Hispanic or African-American police officers for the cities of Boston, Lawrence, Lowell, Methuen, Springfield, or Worcester, or for the Massachusetts Bay Transportation Authority ("MBTA").[4] According to the complaint, each of the plaintiffs took HRD's police-sergeant examination in 2005, 2006 or 2007, but has not, of date, been selected for

---

[4] For simplicity, this memorandum will refer to the other defendants, including the MBTA, collectively as the "municipalities" or the "municipal" defendants.

promotion. 6th Am. Compl. ¶¶ 1, 3-25. The complaint concedes that plaintiffs work for the respective municipal defendants, not HRD. Id. ¶¶ 3-48. The complaint further concedes that the municipalities, not HRD, are responsible for promotional appointments of their police officers. Id. ¶¶ 51, 53, 55, and 71.

HRD does not exercise any day-to-day control over plaintiffs' work activities. McNeely Aff. ¶ 20. HRD does not pay plaintiffs wages or benefits and has no involvement in their training, supervision, work assignments, or schedules. Id. ¶¶ 20-21. HRD also has no authority to discipline plaintiffs or to terminate their employment. Id. ¶ 22.

**B.    Plaintiffs Did Not File Charges Challenging the 2005 Exams Until 2008.**

Of the municipal defendants, only Springfield and the MBTA participated in the 2005 statewide sergeant's exam, which was administered in October 2005. Id. ¶ 24. HRD mailed candidates their scores on December 27, 2005, and made public the rank-ordered eligible lists on March 24, 2006. Id. ¶ 25. The eligible lists expired on March 29, 2008, after which they were no longer used to make promotions. Id. ¶ 26. The Springfield and MBTA plaintiffs did not file charges with the Equal Employment Opportunity Commission ("EEOC") or the Massachusetts Commission Against Discrimination ("MCAD") until September 24, 2008. See Pls.' Reply Mem. to Defs.' Opp. to Sixth Mot. to Amend Compl. (Paper No. 116), Exh. A.

The examination unique to Boston was also administered in October 2005. McNeely Aff. ¶ 27. HRD mailed candidates their scores on December 16, 2005, and released the rank-ordered eligible list on February 13, 2006. Id. ¶ 28. The first four Boston plaintiffs who joined this case, see 4th Am. Compl. (Paper No. 62) ¶¶ 12-15, filed charges with the EEOC and MCAD on March 5, 2008. Affidavit of Iraida Álvarez ("Álvarez Aff."), ¶¶ 4, 6-8 and Exhibits B – E. The remaining Boston plaintiffs did not file charges until September 24, 2008. See Paper No. 116, Exh. A. The current Boston eligible list will expire in the near future. McNeely Aff. ¶ 29.

**ARGUMENT**

I.     **COUNT I SHOULD BE DISMISSED AS TO HRD BECAUSE HRD IS NOT THE PLAINTIFFS' EMPLOYER.**

Title VII makes it unlawful for an "employer"—defined as "a person engaged in an industry affecting commerce who has fifteen or more employees," 42 U.S.C. § 2000e(b)—to discriminate against his employees[5] on the basis of race or color.  Id. § 2000e-2(a).  The threshold requirement for liability to attach is that there must be an "employment relationship" between the plaintiff and the entity that is allegedly discriminating against him.  Camacho v. Puerto Rico Ports Auth., 369 F.3d 570, 573 (1st Cir. 2004);[6] see Alberty-Velez v. Corporacion de Puerto Rico Para la Difusion Publica, 361 F.3d 1, 6 (1st Cir. 2004).  Plaintiffs here have no such relationship with HRD, and so their Title VII claims against HRD must be dismissed.

A.     **HRD is not the Plaintiffs' Direct Employer.**

Ordinarily, liability under Title VII "depends upon the existence of a direct employer-employee relationship."  Camacho, 369 F.3d at 574.  Here, it is obvious that there is no direct employment relationship between plaintiffs and HRD.  Although HRD is a Title VII employer of its own employees (none of whom are charged with the supervision of police officers, McNeely Aff. ¶ 30), it is not the direct employer of police officers who are hired, compensated, supervised, promoted, and fired by the various municipal appointing authorities.  See Camacho, 369 F.3d at 574.  HRD cannot therefore be held liable under Title VII simply by virtue of the fact that it administered an exam that was used by some appointing authorities during the

---

[5]  Title VII defines "employee" as "an individual employed by an employer."  42 U.S.C. § 2000e(f).

[6]  Camacho involved a claim under the Age Discrimination in Employment Act (ADEA), not Title VII.  369 F.3d at 571-72.  It is settled, however, and Camacho reaffirmed, that the ADEA and Title VII are analogous statutes and so "judicial precedents interpreting one such statute [are] instructive in decisions involving [the other]."  Id. at 578 n.5 (quotation marks omitted).

promotional process. See EEOC v. Illinois, 69 F.3d 167, 169 (7th Cir. 1995) (finding it "implausible" that Congress intended to "create a blanket liability to employees of other employers for interference with their employment relationships").

**B.    HRD is not the Plaintiffs' De Facto Employer.**

**1.    None of the Common-Law Agency Factors Support a Finding of an Employment Relationship.**

Because they have no direct employment relationship with HRD, plaintiffs can only maintain a Title VII claim[7] if HRD "so extensively controls [their] employment relationship [with the municipalities] so as to become [their] de facto employer." Camacho, 369 F.3d at 574 (emphasis added). In Nationwide Mutual Ins. Co. v. Darden, 503 U.S. 318 (1992), the Supreme Court expressly rejected the idea that "employee" should be liberally construed to advance the remedial purposes of a statute (there, the Employee Retirement Income Security Act). Id. at 324-25. Rather, the Court held that, in the absence of a statutory definition of "employee," it must be assumed that "Congress intended to describe the conventional master-servant relationship as understood by common-law agency doctrine." Id. at 322-23.

The First Circuit has applied Darden in the Title VII context, holding that the common-law agency test controls whether an individual meets Title VII's definition of "employee." Alberty-Velez, 361 F.3d at 6-7; see Camacho, 369 F.3d at 574 & n.3 (applying same test in ADEA context); see also Gulino v. N.Y. State Educ. Dep't, 460 F.3d 361, 374 (2d Cir. 2006) ("An expansive definition of 'employer' [in Title VII context] contravenes Supreme Court precedent and fundamental canons of statutory interpretation."), cert. denied 128 S.Ct. 2986

---

[7]    Setting aside for the moment the plaintiffs' Eleventh Amendment hurdle, which will be discussed in Point II, infra.

8

(2008). Under that test the court must consider the following, so-called <u>Reid</u> factors[8]:

> the hiring party's right to control the manner and means by which the product is accomplished[;] . . . the skills required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

<u>Alberty-Velez</u>, 361 F.3d at 7. Although no one factor is decisive, in most cases, the first factor—the common-law element of "control"—"will be the most important . . . in the analysis." <u>Id.</u>; accord <u>Gulino</u>, 460 F.3d at 371.

Here, none of the traditional hallmarks of an employer-employee relationship are present, and so HRD cannot reasonably be deemed plaintiffs' de facto employer under the common-law test. Most fundamentally, HRD does not hire or pay wages to plaintiffs. Thus, because "no financial benefit is obtained by" plaintiffs from HRD, "no plausible employment relationship of any sort can be said to exist." <u>Gulino</u>, 460 F.3d at 372 (quotation marks omitted). Moreover, HRD does not train, transfer, assign work to, set work schedules for, supervise, discipline, pay benefits to, or fire municipal police officers. In short, HRD exercises no "control" whatsoever over plaintiffs' day-to-day work activities, as is required to establish an employment relationship. <u>Alberty-Velez</u>, 361 F.3d at 7; <u>Camacho</u>, 369 F.3d at 574. The <u>Reid</u> factors set forth above require a level of control that is "direct, obvious, and concrete, not merely indirect or abstract." <u>Gulino</u>, 460 F.3d at 379. Because HRD exercises no such control over plaintiffs, it simply cannot be characterized as their "employer" under Title VII.

---

[8] <u>Community for Creative Non-Violence v. Reid</u>, 490 U.S. 730, 751-52 (1989).

9

### 2. No Employment Relationship Exists Where, as Here, the State Agency is Acting in a Regulatory Capacity and Does Not Otherwise Exercise Workaday Supervision Over the Plaintiffs.

HRD's position is supported by "a long line of cases" holding that Title VII liability cannot lie against a state agency acting in a regulatory capacity. Camacho, 369 F.3d at 578. When a state agency, as opposed to a private entity, is the defendant in a Title VII action, considerations of state sovereignty and federalism come into play. Gulino, 460 F.3d at 375. For it is well-settled that, to "safeguard[] the sovereignty retained by the states in our federal system," Congress must be "unmistakably clear" when and to what extent "it intends to pre-empt the historic powers of the States." Gregory v. Ashcroft, 501 U.S. 452, 460-61 (1991); see Gulino, 460 F.3d at 375.[9]

Applying this principle, courts have consistently recognized that Congress did not intend to hold state regulatory or licensing agencies liable under Title VII absent a traditional common-law employment relationship. In enacting Title VII and similar employment statutes, Congress was "obviously aware" of state regulatory and licensing activities that affect individuals' employment prospects to varying degrees. NOW, 468 F. Supp. at 321. Yet while Congress explicitly extended Title VII's reach to certain parties apart from traditional common-law employers—i.e., labor unions and employment agencies, 42 U.S.C. § 2000e-2(a)-(c)—the legislative history "is barren of any reference" to state regulatory and licensing agencies or to the people affected by their activities. NOW, 468 F. Supp. at 321; accord Haddock v. Bd. of Dental

---

[9] See also United States v. N.Y. State Dep't of Motor Vehicles, 82 F.Supp.2d 42, 51 (E.D.N.Y. 2000) (state cannot be held liable under Americans with Disabilities Act "[w]ithout Congressional manifestation of an intent to sanction states for actions taken in their sovereign capacity"); Nat'l Org. for Women v. Waterfront Comm'n of N.Y. Harbor, 468 F.Supp. 317, 321 (S.D.N.Y. 1979) ("NOW") (courts must "assume that Congress [in enacting Title VII] was cognizant of the Supreme Court's repeated reminder that it disfavors inroads by implication on state authority") (quotation marks omitted).

Examiners of Cal., 777 F.2d 462, 464 (9th Cir. 1985). Congress therefore "obviously" intended that "only [those] two additional groups would be included within the reach of" private actions under Title VII. Gulino, 460 F.3d at 375; see Sunshine Dev., Inc. v. FDIC, 33 F.3d 106, 116 (1st Cir. 1994) ("legislature's affirmative description of certain powers or exemptions implies denial of nondescribed powers or exemptions"). Further support for this reading can be found in 42 U.S.C. § 2000e-6(a), which gives the Attorney General the authority to seek an injunction against "any person," not just "employers," engaged in a pattern or practice of discrimination. See United States v. Bd. of Educ. for the Sch. Dist. of Phila., 911 F.2d 882, 892 (3d Cir. 1990).

Consistent with this rationale, the First Circuit held in Camacho that, while "a state licensing and regulatory agency" such as HRD "may qualify as an employer of those individuals it hires and supervises," it "does not become an employer of those individuals whom it neither hires, compensates, nor supervises day-to-day even though it licenses and regulates them." 369 F.3d at 578.[10] This holding is dispositive here. Camacho had brought an ADEA claim after the Puerto Rico Ports Authority revoked his harbor pilot's license when he turned 70, the maximum age allowed by the licensing statute. The First Circuit acknowledged that pilotage was a "heavily regulated profession" in that the Authority had the power to issue, renew, suspend, and revoke licenses; to limit licenses to certain ports; to fine or otherwise discipline pilots for improper conduct; to fix rates for pilotage services; and to establish standard procedures to guide pilots in boarding and taking command of ships. Id. at 576. The court further acknowledged that

---

[10]   See also Sch. Dist. of Phila., 911 F.2d at 891 (no employment relationship under Title VII where state's "control over the terms of employment" is being "exercised exclusively in its regulatory capacity rather than in the course of a customary employer-employee relationship"); George v. N.J. Bd. of Veterinary Med. Examiners, 635 F. Supp. 953, 955 (D.N.J. 1985) ("where a governmental organization is exercising its police power, the control it exerts over a person's access to the job market does not render the governmental organization an 'employer' . . . within the meaning of Title VII"), aff'd 794 F.2d 113 (3d Cir. 1986).

11

the Authority had set up a retirement plan for the benefit of harbor pilots and that such plan was funded entirely by contributions at rates determined by the Authority.  Id.  Nevertheless, and despite plaintiff's claim that the Authority's regulations evidenced "an unusually high level of control over the pilots' day-to-day activities," the court held that these "regulations [fell] far short of evincing the degree of control and supervision traditionally considered sufficient to create an employer-employee relationship."  Id.  Importantly, the court found it dispositive that all the traditional hallmarks of an employment relationship were missing:

> In practice, [the Authority] simply does not act like an employer vis-à-vis the harbor pilots.  After all, it does not hire or fire harbor pilots, withholds no taxes from their earnings (which come wholly from the shipowners), pays no F.I.C.A. premiums, carries no workers' compensation insurance referable to them, affords them no paid vacations or other fringe benefits, . . . furnishes them no gear, . . . [and] is not engaged either in selling pilotage services or in contracting with others to make such services available.  These attributes militate strongly against a finding that the Authority functions as the de facto employer of the harbor pilots.

Id. at 577.

Similarly, in the recent Gulino decision, the Second Circuit held that city school teachers could not sue the state under Title VII for creating and administering an allegedly discriminatory teacher's certification examination.  460 F.3d at 370-79.  Applying the "traditional indicators of employment under the common law of agency," the court found it dispositive that the state (1) did not hire or compensate the teachers; (2) did not promote, demote, or fire them; (3) did not decide issues of tenure, pay, and benefits; and (4) while "control[ling] basic curriculum and credentialing requirements," did "not exercise the workaday supervision necessary to an employment relationship."  Id. at 379.  Thus, based on these factors, the court found that the state was "plainly not [the teachers'] employer for the purposes of Title VII liability."  Id.

Numerous other courts have likewise held that state agencies acting in a regulatory capacity are not liable as "employers" under Title VII absent evidence that they hired,

compensated, and exercised day-to-day control over the worker's activities.[11] This Court should now follow this great weight of authority and hold that HRD is not a de facto employer of the plaintiffs. Similar to the facts in Camacho, Gulino, and the other cited cases, HRD does not hire or pay plaintiffs and exercises no control over their daily activities. The "absence of that degree of control defeats" plaintiffs' claim. Camacho, 369 F.3d at 577. To hold otherwise would require the Court to rewrite Title VII "despite the utter absence of any intent that Congress intended to extend liability to state agencies that merely exercise licensing and regulatory authority pursuant to a state's police power." Id. at 578. As in Camacho, this Court should "refuse to start down so slippery a slope." Id.

### 3. HRD is not a De Facto Employer with Regard to Promotions Only.

Plaintiffs will likely argue that, even though none of the traditional indicators of employment are met, HRD exercises enough control over the promotional process to be a de facto employer with regard to that aspect of their employment only. Any such argument would

---

[11] E.g., EEOC v. Illinois, 69 F.3d at 171 (state was not "employer" of local school teachers where powers of "hiring and firing" were in hands of school district); Fields v. Hallsville Indep. Sch. Dist., 906 F.2d 1017, 1020 (5th Cir. 1990) (state's administration of teachers' certification exam did not create employment relationship where state "played [no] role in the general hiring or firing of teachers" and was not "involved in the daily supervision of [t]eachers"); Haddock, 777 F.2d at 464 (state dentistry board's administration of dental exam did not create employment relationship where board "neither pa[id] the wages nor engage[d] the services of the examinees"); Conroy v. City of Phila., 421 F.Supp.2d 879, 888-90 (E.D. Pa. 2006) (state was not "employer" of city police officers despite its control over hiring and certification process, where it did not tell city when to hire or fire officers or how much to pay them and where city could add own eligibility requirements with respect to hiring); N.Y. State Dep't of Motor Vehicles, 82 F.Supp.2d at 54 (state agencies had no employment relationship with school bus drivers where they had "no authority to hire or fire drivers, to supervise drivers' work or the conditions of their employment, to determine their rate or method of pay, or to maintain records of their employment"); George, 635 F. Supp. at 955-56 (state veterinary board was not "employer" of license applicant where board did not pay wages or "control the day-to-day operations of veterinarians"), aff'd 794 F.2d 113 (3d Cir. 1986); NOW, 468 F. Supp. at 320 (state waterfront commission was not an "employer" where it "neither pa[id] the wages nor engage[d] the services of persons it register[ed]").

13

be foreclosed by the First Circuit's pronouncement in Camacho that, in determining whether an employment relationship exists, "one swallow does not a summer make." 369 F.3d at 577. That is, even if HRD has some role in the promotional process, Camacho, and numerous other cases analyzing the Reid factors, make clear that no one factor is dispositive. Thus, in Camacho, even though the Authority was in charge of administering a retirement plan for the harbor pilots and determined the rates for contributions, the court held that those acts were not enough, standing alone, to justify treating the Authority as the pilots' de facto employer for ADEA purposes. Id.

Similarly, here, all of the Reid factors—including the critical element of "control" over work activities—must be analyzed in determining whether HRD is plaintiffs' de facto employer under Title VII. In this regard, HRD respectfully submits that the court erred in Bradley v. City of Lynn, 403 F.Supp.2d 161 (D. Mass. 2005), in holding that HRD was a de facto employer of municipal firefighters and police officers "with respect to . . . entry-level hiring" only. Id. at 169. By analyzing only one aspect of the relationship between the plaintiffs and HRD, the Bradley court ran afoul of the settled principle that no one factor is decisive.[12]  Camacho, 369 F.3d at 577; Alberty-Velez, 361 F.3d at 7; Gulino, 460 F.3d at 371. The First Circuit's decisions, not Bradley, should of course control this case.

Moreover, Bradley is factually distinguishable in a critical way. There, the court found that HRD "extensively control[led]" the entry-level hiring of municipal firefighters and police

---

[12]  Although the court noted in passing that "HRD plays an extensive role in the promotion process," Bradley, 403 F.Supp.2d at 169, that was not a factual determination. Rather, in support of its statement, the court relied solely on Mass. Gen. Laws ch. 31, § 59, which is the general provision outlining the process for original and promotional appointments of municipal police officers and firefighters.  HRD is barely mentioned in that provision, and only in relation to administrative acts that it must perform when a municipal appointing authority wishes to offer its promotional examination to someone other than a full-time member of the regular force. Mass. Gen. Laws ch. 31, § 59, ¶ 3. Moreover, elsewhere in the decision, the court makes the contrary observation that HRD "exercise[d] extensive control over hiring but little control over other aspects of the employment relationship." Bradley, 403 F.Supp.2d at 168.

14

officers in that "Massachusetts civil service law reduces the role that municipalities have in the [entry-level] hiring process to deciding yes or no to the candidates that the HRD provides." 403 F.Supp.2d at 169. In other words, at the entry-level stage, municipalities have no choice but to use HRD's examination. Id.; McNeely Aff. ¶ 4. Here, in contrast, plaintiffs concede that the municipalities may conduct their own promotional examinations, 6th Am. Compl. ¶ 82, and some have in fact done so. McNeely Aff. ¶¶ 5-8. And with respect to some communities, HRD does not even receive notification regarding the promotions that are ultimately made. Id. ¶ 11.

Thus, even were it proper to disregard all the other Reid factors, HRD's alleged influence over the promotional process is not enough, given the municipalities' ultimate control over the process, to create an employment relationship. See Conroy, 421 F.Supp.2d at 890 ("City's ability to place its own requirements upon the hiring process, its control over the rate of hiring, and its authority vis à vis firings, all militate against finding that the Commonwealth has an indirect or de facto employment relationship with [police officer applicant]"). Again, "control" is the critical question, Alberty-Velez, 361 F.3d at 7, and HRD simply does not exercise the direct level of control necessary to give rise to liability under Title VII. For all these reasons, this Court should dismiss Count I of the complaint as against HRD.

## II.  PLAINTIFFS' TITLE VII CLAIMS AGAINST HRD ARE BARRED BY THE ELEVENTH AMENDMENT.

The Eleventh Amendment's "ultimate guarantee" is "that nonconsenting States may not be sued by private individuals in federal court." Bd. of Trustees of Univ. of Ala. v. Garrett, 531 U.S. 356, 363 (2001). Congress may abrogate Eleventh Amendment immunity only if it "unequivocally expresse[s] its intent to abrogate" by "a clear legislative statement," and it acts "pursuant to a valid exercise of power." Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 55 (1996) (quotation marks omitted). "To determine whether a federal statute properly subjects

15

States to suits by individuals," the Supreme Court applies a "simple but stringent test: 'Congress may abrogate the States' constitutionally secured immunity from suit in federal court only by making its intention unmistakably clear in the language of the statute.'" Dellmuth v. Muth, 491 U.S. 223, 228 (1989) (quoting Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 242 (1985)).

In Fitzpatrick v. Bitzer, 427 U.S. 445 (1976), the Court held that, in enacting the 1972 amendments to Title VII, Congress intended a limited override of the States' Eleventh Amendment immunity, noting that the statute made unequivocal reference to the availability of private actions against state and local governments. 427 U.S. at 452.[13] Congress, however, only authorized former, current, or prospective employees to "sue the State as employer."[14] Id.

---

[13] Unlike here, all of the plaintiffs in Fitzpatrick were present or former state employees. 427 U.S. at 448. They had sued state authorities under Title VII challenging the validity of the Connecticut State Employees' Retirement Act, on its face and as applied, insofar as it discriminated against male state employees with respect to retirement age and the computation of benefits. Id.; 390 F. Supp. 278, 279 (D. Conn. 1974). The respondent state officials did not appeal from the District Court's finding of a Title VII violation; rather, the employees appealed from the denial, on Eleventh Amendment grounds, of any pecuniary recovery. 427 U.S. at 450 & n.7. The Court held that the Eleventh Amendment did not bar an award of retroactive retirement benefits to these state employees because Congress had specifically provided in the 1972 amendments for just such a remedy to safeguard the substantive provisions of the Fourteenth Amendment (which forbid States from, inter alia, enforcing statutes that deny citizens "the equal protection of the laws"). Id. at 456.

[14] As previously noted, Title VII's definition of "employer" is "a person engaged in an industry affecting commerce who has fifteen or more employees[.]" 42 U.S.C. § 2000e(b). The 1972 amendments amended the definition of "person" to include "governments" and "governmental agencies." 86 Stat. 103, 42 U.S.C. § 2000e(a). But the key operative provision of Title VII, on which plaintiffs base their claim here, clarifies that the aggrieved individual and the "employer" (whether private or public) must be in a direct (actual or contemplated) employment relationship:

It shall be an unlawful employment practice for an employer--
. . .
. . . to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

. . . footnote continues on the next page

16

(emphasis added); see also id. at 449 n.2 (Congress achieved abrogation in the 1972 amendments chiefly by striking from Title VII's former definition of "employer" an express exclusion for "State[s]"). Accordingly, Fitzpatrick concluded only that "congressional authorization to sue the State as employer" (and to that limited extent "abrogat[ing] the immunity conferred by the Eleventh Amendment") was "clearly present" in the 1972 amendments. Id. at 452 (citation and internal quotation marks omitted, emphasis added).

Here, plaintiffs "challenge the sergeant's promotional examination on grounds that it has a disparate impact on minority test takers and cannot be shown to be job-related under applicable federal [regulatory and state statutory] standards." 6th Am. Compl. ¶ 1. The abrogation of Eleventh Amendment immunity upheld in Fitzpatrick does not extend to this case where (i) HRD, in devising and administering the challenged exams, is not acting as an "employer," as required for Title VII liability to attach; [15] and (ii) plaintiffs are not alleging the type of unlawful employment practice explicitly forbidden to States in the text of Title VII. See Dellmuth, 491 U.S. at 230 ("[E]vidence of congressional intent [to abrogate immunity] must be both unequivocal and textual."). Accordingly, plaintiffs' Title VII claim is barred by the Eleventh Amendment because Congress did not manifest a clear intent, in the text of the statute itself, to authorize the particular claim plaintiffs are pressing against HRD.

As recognized in Fitzpatrick, States and state agencies are only included among the class

---

42 U.S.C. § 2000e-2(a)(2) (emphasis added). See also 42 U.S.C. § 2000e(f) (defining "employee" as "an individual employed by an employer") (emphasis added).

[15] Eleventh Amendment immunity applies equally to any department or agency of the state that has no existence separate from the state (such as HRD). Pennhurst, 465 U.S. at 100; Laskaris v. Thornburgh, 661 F.2d 23, 25 (3d Cir. 1981). Eleventh Amendment immunity also extends to state officials sued in their official capacities (Paul Dietl's status here, see 6th Am. Compl. ¶ 50) because such suits are just another way of pleading a claim against the state itself. Pennhurst, 465 U.S. at 101-102; Bettencourt v. Board of Reg. in Medicine, 904 F.2d 772, 781 (1st Cir. 1990).

of potential defendants when sued under Title VII for their actions as "employers." Here, there is no indication in the text of Title VII that Congress intended to subject sovereign states to potential liability when the state defendant is not the actual employer of the plaintiffs. Gulino, 460 F.3d at 375. The absence of a clear statement by Congress that the definition of public "employer" is to be construed expansively means that the Eleventh Amendment bars Title VII claims brought against a State that is acting in a non-employer, non-proprietary capacity. "In traditionally sensitive areas, such as legislation affecting the federal balance, the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision." United States v. Bass, 404 U.S. 336, 349 (1971).

Any attempt to read into the statute by implication authorization for suit against a non-employer state defendant must fail. The holdings of Atascadero and Dellmuth severely limit judicial inquiry; in order for plaintiffs' case to proceed against HRD, this Court must find congressional intent to abrogate sovereign immunity solely from "the unmistakable language of the statute itself." Atascadero, 473 U.S. at 242. Moreover, traditional constraints against courts acting as a "super legislature" preclude any effort to read language into Title VII that Congress did not enact, and likely did not intend. See City of New Orleans v. Dukes, 427 U.S. 297, 303 (1976); Griswold v. Connecticut, 381 U.S. 479, 482 (1965). In the absence of a clear statutory statement, this Court should not conclude that Congress intended for Title VII suits to be brought against state entities that merely act as test developers and administrators and oversee the civil-service process.[16] The only provisions of Title VII that bear any relevance to the present

---

[16] If Congress had intended to reach the activities of state entities not acting in a direct employer capacity, in order effectively to abrogate sovereign immunity, Congress would have had to, at a minimum, define "employer" in the way it is defined in the Fair Labor Standards Act: "any
. . . footnote continues on the next page

controversy plainly do not apply on their face to plaintiffs' claims against the state defendants.[17]

In the absence of a clear textual statement by Congress that the claims set forth in the plaintiffs'

Sixth Amended Complaint may be asserted against a non-employer state defendant, all such

claims must be dismissed under the Eleventh Amendment.

### III.   ALL CLAIMS CHALLENGING THE 2005 EXAMS SHOULD BE DISMISSED BECAUSE THEY ARE BARRED BY THE STATUTE OF LIMITATIONS.

#### A.   None of the Plaintiffs Filed a Charge Within 300 Days of the 2005 Exams or Within 300 Days of the Date That Eligible Lists Were Established From Those Exams.

Title VII contains a charge-filing provision, 42 U.S.C. § 2000e-5(e)(1), that "specifies

with precision the prerequisites that a plaintiff must satisfy before filing suit." Nat'l R.R.

Passenger Corp. v. Morgan, 536 U.S. 101, 109 (2002) (quotation marks omitted). Specifically, if

an employee has "initially instituted proceedings with a State or local agency with authority to

---

person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency." 29 U.S.C. § 203(d).

[17] Each of the provisions of Title VII that Congress made applicable to state entities via the 1972 amendments govern only "employers." In addition to the key "unlawful employment practices" quoted in footnote 13, supra, subsection (h) of 42 U.S.C. § 2000e-2 provides:

> Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to . . . give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex or national origin.

Whether or not the above provision applies to the plaintiffs' actual employers (i.e., the municipalities), it contains no text clearly stating that it is applicable to the state defendants, none of which is an "employer" in the context of this case. In 1991 Congress further amended Title VII to add two provisions -- sections (l), entitled "Prohibition of discriminatory use of test scores," and "(k) Burden of proof in disparate impact cases." Similarly, nowhere in these provisions does Congress use the terms "States," "governmental agencies," or the like. Instead, the target of the prohibitions contained therein is simply "the respondent," which is defined in 42 U.S.C. § 2000e(n) to mean "an employer" or certain other entities (such as a "labor organization"), but not a sovereign State acting in a non-employer capacity.

19

grant or seek relief from [the allegedly unlawful employment] practice," he or she must file a charge with the EEOC, and serve notice upon the employer, within 300 days of the employment practice. 42 U.S.C. § 2000e-5(e)(1). In all other cases, the charge must be filed with the EEOC, and notice must be served, within 180 days. Id. By "choosing what are obviously quite short deadlines," Congress made clear its "inten[t] to encourage the prompt processing of all charges of employment discrimination." Morgan, 536 U.S. at 109 (quotation marks omitted). Filing a charge within the prescribed period is "mandatory" in order to maintain a Title VII suit. Id.

Here, as set forth above, the 2005 Boston exam and the 2005 statewide exam utilized by Springfield and the MBTA were both administered in October 2005. McNeely Aff. ¶¶ 24, 27. HRD mailed the Boston candidates their scores and released the rank-ordered eligible list for Boston by February 2006, and did the same for Springfield and the MBTA by March 2006. Id., ¶¶ 25, 28. Plaintiffs who took the 2005 exams did not, however, file charges with the EEOC and MCAD until March and September 2008 (Álvarez Aff., Exhs. B-E & Paper No. 116, Exh. A), well beyond the 300-day maximum time limit for acting upon any potential cause of action. See 42 U.S.C. § 2000e-5(e)(1). All claims challenging the 2005 exams should therefore be dismissed as time-barred.[18]

---

[18] Even if the claims were tolled pending a decision on plaintiffs' motion for class certification, they are still untimely. The original plaintiffs in this case did not amend their complaint to add class allegations until January 4, 2008, see 2d Am. Compl. (Paper No. 21), and they did not add claims based on the 2005 exam until March 17, 2008, see 4th Am. Compl. (Paper No. 62). This Court denied the class-certification motion on June 9, 2008, and denied plaintiffs' motion for reconsideration on June 26, 2008. See Docket. On September 12, 2008, the First Circuit declined to grant an interlocutory appeal. See id. Plaintiffs' claims could therefore have been tolled for at most three months (from March 17 to June 26, 2008).

**B.      Even if the Municipalities Made Promotions from the Certification Lists Within the Limitations Period, the Continuing-Violation Doctrine Does Not Rescue Plaintiffs' Claims.**

**1.      The Supreme Court Has Consistently Rejected Attempts to Revive Time-Barred Claims by Relying on Current Effects of Past Uncharged Acts of Discrimination.**

Plaintiffs will likely argue that, so long as the municipalities made promotions from the certification lists within the limitations period, the continuing-violation doctrine allows them to challenge the exams themselves, even though no charges were filed within 300 days of the exams or the date the eligible lists were made public. Any such argument should be rejected, as it is squarely foreclosed by a long line of Supreme Court precedent.

Beginning with United Air Lines, Inc. v. Evans, 431 U.S. 553 (1977), the Court has made clear that Title VII's limitations period begins to run when a discrete discriminatory act occurs and is not restarted by later acts that are merely continuing effects of the alleged past discrimination. United Air Lines had forced Evans to resign pursuant to its policy forbidding female flight attendants to be married, and Evans did not file a timely EEOC charge challenging her termination. Id. at 554-55. After the airline did away with the "no marriage rule," it rehired Evans but treated her as a new employee for seniority purposes. Id. Evans then filed an EEOC charge, claiming that the airline was guilty of a continuing violation because its refusal to give her credit for prior service gave "present effect to [its] past illegal act [termination]." Id. at 557. The Court rejected this argument, explaining that, in a limitations analysis, "the emphasis should not be placed on mere continuity" but on "whether any present violation exists." Id. at 558. In Evans's case, because she did not file a timely charge challenging her termination, the airline "was entitled to treat that past act as lawful." Id. In other words, the past act had "no present legal consequences" and could not therefore be the predicate for Evans's later challenge to the

21

seniority system, which was "neutral in its operation." Id.

The Court reached the same conclusion in Delaware State College v. Ricks, 449 U.S. 250 (1980). Ricks, a college librarian, was denied tenure in March 1974 but was given a final, nonrenewable contract that expired in June 1975. Id. at 252-53. In April 1975 he filed an EEOC charge alleging race discrimination. Id. at 254. Applying the rationale of Evans, the Court found Ricks's charge to be untimely because "the only alleged discrimination occurred—and the filing limitations periods therefore commenced—at the time the tenure decision was made and communicated . . . even though one of the effects of the denial of tenure [termination] . . . did not occur until later." Id. at 258.

The same approach controlled in Lorance v. AT & T Technologies, Inc., 490 U.S. 900 (1989), which involved a challenge to a new seniority rule contained in a collective-bargaining agreement. Three years after the agreement was adopted, the plaintiffs, all women, were demoted because of their low seniority as calculated under the new rule. Id. at 902. They then filed EEOC charges alleging that the rule had been motivated by discriminatory intent. Id. at 905. The Court held that the charges were untimely "[b]ecause the claimed invalidity of the facially nondiscriminatory and neutrally applied . . . seniority system [was] wholly dependent on the alleged illegality of signing the underlying agreement." Id. at 911. Thus, the Court concluded, "it [was] the date of that signing which govern[ed] the limitations period." Id.

More recently in Morgan, the Court confirmed that the EEOC charging period begins to run when a discrete unlawful practice occurs and is not retriggered by later effects of that past practice. The Court observed that Title VII "explains in great detail the sorts of actions that qualify as '[u]nlawful employment practices' and includes among such practices numerous

22

discrete acts." Morgan, 536 U.S. at 111.[19]    According to the Court, there is "simply no indication" that Congress intended that such acts be "convert[ed] . . . into a single unlawful practice for the purposes of timely filing"; thus, "discrete discriminatory acts are not actionable if time-barred, even when they are related to acts alleged in timely filed charges." Id. at 113; see also Marrero-Gutierrez v. Molina, 491 F.3d 1, 6 (1st Cir. 2007) (statute of limitations accrues "at the first discrete act of discrimination"); Rivera v. Puerto Rico Aqueduct & Sewers Auth., 331 F.3d 183, 188 (1st Cir. 2003) ("a discrete discriminatory act transpires only at the time it takes place, even if it was related to acts that were timely filed").

The Court's latest foray into this arena was Ledbetter v. Goodyear Tire & Rubber Co., 127 S.Ct. 2162 (2007). Ledbetter had sought to bring a pay discrimination claim on grounds that her supervisors had in the past given her poor evaluations because of her sex; that as a result her pay was not increased as much as it should have been; and that these past pay decisions continued to affect the amount of her pay throughout her employment. Id. at 2165-66. The Court held that Ledbetter's claim was untimely because she did not file an EEOC charge within "180 days after each allegedly discriminatory pay decision was made and communicated to her." Id. at 2169. In so holding, the Court rejected Ledbetter's argument that "the paychecks that she received during the charging period each violated Title VII and triggered a new EEOC charging period." Id. That argument, in the Court's view, could not be reconciled with Evans, Ricks, Lorance, and Morgan, all of which stand for the principle that "current effects alone cannot breathe life into prior, uncharged discrimination." Id.

---

[19] For example, as mentioned above, the statute makes it unlawful "for an employer . . . to limit, segregate, or classify . . . his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities" because of the individual's race or national origin. 42 U.S.C. § 2000e-2(a)(2); see footnote 13, supra.

23

**2.      In this Case the EEOC Charging Period Commenced, at the Latest, When the Eligible Lists Were Released and Was Not Retriggered by Any Subsequent Promotions.**

The instruction provided by the Supreme Court is "clear":  the EEOC charging period begins to run "when a discrete unlawful practice takes place," and "[a] new violation does not occur and a new charging period does not commence upon the occurrence of subsequent nondiscriminatory acts that entail adverse effects resulting from the past discrimination." Ledbetter at 2169.  Here, the "discrete" act that plaintiffs are challenging is the exam itself, which they allege was discriminatory against minority officers.  6th Am. Compl. ¶ 1, 80-88. Thus, with respect to their 2005 claims, the EEOC charging period began accruing no later than February and March 2006, when HRD completed the examination process by issuing the eligible lists for Boston and for Springfield and the MBTA, respectively.  See Ledbetter, 127 S.Ct. at 2169; Morgan, 536 U.S. at 111; Marrero-Gutierrez, 491 F.3d at 6; Rivera, 331 F.3d at 188.

Because plaintiffs failed to bring timely charges after administration of the exams and establishment of the eligible lists, HRD and the municipalities were "entitled to treat [the exams and the lists] as lawful." Evans, 431 U.S. at 558.  Plaintiffs cannot therefore argue that a new charging period was triggered each time Boston, Springfield, or the MBTA made promotions from the lists.  The promotions themselves are made neutrally—i.e., in rank order unless a municipality chooses to make a bypass.  Further, HRD's role in the promotional process is more or less ministerial; it issues the lists to the municipalities and, in non-delegated communities, records the fact of the promotions.  McNeely Aff. ¶ 12.  Thus, to the extent plaintiffs claim that the promotions are invalid, that claim, as to HRD, is "wholly dependent on the alleged illegality of" the underlying exams and eligible lists. Lorance, 490 U.S. at 911.  The date that the lists were established therefore "governs the limitations period." Id.; see Evans, 431 U.S. at 560 (past uncharged act had "no present legal significance" and could not be predicate for challenge to

24

"neutral" seniority system).

This result is consistent with other cases applying a limitations analysis in the testing context. For example, in <u>Lewis v. City of Chicago</u>, 528 F.3d 488 (7th Cir. 2008), the court was confronted with facts much like those here. The City of Chicago had administered a firefighter exam in 1995 and placed applicants in three categories based on their scores: "well qualified," "qualified," and "not qualified." <u>Id.</u> at 490. Applicants were notified of their scores in January 1996 and were informed that anyone who did not score in the "well qualified" category was unlikely to be hired. <u>Id.</u> Applicants rated "qualified" would, however, remain on the eligibility list for as long as the list was used. <u>Id.</u> The plaintiffs, black applicants who placed in the "qualified" category, filed EEOC charges in March 1997—420 days after receiving notification of the test results but within 300 days of the City's hiring of "well qualified" applicants. <u>Id.</u> The court held that these charges were untimely because the alleged discrimination was complete, and the claims accrued, "when [plaintiffs] were placed in the 'qualified' category of the hiring list on the basis of their score[s] in the firefighters' test; for that categorization delayed indefinitely their being hired." <u>Id.</u> at 493. The court also rejected plaintiffs' assertion of a continuing violation, reasoning that the City's subsequent hiring of "well qualified" applicants did not restart the limitations period because the hiring "was the automatic consequence of the test scores rather than the product of a fresh act of discrimination." <u>Id.</u> at 491.

The Sixth Circuit reached the same result in <u>Cox v. City of Memphis</u>, 230 F.3d 199 (6th Cir. 2000). In November 1995 the City of Memphis began a testing process, involving exams and various assessments, for promotion of lieutenants to the rank of major. <u>Id.</u> at 201. The City published a rank-ordered list of the candidates in May 1996, stating that the list would be effective for two years. <u>Id.</u> Plaintiffs filed EEOC charges in November 1998—over two years after the list was published but within five months of the City's latest round of promotions—

25

claiming discrimination against white females.  Id.  The court held that the charges were untimely because the limitations period began running "at the point of promulgation of the roster," for it is at that point that "a potential plaintiff is aware that alleged discrimination is likely to play a pivotal role in her future advancement."  Id. at 204.  The court further held that the fact that "the promotions were made neutrally, i.e., in rank order, from the eligibility list" brought the case "under the rules articulated in Evans and Lorance."  Id.  That is, the facial neutrality of the list foreclosed any claim that promotions from the list constituted fresh acts of discrimination; at most, they were "current effect[s]" of past discriminatory acts.  Id. at 205.

The same reasoning applies in this case.  The eligibility lists that were established from the 2005 exams are facially neutral, and promotions from those lists were "made neutrally, i.e. in rank order."  Id. at 204.  Thus, as in Lewis and Cox, the alleged discrimination occurred, and plaintiffs' claims accrued, no later than the date they were notified of their placement on the lists.  A contrary result would directly contravene the Supreme Court's instruction that "current effects alone cannot breathe life into prior, uncharged discrimination."  Ledbetter, 127 S.Ct. at 2169.  Moreover, "[t]o allow employees to challenge an eligibility roster during the entire time it is used would . . . create substantial uncertainty for employers who have to make important staffing decisions based upon the list."  Cox, 230 F.3d at 205.  This "important policy consideration[]" additionally "counsel[s] against treating promotions from a questionable list as a continuing act" for purposes of liability under Title VII.  Id.; accord Lewis, 528 F.3d at 493 (extending charging period for duration of eligibility roster would have "ludicrous consequences" in that it would subject employer to open-ended period of liability).

**C.    The "Discovery Rule" Does Not Postpone Accrual of Plaintiffs' Claims.**

Plaintiffs may also argue that they could not have brought their claims sooner because, until the eligibility lists expired, they could not have known whether or not they would be

26

promoted. Any such argument would fail because a "claimant is deemed to 'know' or 'learn' of a discriminatory act at the time of the act itself and not at the point that the harmful consequences are felt." Marrero-Gutierrez, 491 F.3d at 5-6; see Ricks, 449 U.S. at 258 ("proper focus is upon the time of the discriminatory acts, not upon the time at which the consequences of the acts became most painful") (quotation marks omitted). Here, the complaint alleges that written exams such as the 2005 exams "have, over the last 20 years, been shown to have a significant adverse impact upon minority . . . test takers." 6th Am. Compl. ¶ 81. But if that were true, plaintiffs knew about the alleged discrimination when the 2005 exams were administered or, at the latest, when the eligible lists were released. For it was at that point that plaintiffs were made "aware that alleged discrimination [was] likely to play a pivotal role in [their] future advancement." Cox, 230 F.3d at 204; see Lewis, 528 F.3d at 491 ("discrimination was complete when the tests were scored and . . . was discovered when the applicants learned the results").

Cox is instructive on this issue. There, the court held that "the assignment of an allegedly discriminatory ranking is the relevant discriminatory act" for limitations purposes, "even where the low ranking is not a 'certain prelude' to an adverse employment action." 230 F.3d at 205. Otherwise, the court reasoned, employees could "'sit on their rights' in the hopes that promotion would occur despite alleged discrimination in an eligibility roster." Id. Such a rule would contradict "important policy considerations"—namely, it would create uncertainty for employers "during the entire period in which a roster was utilized, and for a substantial period thereafter if litigation ensues." Id. This would be "an unreasonable demand to make upon employers when potential plaintiffs know of alleged discrimination in ranking many months or years before a failure to promote." Id.

Similarly, in Lorance, the Court held that plaintiffs suffered concrete harm when the challenged seniority rule was adopted, even though plaintiffs had no reason to believe at the time

27

that they would ever be demoted because of the rule. According to the Court, "it makes no sense to say that no 'concrete harm' occurs when an employer provides a patently less desirable seniority guarantee than what the law requires." 490 U.S. at 907 n.3. While acknowledging that "the injury to the employee becomes substantially _more_ concrete when the less desirable seniority system causes his demotion," the Court found that "irrelevant" to the analysis. Id. The pertinent question, rather, was "whether there was any concrete injury at the outset." Id.

Lorance and Cox preclude any argument here that the expiration of the eligible lists is the relevant event for limitations purposes. It is of no matter that plaintiffs' injury may "become[] substantially more concrete" once they know for certain that they will not be promoted. Id. The relevant inquiry is whether "there was any concrete injury at the outset," id., and, as in Cox, the release of allegedly tainted eligible lists is "an event that should . . . alert[] the average lay person to protect his rights." 230 F.3d at 204 (quotation marks omitted). This is particularly true in view of the fact that the lists remained in effect for two years—or, in the case of Boston, for three years—after their promulgation. This "degree of permanence . . . should trigger an employee's awareness of a duty to assert his or her rights." Id. (quotation marks omitted).

Factually, this is confirmed by the deposition testimony of plaintiff Angela Williams-Mitchell, a Boston police officer and president of the Massachusetts Association of Minority Law Enforcement Officers ("MAMLEO"). See Álvarez Aff., Exh. A at 8. Williams-Mitchell testified that even before the release of the individual scores in late 2005, and shortly afterwards, MAMLEO consulted with an attorney from the Lawyers' Committee for Civil Rights Under Law regarding the potentially discriminatory nature of Boston's 2005 exam. Id. at 56-59. She further testified that MAMLEO raised concerns about the exam with Boston's Police Commissioner both before and after the results were released. Id. at 48. This testimony forecloses any argument that plaintiffs could not have known of potential discrimination until expiration of the

28

lists.

Such an argument would also be undercut by the fact that plaintiffs are challenging the 2007 exam even though the eligible lists created from that exam likely will not expire any sooner than October 2009. McNeely Aff. ¶ 31. Indeed, when plaintiffs amended their complaint on January 15, 2008, to include the 2007 claims, see Paper No. 30, the lists had not even been released to the public. McNeely Aff. ¶ 32. Yet the complaint still asserts that the 2007 exam is discriminatory because, "[a]lthough a majority of the . . . plaintiffs passed the . . . examination, they have not received scores high enough that they will likely be reached for promotion." 6th Am. Compl. ¶ 86; see id. ¶¶ 1, 80-81, 83-85, 87-88. Plaintiffs cannot claim on the one hand that they know that the 2007 exam is discriminatory even though the eligible lists had not yet been established (and, to date, are still being used), and then claim on the other that they could not have known that the 2005 exam was discriminatory until the lists were exhausted.

In sum, even if the municipalities made promotions within the charging period, the relevant event for limitations purposes regarding the 2005 exams is when the eligible lists were promulgated and released in early 2006. Plaintiffs' claims began accruing, at the latest, on that date. Accordingly, because plaintiffs did not file their EEOC charges until March and September 2008, well beyond the 300-day maximum time limit, 42 U.S.C. § 2000e-5(e)(1), all claims challenging the 2005 exams must be dismissed.

## IV.    COUNT II SHOULD BE DISMISSED AS TO HRD BECAUSE IT IS BARRED BY THE ELEVENTH AMENDMENT.

In Count II of the complaint, plaintiffs allege that HRD violated state anti-discrimination laws, in particular, Mass. Gen. Laws ch. 151B, § 4. It is settled, however, that the Eleventh Amendment bars federal courts from instructing state officials on how to conform their conduct to state law. See Pennhurst, 465 U.S. at 106; O'Brien v. MBTA, 162 F.3d 40, 44 (1st Cir. 1998);

<u>Adams v. Mass. Dep't of Revenue, Child Support Enforcement Div.</u>, 510 F.Supp.2d 157, 159-61

(D. Mass. 2007).  Plaintiffs' chapter 151B claim may only be asserted in state court, <u>Adams</u>, 510

F. Supp.2d at 160-61, and so Count II of the complaint should be dismissed.

## CONCLUSION

For the reasons stated, HRD respectfully requests that the Court enter judgment in its favor

on all counts of the plaintiffs' complaint.

Respectfully submitted,

COMMONWEALTH OF MASSACHUSETTS and
PAUL DIETL, in his capacity as Chief Human
Resources Officer of the Human Resources
Division,

By their attorney,

MARTHA COAKLEY
ATTORNEY GENERAL

 /s/ Sookyoung Shin
Robert L. Quinan, Jr. BBO #553010
Sookyoung Shin, BBO # 643713
Assistant Attorneys General
One Ashburton Place, Room 2019
Boston, MA 02108-1698
(617) 963-2554 (Quinan)
(617) 963-2052 (Shin)

Dated:  January 26, 2009

## CERTIFICATION UNDER L.R. 7.1(A)(2)

I hereby certify that I have conferred with counsel for plaintiffs and attempted in good
faith to resolve or narrow the issues set forth in the above pleading.

 /s/ Sookyoung Shin
Sookyoung Shin, BBO # 643713
Assistant Attorney General

## CERTIFICATE OF SERVICE

I hereby certify that the above document and the accompanying affidavits and exhibits referenced herein will be served on January 26, 2009, by electronic notice for registered counsel and copies will be served by first-class mail, postage pre-paid, for non-registered counsel.

/s/ Sookyoung Shin
Sookyoung Shin, BBO # 643713
Assistant Attorney General

EXHIBIT B

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

PEDRO LOPEZ, et al.,
      Plaintiffs,

v.

CITY OF LAWRENCE, et al.,

      Defendants.

Case No.  07-11693

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

I.    **INTRODUCTION**.

Despite a history spanning nearly 40 years in which the Commonwealth has been found liable or settled cases under Title VII involving police and fire civil service examinations, including most recently in a comprehensive decision by Judge Saris, see Bradley v. City of Lynn, et al., 403 F.Supp. 2d 161 (2005), the Commonwealth now attempts to shift responsibility for its discriminatory promotional examinations to the respective municipalities in which such examinations were administered by arguing that it is not a Title VII employer.

The Commonwealth's motion must be denied given the overwhelming evidence relied upon by Judge Saris in Bradley and present here that demonstrates the Commonwealth's pervasive control over the employment of police officers and fire fighters in civil service towns in Massachusetts. The Commonwealth could have appealed the decision of Judge Saris finding HRD to be an employer of municipal police and fire for Title VII purposes, but chose

instead to litigate the matter through trial, lose, and then not appeal.  Having not

appealed this comprehensive decision, having accepted responsibility for such

testing under Title VII, and having identified no "new" evidence that would

support a different outcome, the Commonwealth cannot attempt to circumvent

Judge Saris' decision by bringing it to another Judge here.

In addition, the Commonwealth erroneously argues that Plaintiffs'

challenge to the 2005 examination is time barred.  However, this issue has

already been litigated in this action, as it was the basis for the Commonwealth's

Opposition to Plaintiffs' Motion to Amend Complaint (Docket No.113), and, after

thorough briefing, the Court implicitly decided the issue in Plaintiffs' favor.  Thus,

the Commonwealth cannot raise the issue again.  Even if it could, the argument

is clearly wrong.  Because the fall 2005 examination, which was not certified until

2006, continued to result in discriminatory promotions through 2008, all of the

Plaintiffs' claims are timely.

Moreover, the vast majority of circuits and court decisions explicitly make

clear that in a disparate impact challenge to an entry-level or promotional exam

where the plaintiffs pass such examination and are on a list for hiring or

promotion, the time for challenging such list continues until the expiration of such

list, not its commencement.  This is because it would make no sense for

someone who has passed a promotional exam, and thus has a real chance of

being promoted from that list, to institute litigation before it becomes apparent

that the test results will preclude their promotion.  Even the cases upon which

Defendants' rely make this critical distinction.  Because the overwhelming weight

of judicial authority supports the Plaintiffs on this issue, Defendants' motion must be denied. Further, granting the motion would not in any way end this litigation with respect to the challenges here to the 2006 and 2007 exam.

Finally, the Plaintiffs do not object to the Court dismissing the state law claims without prejudice, and Plaintiffs have re-filed them in state court.

## II.    STATEMENT OF FACTS RELEVANT TO THESE MOTIONS.

Plaintiffs have filed herewith a detailed statement of material facts, including their response to the Commonwealth's statement of material facts. However, for the convenience of the Court, the key facts are summarized here.

### A.    Facts Relating To The 2005 Examination And The Plaintiffs' Knowledge Of The Likelihood Of Their Being Promoted.

In October of 2005, the Commonwealth of Massachusetts administered a statewide police sergeants' promotional exam. Pl.'s SOF ¶1. A number of cities and towns throughout the Commonwealth, including the City of Springfield, the City of Boston, and the Massachusetts Bay Transportation Authority ("MBTA") utilized the exam for the purposes of making promotions.[1] Id. at ¶2. Generally speaking, the police officers in those cities received notice of their examination score in late December of 2005, but the eligibility list – listing the rankings for

---

[1] The Springfield police officer plaintiffs taking the exam were James Jackson, Juan Rosario, Louis Rosario, Julio Toledo, Devon Williams, and Obed Almeyda. Pl.'s SOF ¶3. The MBTA police officer plaintiffs taking the exam were Lynn Davis and Royline Lamb. Id. at ¶4. The City of Boston police officer plaintiffs taking the exam were Shumeane Benfold, Angela-Williams Mitchell, Gwendolyn Brown, Lynette Praileau, Tyrone Smith, Eddy Chrispin, David E. Melvin, Steven Morgan, William E. Iraolo, Jose Lozano, Courtney A. Powell, James L. Brown, George Cardoza, Larry Ellison, David Singletary, Charisse Brittle-Powell, Cathenia D. Cooper-Paterson, Molwyn A. Shaw, Lamont Anderson, Gloria Kinkead, Kenneth Gaines, Murphy Gregory, Julian Turner, Neva Grice, Delores E. Facey, Lisa Venus, Rodney O. Best, Karen VanDyke, and Robert C. Young. Id. at ¶5.

3

each town and city - were not made public until February or March 2006.  Id. at

¶¶6-8.  While it may be true that the so-called eligibility list for each city or town

was released in February/March of 2006 that eligibility list was not sent to any of

the Plaintiffs, nor is there any evidence as to when or whether any of the

Plaintiffs in these cities or towns even saw the list.  Id. at ¶¶9-10.

While a few of the Plaintiffs in these cities or towns received failing scores

on these examinations, the vast majority of the named Plaintiffs from these cities

and towns received passing scores and therefore had no way of knowing at that

time whether or not they would be reached for promotion during the duration of

such eligibility list.  Pl.'s SOF ¶¶13-16, and 23.  Indeed, on the eligibility lists that

were publicly available through the Commonwealth's Human Resources Division

("HRD") website, scores are not provided, and the race and ethnicity of the test

taker is also not provided.  Id. at ¶ 11. Further, no information was provided by

the Commonwealth as to how the examination was scored, what the overall

statistics demonstrated with respect to the disparate impact, or relative scores

received by minority and non-minority test takers. Id. at ¶¶11-12.  Finally, HRD

provided absolutely no information to any of the Plaintiffs as to any job-

relatedness studies demonstrating the validity of the examination under EEOC

standards. Id.

Promotions from these lists for Boston, Springfield and the MBTA did not

begin until, at the earliest, March 24, 2006, and continued to be made in

Springfield and the MBTA until the lists expired in the beginning of 2008 and are

continuing to be made in Boston where the list has not yet expired. Id. at ¶23.

During this time the Plaintiffs who took that examination believed that they might be reached for promotion, they hoped that they would be reached for promotion, and they had no way of knowing that they would not be reached. Id. at ¶¶13-16, and 23.

According to Dr. Joel Wiesen, who has conducted *thousands* of adverse impact analyses of employment decisions, it was impossible for an adversely affected minority applicant for promotion to sergeant in the City of Boston, Springfield and MBTA to notice and evaluate the overall level of possible adverse impact of the Commonwealth's 2005 sergeant examination as to appointments *prior to* the completion of all hiring and/or expiration of the eligibility lists created by that examination. Pl.'s SOF ¶24. For BPD, the plaintiffs could not have had this data until *at least* 10/24/2008, the date of the last appointments so far off the 2005 eligible list (which has not yet expired). For Springfield and the MBTA, the plaintiffs could not have had this data until *at least* 3/24/2008, when the eligible Lists based on the 2005 exam were replaced by eligible Lists based on the 2007 sergeant exam. Id. Moreover, as detailed above, the data needed to conduct an adverse impact analyses relative to the number of applicants passing and failing the exams and in the case of the grades on the written exams was not made available to applicants by HRD and absent such necessary data it was and remains impossible for applicants to evaluate the level of possible adverse impact of the written tests. Id.

There was, in short, absolutely no way for any named Plaintiff who passed the 2005 exam to know prior to March of 2008: (1) whether or not they would be

promoted; (2) what the other scores were of minority and non-minority

candidates; (3) what the scores were of minority and non-minority candidates in

other communities that had taken the exam; or (4) whether there had been

disparate impact with respect to the score results.

**B.    Facts Relating To The Commonwealth's Pervasive Control Over The Employment Of Police Officers And Fire Fighters In The Commonwealth Of Massachusetts.**

In Massachusetts, municipalities have the option of accepting the civil

service law, M.G.L. Chapter 31. Id. at ¶27.  If a municipality accepts Chapter 31,

the Commonwealth assumes much of the responsibility for not only hiring, but

also determining qualifications, addressing layoffs, recalls, promotions, discipline,

and other matters typically handled by an "employer."  Id.   Unlike most other

states in the country, Massachusetts has elected, through its civil service

statutes, to retain extensive control over the careers of municipal police officers

and fire fighters starting from their hiring, continuing through their employment,

and ending with their retirement.   Pl.'s SOF ¶28.

This control is exhaustively described by Judge Saris in Bradley, et al. v.

City of Lynn, 403 F.Supp.2d 161 (D. Mass. 2005), and Bradley et al v. City of

Lynn, 443 F.Supp.2d 145 (D. Mass. August 8, 2006).   As Judge Saris found in

her two published opinions in Bradley, et al. v. City of Lynn, 403 F.Supp.2d 161

(D. Mass. 2005), and 443 F.Supp.2d 145 (D. Mass. August 8, 2006), HRD

effectively controls the entry level hiring process for all civil service police officers

and firefighters in the Commonwealth.[2]

_____

[2] Recently, in response to the Bradley, et al. v. City of Lynn case, the Commonwealth has taken to "banding" candidates such that people within a range of certain test scores are banded and

First, in order to become a police officer in a civil service town or city, including all of the towns and cities in this case, an individual interested in such position must apply for and take an examination devised, administered, scored, and promulgated by the HRD.  See M.G.L. Chapter 31, §§ 5, 16, 21, 48, and 59.  After those exam scores are issued, applicants may appeal their scores to HRD, and not to the municipality.  See Chapter 31, §§ 22 -24.   It is HRD, and not the municipality, that decides all such appeals of the scoring and of the test questions given.  Id.

It is then HRD that determines how to rank the candidates in order of their exam scores while giving certain absolute preferences to certain individuals such as veterans or the sons and daughters of deceased police officers who died in the line of duty.  See Chapter 31, §§ 6 and 26.  See also Quinn, et al. v. City of Boston, 325 F.3d 18 (1st Cir. 2003) (describing such statutory preferences); see also Affidavit of Sally McNeeley in Support of State Defendants' Motion to Dismiss/Summary Judgment, ¶¶2, 12, 25 and 28.

Recently, HRD made sudden and significant changes to both the scoring and the establishment of eligibility lists for sergeant promotional examinations.  Pl.'s SOF ¶¶ 34-35. HRD established a new passing point for the written component of the 2008 Boston sergeant examination and similar to candidates for initial hire is issuing the exam results in score "bands" such that people within a range of certain test scores are banded and treated as though they had the same score.  The cities or towns have no role in the determination of the bands.

treated as though they had the same score.  The cities or towns have no role in the determination of the bands.  This is further evidence that it is HRD that determines how initial hirings are made. Pl.'s SOF ¶34.

Id. This is further evidence that HRD determines how hirings are made in municipalities.

The Commonwealth does not just establish the eligibility list, but it is the Commonwealth alone that determines how people are reached for hire.  It is the Commonwealth alone that sets the initial medical standards that each candidate for police officer must meet in order to be hired.  See Carlton v. Commonwealth of Massachusetts, 447 Mass. 791 (2006).  And it is the Commonwealth alone that is responsible for setting ongoing fitness and medical standards to which police officers must adhere during the course of their employment.  See M.G.L. Chapter 31, § 61

Moreover, even after a candidate has been approved for hire, he or she is subject to all of the training and academy requirements set by the Commonwealth of Massachusetts and not the city or town.  Thus, the Commonwealth's Criminal Justice Training Council (see M.G.L. Chapter 6, §116, et. seq.) sets all of the requirements and training which a police officer candidate must go through in order to become a police officer.  Further, the Mass Criminal Justice Training Council, a state agency, decides the medical standards for persons entering such local police academies.  See also, Chapter 41, § 96B. Before an individual can even be hired as a police officer, or attend a Criminal Justice Training Council approved police academy, they must pass a physical agility test that is designed and administered by the Commonwealth of Massachusetts.  See Chapter 31, §61A; see also Pl.'s SOF ¶40.

In addition it is the Commonwealth and HRD that set the procedures for how layoffs and recalls occur, should that become necessary. See M.G.L. Chapter 31, §§ 42 - 44. See also Boston Chapter NAACP v. Beecher et al., 679 F.2d 965 (1982). Even such matters as leaves of absence and discipline are regulated by the state civil service system and not the municipality. See M.G.L. Chapter 31, §§7-15, 39, and 41-43.

Moreover, of particular relevance to this case, the Commonwealth and HRD exercise pervasive control over the promotional process in cities and towns subject to civil service. While a municipality may, in theory, apply to HRD for the right to administer its own promotional examination, if it does so, it must have that alternative examination reviewed and approved by HRD. See M.G.L. c. 31, §§9-11. In practice, it is rare that any community ever opts out of the Commonwealth's promotional exam system. For example, according to HRD, for the years 2005, 2006, and 2007, every civil service promotional exam for police officers has been devised, created, and administered by HRD with two small exceptions, one year in the City of Leominster and one year in the City of Salem. See Affidavit of Sally McNeeley in Support of State Defendants' Motion to Dismiss/Summary Judgment, ¶¶ 5-6. Every other municipality has simply utilized HRD's promotional examination system and, in this case, all the municipalities involved, and all the named Plaintiffs, are from cities or towns that relied upon the HRD promotional examination system and nothing else. Id. Further, HRD has done literally nothing to require such municipalities to utilize an alternative examination processes for promotion. In addition, while it is true

9

that the City of Boston has on two prior occasions created its own alternative

examination, the last time it did so was in 2002 (and that was in response to a

consent decree in which HRD was involved). Pl.'s SOF ¶¶43-44.  In all the years

since then, Boston has utilized HRD's promotional exam.  (See discussion

below.)

Significantly, when HRD administers a police promotional exam, it devises

the exam entirely on its own utilizing its in-house staff.  Id. at ¶45.  It creates the

format for the exam, and it alone determines how grading will be accomplished.

Id.  Further, it determines all issues on appeal as to whether a question should

be thrown out or credit given for more than one answer, et cetera.  Id. at ¶46.

Moreover, it is HRD that tracks whether the exam has disparate impact on

minority officers.  Id. at ¶47. It is then HRD that notifies the candidates of their

score and ranks the candidates on their respective municipality eligibility list.

HRD then provides those eligibility lists to the municipalities and to the

candidates.  Id. at ¶48.

Further, pursuant to state law and practice, it is the Commonwealth that

requires that if one vacancy exists for a police promotional opportunity, the

person hired must be among the top three on the list. Id. at ¶49.  This is known

as the "2N plus one" rule.  Id.  Thus, if three vacancies exist for police sergeant,

those three must be picked from the top seven candidates.  Id.  As a

consequence, even if a municipality wanted to hire more minority police officers,

it normally could not do so because it must hire from the top of the HRD-

determined eligibility list.  Pl.'s SOF ¶¶43-44.  Equally important, if the

municipality attempts to bypass the highest ranked candidate without good and sufficient reason, HRD will not approve such bypass, and the individual is entitled to a hearing before the state Civil Service Commission. See M.G.L. Chapter 31, § 27; see also Cotter v. City of Boston, 323 F.Supp.3d 160 (D. Mass. 2003).

Contrary to what it argues in its brief, HRD has the right to, and has exercised the right to have significant involvement in the police promotional process, and this has been particularly true when minority candidates are involved (see discussion below).

### C.    Facts Relating To The Commonwealth's Involvement In Police Hiring And Promotional Exam Litigation.

The Commonwealth's argument that it is not an employer for Title VII purposes must be judged in light of history spanning almost 40 years in which the Commonwealth has been found to be liable under Title VII, and/or was intimately involved with litigation involving promotional exams which it created, administered, and scored.  As far back as 1974, see United States of America v. City of Boston and Boston Chapter NAACP v. Beecher, 371 F.Supp. 507 (D. Mass. 1974), the Commonwealth of Massachusetts was held liable under Title VII for creating and administering an entry-level fire fighter examination.  The Commonwealth was also held liable for such police examinations in Castro v. Beecher, 459 F.2d 725 (1st Cir. 1972).  In both cases, the Commonwealth's then-called "Civil Service Division" was found to be liable for the creation of an entry-level police and fire exam that had significant disparate impact upon minority candidates.  The Commonwealth, as here, defended its entry-level examinations under Title VII, but the court disagreed and found the exams to be discriminatory.

11

See Boston Chapter NAACP, 370 F. Supp. at 515-518.  Thus, the court issued a decree ordering "the Massachusetts Division of Civil Service and their official agents and employees and all persons in act of concert … from engaging in any act or practice which has the purpose or effect of discriminating…."  Id. at 521. Specifically, the Massachusetts Division of Civil Service was ordered to cease using its written examination.  Id. at 521-522.  See also United States of America v. City of Boston, et al., 1973 WL 301 (D. Mass. 1973) Significantly, at no time in that litigation is there any reported decision in which the Commonwealth ever sought to escape liability under Title VII on the grounds that it was not an "employer" under the statute.

Later, in the mid-1980's, there was additional litigation involving the Commonwealth of Massachusetts and police promotional exams.  See Massachusetts Association of Afro-American Police, Inc. v. The Boston Police Department, at al., 106 F.R.D. 80 (D. Mass. 1985).  According to the history reported in Judge McNaught's opinion in that case, in 1978, Black police officers filed a complaint against the Boston Police Department and various state defendants challenging the Commonwealth's police sergeant's promotional examination.  After several years of negotiation the parties entered into a consent decree requiring the Boston Police Department to utilize a non-discriminatory promotional sergeant's examination.  Specifically, the decision specifies that an Assistant Attorney General defended the "state defendants" in that case.  The First Circuit reviewed the consent decree resulting from that litigation in Massachusetts Association of Afro-American Police, Inc. v. Boston Police

12

Department, et al., 780 F.2d 5 (1st Cir. 1985). The defendant in that case was the "appellee Department of Personnel Administration of the Commonwealth of Massachusetts," which is now the Human Resources Division (HRD). Once again, there is no indication that the Commonwealth sought to exempt itself from this litigation based on an argument that it was not an employer.

During the 1990's and reaching into this decade, HRD continued to have significant involvement in police promotional litigation involving minority officers, or claims of reverse discrimination. In the late 1990's, a group of white Boston police officers who had earned a score of 84 on the civil service sergeant's examination "administered by the Commonwealth of Massachusetts Human Resources Division" brought an action alleging reverse discrimination in how the promotional list was administered. HRD was named a defendant in that case, and moved to dismiss claiming that it was not responsible for the allegedly discriminatory actions. See Cotter, et al. v. City of Boston and James Hartnett, Director of Department of Personnel Administration, 73 F.Supp.2d 62 (D. Mass. 1999).[3] Judge Young flatly rejected the Commonwealth's motion to dismiss the case. Noting that the Defendant was "James J. Hartnett, in his official capacity as the Personnel Administrator of the [Human Resource Division]" the court commented "Hartnett says in effect '**Who? Me?**' And moves to dismiss the

---

[3] In that case, HRD administered a police sergeant's examination and "after scoring the exams the [Commonwealth] provided the police department with a list of the 69 highest scorers arranged in alphabetical order by each score (ranging from 92 down to 82). The group with the score of 84 included both White officers and Black officers ... the police department eventually promoted a total of 36 individuals, including the Black officers. The White officers, despite the fact that they had the same score as the Black officers, did not receive promotions." See 73 F.Supp.2d at 64-65.

White officers' claims against him for failure to state a claim." (Emphasis

supplied.)

Judge Young then exhaustively listed the obligations of HRD under the

civil service law – the same obligations that HRD continues to have today. <u>See</u>

<u>id</u>. at 65. He noted that:

> As the Personnel Administrator of the Human Resources Division,
> Hartnett is charged with providing eligible lists based on test scores
> … when, however, the police department awards a promotional
> appointment to an individual other than the qualified person whose
> name appears highest on the list … the police department must
> immediately file with Hartnett a written statement of reasons for
> appointing the person whose name was not highest … Hartnett has
> the power to accept or reject the reasons given by the police
> department for the bypass…. Hartnett relied on this power of
> rejection when it prevented the police department's attempt to
> promote the Black police officers to the exclusion of White
> candidates with test scores.

<u>Id</u>. at 65-66.

The Court went on to hold:

> Since the allegations illustrate that Hartnett was aware of and
> disapproved of the police department's attempt to promote the
> Black officers on basis of race, his failure to require the police
> department to justify the eventually promotion of the Black officers
> to the exclusion of the equally scoring White officers does not
> comport with basic merit principles. Hartnett failed to assure 'fair
> treatment … without regard to race' and protect the White officers
> from arbitrary and capricious action.

> Second, Hartnett has the authority to approve or disapprove
> specifications and qualifications submitted by an appointing
> authority…. Hartnett was required to disapprove and establish
> satisfactory qualifications and specifications.
> Third, Hartnett has the authority to evaluate the qualifications of
> applicants for civil service positions. This broad grant of discretion
> … is triggered when, as is the case here, Hartnett knows that the
> race is the primary qualification of a selected applicant. In light of
> the three general statutory obligations, Hartnett's attempt to shrug
> off his authority to prevent what is alleged to be a known and

admittedly race-based appointment policy, one that is clearly
violative of basic merit principles – is unacceptable.

Id. at 66-67.  Not surprisingly, the Court denied the Commonwealth's motion.

Finally, in more recent years, HRD has continued to exert pervasive

responsibility for determining promotions in civil service police departments.  In

William Brackett, et al. v. Civil Service Commission, et al., 447 Mass. 233 (Mass.

2006), white police officers challenged, among other things HRD's creation of

regulations and policies providing for so-called "special certifications" permitting

the promotion of minority and female candidates to police positions, and

authorizing same, even where higher scoring non-minority candidates were

ranked higher on such eligibility lists.  Significantly, HRD was a party to that case

and argued vigorously that it could authorize municipalities to engage in such

race-based promotional decisions where there was evidence of a significant

under-representation by minorities in supervisory law enforcement positions.

Ironically, in its brief to the Supreme Judicial Court, HRD extolled the extensive

authority it had to determine such promotional issues in civil service

communities.  See "Brief of the Appellee Human Resources Division of the

Commonwealth of Massachusetts in Bracket v. Civil Service Commission, see

2005 WL 3954113 (Mass.).  In that brief, the same counsel for HRD as in this

case wrote:

> As both the Commission and the Superior Court determined, HRD
> acted within its statutory authority in adopting Rule 10 … civil
> service law **gives HRD broad power to make rules governing
> the appointment and promotion of candidates for civil service
> positions. G.L. Chapter 31, Sections 3 and 4.  Section 3
> provides that HRD's administrator shall make and amend rules
> which shall regulate the recruitment, selection, training, and**

employment of persons for civil service positions.  Rule 10 is within this grant of authority.

Id. at 38-39. (Emphasis added.)

HRD went on to argue in its brief;

In addition to this general grant of rule making authority, the legislature specifically instructed HRD to promulgate rules regarding:  promotional appointments, on the basis of merit as determined by examination, performance evaluation, seniority of service or any combination of factors which fairly test the applicant's ability to perform the duties of the position as determined by the administrator.  Chapter 31, Section 3(e).  By setting up a procedure to remedy discrimination based on race or gender, Rule 10 accomplishes this goal of fairly testing the applicant's ability.  There is no statutory requirement that HRD restricts consideration for promotion to examination scores alone.

Id. at 41-42.

Viewed against this background, it is truly ironic that HRD would now claim, as Judge Young so eloquently put it **"who me."**

III.    **THE FINDING OF JUDGE SARIS IN BRADLEY, ET AL. V. CITY OF LYNN, ALONG WITH THE CASES CITED THEREIN, CONCLUSIVELY ESTABLISH THAT HRD IS AN EMPLOYER IN THIS CASE FOR TITLE VII PURPOSES.**

A.    **The Decision Of Judge Saris In Bradley, et al. v. City of Lynn Is Dispositive Of The Commonwealth's Motion, And Requires That It Be Denied.**

In arguing that the Commonwealth cannot be held liable under Title VII as an employer in this case, the Commonwealth states:

One swallow does not a summer make … that is, even if HRD has some role in the promotional process, Camacho and numerous other cases … make clear that no one factor is dispositive.

(Commonwealth Br. at 14.)

16

Ironically, this is one point on which both the Commonwealth and the Plaintiffs agree. If HRD simply had "some limited role" in police promotions, but had no other involvement in the employment relationship of civil service police officers, then the Commonwealth might not have Title VII liability. But if "one swallow does not a summer make," certainly flocks of swallows coupled with thousands of blooming flowers does a summer make. That is the case here as described above at pp. 6 to 12. The Commonwealth of Massachusetts, unlike most other states,[4] retains pervasive control over the initial hiring, the employment of, the training, the discipline, and promotion of all civil service police officers and fire fighters in the Commonwealth. These facts led Judge Saris to find that the Commonwealth of Massachusetts is a Title VII employer with respect to municipal civil service fire fighters and police officers in the Commonwealth of Massachusetts. In reaching this conclusion, Judge Saris first recited the extensive "statutory and administrative framework" that gives overwhelming responsibility to HRD for establishing entry-level fire and police examinations for Massachusetts municipalities. Bradley v. City of Lynn, 403 F.Supp. at 163. The court noted the vast authority given to HRD with respect to Massachusetts civil service police officers and fire fighters for conducting and

---

[4] The only other state to have similarly pervasive control over municipal police and fire hiring and promotion is the State of New Jersey. In a series of cases challenging the New Jersey civil service examinations for police and firefighters, courts have not hesitated to hold New Jersey liable under Title VII for discriminatory examinations. See, e.g., United States v. State of New Jersey, New Jersey State Department of Personnel, 1995 WL 1943013 (D. N.J. 1995) (approving consent decree in longstanding employment discrimination case involving entry-level law enforcement positions in municipalities throughout New Jersey). See also Vulcan Pioneers v. New Jersey Department of Civil Service, 832 F.2d 811 (3rd Cir. 1987) (affirming that New Jersey's promotion, selection, examination procedures for municipal fire fighters violated Title VII). See also United States of America v. State of New Jersey, et al., 1980 WL 90 (D. N.J. 1980) (granting preliminary injunctive relief); United States of America v. State of New Jersey, 473 F.Supp. 1199 (D. N.J. 1979) (holding specifically that both state and municipality were liable for discriminatory hiring and promotion procedures in fire department of various municipalities).

17

determining the form, method, and subject matter of examinations, its authority to

establish, maintain, or devise eligible lists that must be used in the hiring and

promoting of police and fire forces, and its authority for determining whether or

not the top person on such list could lawfully be bypassed by a lower ranking

individual.  Id. at 163.  Further, the court recognized that HRD was empowered to

establish mandatory standards, specifications, and qualifications for all police

and fire, including standards that would be used to evaluate the qualifications of

applicants.  Citing M.G.L. Chapter 31, §5(c)(f), the court noted that such

examples include health and fitness standards, height minimums, educational

requirements, et cetera.  In addition to this extensive control, the court also noted

the history of the Commonwealth in federal court litigation involving police and

fire examinations.  It noted that the Commonwealth of Massachusetts was

directly involved as a defendant in Boston Chapter NAACP v. Beecher, 371 F.

Supp. 507 (D. Mass. 1974), and in Castro v. Beecher, 365 F. Supp. 655 (D.

Mass. 1973).

　　　　As in this case, the Commonwealth strenuously argued that because its

only role with respect to municipal police officers and fire fighters was in

constructing, devising, and scoring entry-level examinations, its function was

more akin to those cases where the state was found not to be a Title VII

employer by reason of the fact that it created and administered certification or

licensing examinations with respect to other occupations.  In support, the

Commonwealth cited Camacho v. Puerto Rico Ports Authority, 369 F.3d 570,

573-74 (1st Cir. 2004) (Puerto Rico Port Authority revoked plaintiff's harbor pilot's

18

license because he had reached his 70th birthday, even though harbor pilots

function as independent contractors taking on work for various shipping

companies), and similar cases from other jurisdictions, such as <u>Haddock v.</u>

<u>Board of Dental Examiners</u>, 777 F.2d 462 (9th Cir. 1985) (dental board giving

examination which plaintiff failed did not make dental board an employer).

<u>Woodard v. Virginia Board of Bar Examiners</u>, 598 F.2d 1345, 1346 (4th Cir. 1979)

(bar examiners not employers).

The <u>Bradley</u> court specifically found that such cases notwithstanding, the

fact that a state entity administered an examination did not foreclose it from being

considered an employer for Title VII purposes where such entity also "exercises

other control over the relationship between the employee and her customary

employer."  403 F. Supp. 168 (<u>citing</u> <u>Association of Mexican-American Educators</u>

<u>v. California</u>, 231 F.3d 572, 581-583 (9th Cir. 2000) (holding that state liable as an

employer for administering a teacher certification examination where the state

exerted a high degree of control over the operation of the local school activities)).

In this regard, Judge Saris specifically rejected the Commonwealth's contention

that <u>Camacho</u>, overruled <u>Car Parts Distribution Center, Inc. v. Auto Wholesalers</u>

<u>Association of New England, Inc.</u>, 37 F.3d 12, 16 (1st Cir. 1994).  In that case, the

First Circuit explicitly held that a defendant would be treated as an employer if it

"exercised control over an important aspect of the employee's employment,"

even if it did not control other aspects.  <u>Bradley</u>, 403 F. Supp. at 167.  The First

Circuit held that defendant Car Parts was an "employer" with respect to

employee health care coverage if it existed for the purpose of enabling the

employer to delegate its health insurance responsibility to another.  Car Parts, 37 F.3d at 17.

In this case, as in Bradley, the Commonwealth is implicitly arguing that Camacho overruled Car Parts.  Judge Saris correctly rejected this argument, holding that Camacho was best understood as part of that line of cases finding that when states administer examinations as part of their "licensing authority," they are not employers.

Thus, Judge Saris held in Bradley that where an entity, such as the Commonwealth of Massachusetts, has by statute taken on such broad authority to regulate hiring and employment of police officers and fire fighters in Massachusetts, well beyond merely providing examinations, it must be considered an employer for Title VII purposes:

> Accordingly, while there is no question that Massachusetts law established HRD, pursuant to a governmental exercise of police power, the HRD does more than merely license and regulate.  The HRD acts as a hiring party that extensively controls the manner and means by which fire fighters and police officers are selected.  Therefore, Camacho does not control the outcome of this case.

Id. at 169.

As described above, not only does Bradley control the outcome of this case, but the First Circuit's decision in Car Parts requires the same result.  Car Parts relies on a long line of cases from this Circuit holding that an entity that has the means and authority to control a significant portion of one's employment is a statutory employer under Title VII.  See Baranek v. Kelly, 630 F. Supp. 1107, 1113 (D. Mass. 1986) (holding that agency with "the means and authority to control discriminatory employment practices" of regional employers was an

"employer" under Title VII); <u>Barone v. Hackett</u>, 602 F. Supp. 481, 483 (D. R.I.

1984) (director of state agency that administered disability benefits for state

employees was liable under Title VII even though agency did not employ

plaintiffs); <u>Mas Marques v. Digital Equipment Corp.</u>, 637 F.2d 24, 27 (1st Cir.

1980) (district court properly considered whether the defendant parent

corporation exercised sufficient control over its subsidiary to be liable under Title

VII for discriminatory hiring practices); <u>Curran v. Portland Superintending School</u>

<u>Committee</u>, 435 F. Supp. 1063, 1072-73 (D. Me. 1977) (although city was not

permitted by its charter to engage in actual management of school system, it was

liable as an employer under Title VII because it limited the school committee's

hiring authority through its role in appropriating funds and setting salaries).

 Given that HRD and the Commonwealth perform so many functions

related to the hiring, promotion and employment conditions of police officers in

civil service communities, the Commonwealth must be viewed as an "employer"

in this case for Title VII purposes under all the criteria set forth in <u>Car Parts</u>.

HRD clearly exercises control over important aspects of municipal police officers'

employment for, by example, administering entry-level exams for hiring,

administering all exams for promotions, mandating the requirements for initial

hire, setting the medical standards, setting the physical agility test standards,

requiring ongoing fitness programs, and setting forth rules for leaves of

absences, discipline, bypassing people for promotion, et cetera.  In addition,

HRD clearly acts as a civil service municipalities' "agent" in administering so

many aspects of the hiring, employment, and promotion of police officers.  As

stated above, Car Parts makes clear that an employer cannot "insulate a discriminatory condition of employment from attack under Title VII" by having another entity perform that duty.  Car Parts, 37 F.3d at 17-18 (quoting Spirit v. Teachers Insurance and Annuity Association, 691 F.2d 1054, 1063 (2nd Cir. 1982), vacated on other grounds, 436 U.S. 1223 (interpreting the term employer under Title VII and noting that the term employer … "is sufficiently broad to encompass any party who significantly affects access of any individual to employment opportunities")).

Thus, since HRD's extensive involvement in civil service communities' hiring, employment, and promotional practices so plainly fits under each and all of the theories of liability set forth in Car Parts, and since the Commonwealth could be considered an "employer" subject to Title VII liability in this case under any one of these theories, the Plaintiffs submit that HRD must be subject to liability under Title VII.[5]

**B.    Camacho, Upon Which Defendant Primarily Relies, Is Clearly Not On Point.**

As described above, in Bradley, Judge Saris specifically held that the case primarily relied upon by the Commonwealth here, Camacho v. Puerto Rico Ports Authority, was clearly distinguishable from the present case, and did not purport to and did not overrule the First Circuit's decision in Car Parts.  Her reasoning, described above, is persuasive.

---

[5] While it is difficult to imagine how, on these facts, this Court could conclude otherwise,  Plaintiffs submit that HRD's extensive involvement in municipalities' hiring and employment of police officers must at least present an issue of fact regarding HRD's status as an employer and that this issue would have to be resolved at trial rather than on this motion.

Moreover, an examination of the facts and decision in Camacho make
clear that it is not on point.  First, the court in Camacho held that a state agency's
performance of a mere licensing function is not subjected to Title VII liability.  369
F.3d at 577-78.  However, here, Plaintiffs allege that HRD exercised significant
control over many aspects of hiring, conditions of employment, and promotion,
far beyond any act of licensing.  Second, in Camacho, the court concluded only
that the Port Authority did not "so extensively control the plaintiff's employment
relationship as to become his de facto employer."  Id. at 574.  Camacho and
similar cases cited by the Commonwealth involve state entities performing
licensing functions (i.e. dental board examinations, bar examinations, etc.) and
not employment arrangements.  See Camacho, 369 F.3d at 576-77.  Thus, in
Camacho, the court emphasized that the Port Authority had no involvement in
the hiring, firing, or terms and conditions of employment of the harbor pilots,
except that it had the authority to license such harbor pilots and had general
regulatory authority over the harbor.  This is in sharp contrast to the
Commonwealth of Massachusetts, which controls multiple critical aspects of a
police officers employment beginning with hiring, extending through promotions,
layoffs and recalls, discipline, health and medical standards, etc.  Finally, there is
a critical distinction between the facts in Camacho and those here.  In Camacho,
the plaintiff was not an employee of anyone, but rather was self employed as a
harbor pilot.  He was not an employee of the ship owners; indeed, he was
specifically deemed an "independent contractor."  Thus, the plaintiff was not an

employee for Title VII purposes and there was no employer.   That is obviously

not the case here.

**C.**   **This Court Should Follow The Long Line Of Cases Holding State And Governmental Entities Liable As Title VII Employers Where They Directly Affect The Employment Relationship.**

A long series of Title VII cases have held that a governmental entity can

be held liable as an employer if it discriminates in the employment relationship,

even if it is not the employer of the particular individual bringing suit. [6] See

Barone, 602 F. Supp. at 483; United States v. City of Yonkers, 592 F. Supp. 570,

590 (S.D. N.Y. 1994); United States Equal Employment Opportunities

Commission v. City of Evanston, 854 F. Supp. 534, 538 (N.D. Ill. 1994);

Association of Mexican-American Educators v. California, 231 F.3d. 572, 580 (9th

Cir. 2000); Guardians Association v. Civil Service Commission, 630 F.2d 79,

104-105 (2nd Cir. 1980) (holding that state was properly held to be an employer

pursuant to a Title VII challenge to a municipal police department); Owens v.

Rush, 636 F.2d 283, 287 (10th Cir. 1980); Williams v. Montgomery, 550 F. Supp.

662, 668-69 (N.D. Ala. 1982) (holding personnel board liable as employer under

Title VII as an agent of the city employing the plaintiff); Puntolillo v. New

Hampshire Racing Commission, 375 F. Supp. 1089, 1091-92 (D. N.H. 1974).

The City of Yonkers case is directly on point.  There the court held that the

State of New York would remain a defendant in that Title VII case, even though it

---

[6] In Robert St. Peter v. Commonwealth of Massachusetts Public Employee Retirement Administration Commission (PERAC), Superior Court Case No. 02-5569-H (Hines, 2007), attached hereto as Exhibit 1, the court, borrowing from federal cases interpreting Title VII, held that PERAC was St. Peter's employer under Massachusetts Anti-Discrimination Laws, G.L. c. 151B for purposes of disability retirement because it had control over all decisions regarding St. Peter's disability benefits.

was not actually the employer of the plaintiffs, because the state Civil Service Commission played a pervasive role in the hiring relationship – a role nearly identical to HRD in the present case.  Id. at 589.  The court relied upon the fact that the New York Civil Service Commission designed the exams in question, listed the candidates, decided disciplinary appeals, et cetera.  Therefore, it denied the Commission's motion for summary judgment, stating that the record "strongly supports the view that the State acted as an employer in connection with police hiring in Yonkers during the years covered by the complaint."  Id. at 590.  Further, as described herein in footnote 4, in a series of cases decided by the federal district court in New Jersey, and affirmed by the Third Circuit, the State of New Jersey was held liable for its creation of entry-level hiring and promotional exams for municipal police and fire departments.  See, United States v. State of New Jersey, New Jersey State Department of Personnel; Vulcan Pioneers v. New Jersey Department of Civil Service, 832 F.2d 811 (3rd Cir. 1987).

Moreover, in Massachusetts, the entire history of police and fire entry-level and promotional exams have involved the Commonwealth of Massachusetts, as the entity that created such exams, and never before has the Commonwealth been dismissed from any of these cases.  See Castro v. Beecher, supra; NAACP v. Beecher, supra; African-American Association of Police, supra; and Cotter v. City of Boston, supra.

The Plaintiffs intend to prove at trial that HRD consciously knew that the pen and pencil police sergeant's written exam that they were responsible for

developing and administering would have an unlawful discriminatory impact upon minority candidates, having been on notice of this issue for 20 years, and having been the only entity keeping the statistical records on the passing rates of minorities and non-minorities.  Despite this knowledge that the exam would discriminate, and not withstanding that in <u>Brackett v. Civil Service Commission</u>, <u>supra</u>, the Commonwealth admitted that its exams were discriminatory, the Commonwealth has done nothing to rectify the situation.[7]  For the Commonwealth to try to pass the blame for its promotional examination procedure to the civil service municipalities, which had little or no involvement, and to claim that those cities or towns should have used other examinations and opted out of the Commonwealth's promotional examination process, is clearly disingenuous.  The Commonwealth should not be permitted to escape its own responsibility by placing it on the backs of the municipalities that it is supposed to serve.

IV.    **THE COMMONWEALTH'S STATUTE OF LIMITATIONS ARGUMENT  IS WRONG BOTH AS A MATTER OF LAW AND FACT.**

---

[7] Surprisingly, HRD made sudden and significant changes to the scoring and establishment of eligibility lists for the 2008 sergeant promotional examinations claiming that such changes are being made "after a careful analysis and much guidance by [their] expert testing consult EB Jacobs," the Commonwealth's expert in this litigation.  Specifically, HRD established a new passing point for the written component of the 2008 Boston sergeant examination and similar to candidates for initial hire is issuing the exam results in score "bands" such that people within a range of certain test scores are banded and treated as though they had the same score.  HRD states that its changes were recommended by HRD's experts because they believe that the sergeants' examination does meet the reliability standards that are to be expected for a knowledge test to serve as a basis for strict rank-ordered appointment.  Pl.'s SOF ¶¶35.

26

A.    **This Issue Has Already Been Litigated And Decided Against The Commonwealth**.

After the Court denied class certification in this case in the summer of 2008, Plaintiffs timely moved under applicable Supreme Court precedent to add, as named plaintiffs, individuals who had formerly been putative class plaintiffs. These included individuals from Boston, Springfield, and MBTA, who had taken the sergeant's examination in late 2005.  The Commonwealth asserts that the 300-day clock for purposes of filing claims relating to the 2005 examination began to run when the resulting eligibility lists for those cities were established in February and March of 2006.   Significantly, the Commonwealth does not assert that the lists were provided to any of the Plaintiffs on those dates, just that they were "made public."   Moreover, the Commonwealth completely overlooks that those lists did not list scores, or failures, or the ethnic or racial composition of the test takers, and it did not provide test results for any community other than the one in which the individual was employed.   Pl.'s SOF ¶¶11-12.  Moreover, it is uncontested that the vast majority of the named plaintiffs received a passing score on the promotional exam and, therefore, had no way of knowing at the time they first saw the eligibility list whether or not they would be actually reached for promotion or not.  They certainly had no way of assessing whether there was disparate impact with respect to the entire 2005 exam, and whether or not the examination met Title VII validation standards.[8]

_____

[8] The Commonwealth's math is clearly faulty.  As detailed in plaintiffs' reply memorandum in support of motion to amend complaint (Docket # 116), this action was originally filed both before the EEOC and in court as a putative class action on behalf of all test takers of the 2005, 2006, and 2007 exam.  As such, the law is undisputed that when a case is filed as a class action, the filing of such class action, including the filing of the EEOC complaints, are tolled during the period

27

In the summer of 2008, when Plaintiffs moved, after denial of class certification, to add named plaintiffs from Boston, Springfield, and the MBTA, the Commonwealth vigorously opposed this request, asserting, inter alia, that such amendment would be "futile" because the claims of the Boston, Springfield and MBTA plaintiffs, who took the exam in 2005, were untimely.  See Commonwealth's Opposition to Motion to Amend Complaint (Docket No. 113.)[9] The Commonwealth extensively briefed why such amendment was futile, citing many of the same cases it now cites in support of its motion to dismiss.  The Plaintiffs responded with extensive briefing demonstrating that under applicable precedent, the 300-day filing deadline for individuals who had taken the promotional examination and passed did not run until such time as the list expired or it became clear that they would not be promoted off such list, and therefore the claims were timely.  After briefing, the court granted Plaintiffs' Motion to Amend, and therefore implicitly decided this issue in Plaintiffs' favor. This issue having been decided in Plaintiffs' favor already, the Commonwealth should not be permitted to re-litigate it here.  See US v. Benenhaley, 2007 WL 2012673 (4th Cir. 2007) (by omitting claim from its opinion the court implicitly rejected it); see also In re Swanson, 2002 WL 31342410, 1 (Bkrtcy D.N.D.,

---

that the court considers and either grants or denies class certification.  See Crown Cork and Seal Company v. Parker, 462 US 345, 353-54 (1993); see also Plaintiffs' Sixth Motion to Amend Complaint (Docket No. 110.)  In this case, the original MCAD and EEOC complaints challenging these exams were filed in spring of 2007, months before the lawsuit was filed in September of 2007. Pl.'s SOF ¶17.  Therefore, the 300 days reached back to the spring of 2006.  See discussion in Plaintiffs' Reply Memorandum to Motion for Sixth Amended Complaint (Docket # 116).  Promotions from the 2005 test had hardly begun by that date.  Id. at ¶23.
[9] It should be pointed out that the MBTA and Springfield Plaintiffs also took the 2007 examination, the results of which were certified in early 2008.  Thus, the Court's decision will only affect part of their claims.

2002); see also Peurto Ricans for Puerto Rico Party v. Dalmau, 544 F.3d 58, 69

(Peurto Rico, 2008).

> **B.** **Because the Eligibility List for the October 2005 Exam Was Not Established Until February and March 2006 and Because Promotions From That Exam Continued Through 2008 to Present, the Plaintiffs Taking That Exam Have Asserted Timely Claims.**

Overlooking the numerous cases and circuits taking a contrary position,

the Commonwealth claims that the Boston and Springfield plaintiffs who took the

October 2005 exam were required to file their EEOC claims within 300 days of

the establishment of the eligibility list in February and March of 2006.  This is

clearly not the law.  See Bouman v. Block, 940 F.2d. 1211 (9th Cir. 1991) (holding

that the time for filing a disparate impact challenge to a promotional examination,

for those persons who passed such exams, is at expiration of, not the

commencement of the eligibility list).  Moreover, in 2006, as explained in the

statement of facts, the plaintiffs would have no way of knowing if the exam was

discriminatory under a disparate impact theory since the data on selection rates

that would show disparity impact was unavailable to the candidates/plaintiffs.

Pl.'s SOF ¶¶11-12, and 24-26,

In support of its argument that the 300-day period had already run, the

Commonwealth cites several Supreme Court decisions involving acts of

intentional discrimination, United Airlines v. Evans, 431 U.S. 553 (1977);

Delaware State College v. Ricks, 449 U.S. 250 (1980); Ledbetter v. Goodyear

Tyre and Rubber Co., 127 S.Ct. 2162 (2007).  The Commonwealth argues that

the act of discrimination here occurred when the eligibility list was established in

February and March 2006.  However, the Commonwealth fails to makes the critical distinction between discrete acts of intentional discrimination, and so called "pattern and practice" – disparate impact claims.

The U.S. Supreme Court specifically held in Lorance v. AT&T, 490 U.S. 900, 907-908 (1989), that while the 300-day filing period for disparate treatment/intentional discrimination cases begin to run from the time of the "discriminatory act," where the claim is "one of discriminatory impact," the statute of limitations begins "to run from the time that that impact is felt" Id. at 908. Similarly, in National Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002), the Supreme Court squarely held that each time an employer takes an action (such as making a discriminatory promotion) that violates Title VII, such action starts anew the charge period even if the employee failed to file a charge over an earlier "related" violation.  536 U.S. at 113. Thus, Morgan along with Lorance stand for the proposition that in disparate impact cases, each time a discriminatory promotion is made, a new charge period begins, even if the employee failed to file a charge over an earlier "related" violation.  Morgan, 536 U.S. at 113.  Thus, each time HRD approved new Boston and Springfield promotions in 2006, 2007, and 2008, an adverse employment action caused by a "particular employment practice" that produced a "disparate impact" and was not otherwise justified, occurred, and was actionable. Allen v. City of Chicago, 351 F.3d 306, 311-312 (7th Cir. 2003).

Based on the above, the great majority of circuits that have addressed the issue have held that, in disparate impact cases such as this, the time for filing a

claim starts each time a promotion, hire, or adverse employment action occurs as

a result of the employment policy resulting in such disparate impact.  Bouman  v.

Block, 940 F.2d 1211 (9th Cir. 1991); Anderson v. Zubieta, 180 F.3d 329, 336

(D.C.Cir. 1999); Beavers v. American Cast Iron and Pipe, 975 F.2d 972, 977

(11th Cir. 1992); Guardians Association v. Civil Service, 633 F. 2d 232, 249 (2d

Cir. 1980); Gonzalez v. Firestone Tire and Rubber, 610 F.2d 231, 249 (5th Cir.

1980).  Additionally, the Third Circuit has indicated that it would follow the rule

that specific instances of discrimination that result from "application" of the policy

having a discriminatory impact starts the charge period.  EEOC v. Westinghouse,

725 F.2d 211, 219 (3d Cir. 1983).  Further, the Ninth Circuit has recently affirmed

its position in Tatreau v. City of Los Angeles, 138 Fed. App. 959, 2005 WL

1607221, at  *1 (9th Cir. 2005) (cause of action for denial of police promotion

accrued when eligibility list for promotion expired).

Thus, in the context of police and fire examinations, courts have

distinguished between plaintiffs who receive failing scores on the examination, or

are otherwise informed that their score will not result in their being reached for

hire and promotion, in which case such plaintiff is then on notice of a discrete

adverse action, and those cases in which an individual passes the exam but is

not ultimately reached for hire or promotion during the duration of such eligibility

lists.  Bouman, 940 F.2d at 1221; Tatreau, 2005 WL 1607221, at *1; Lynch, 1993

WL 512597, at *2-3; Alverez v. City of Philadelphia, 98 F.R.D. 286, 290 (1983)

("plaintiffs filed their charges on December 24, 1976….this was timely, the

discriminatory practice of which they complained, the use of an examination

31

which [resulted in a] low ranking on a eligibility roster, cannot not be said to have

ceased when they received notice of their ranking…so long as that roster was

used");  Hood v. New Jersey Department of Civil Service, 680 F.2d 955, 959 (3d

Cir. 1982) (noting that since Hood had been placed on the eligibility list for

timeliness purposes, his case stood on different grounds than those plaintiffs who

had not made it to such list).

     In order to counter this long line of authority, the Commonwealth relies

almost exclusively on two cases, Lewis v. City of Chicago, 528 F.3d 488 (7th Cir.

2008)(petition for certiorari filed, 77 USLW 3449 (January 21, 2009)(No. 08-

974)), and Cox v. City of Memphis, 230 F.3d 199 (6th Cir. 2000).  However, both

of these cases are not only readily distinguishable, but also fully support the

plaintiffs' position here.  In Lewis v. City of Chicago, a panel of the Seventh

Circuit held that where firefighter applicants for initial hire were informed by the

City upon the announcement of their test scores that none of the applicants in

their banded group would be permitted to proceed in the hiring process (because

their scores were too low to proceed), as to that group of plaintiffs their claims

began to run when they were informed, 1) of their score, 2) that they could not

proceed further based on such score, and 3) it was announced publicly by the

mayor that minorities had fared poorly on the exam.  Id. at 494.[10]  That decision

has no application to a case such as this, where the applicants passed the

examination such that their hiring or promotion from the established list was still

---

[10] The lower court had agreed with plaintiffs both on the timeliness question and the merits and
had struck down the entry level exam used by the Chicago Fire Department.  The Seventh Circuit
reversed only as to the timeliness question, and the case is currently being appealed to the U.S.
Supreme Court. Cert. petition was filed by the plaintiffs on January 29, 2009.

quite possible.  The Seventh Circuit specifically noted those cases such as

Bouman v. Block, where that distinction was made.  Accordingly, the Lewis

decision is not relevant to the facts presented here, where most of the named

plaintiffs passed the promotional exam, and had a real opportunity and chance to

be promoted from the list, and the plaintiffs were not informed of the racial and

ethnic composition of the test scores and rankings.

The Commonwealth's reliance on Cox v. City of Memphis is even less

compelling.  First and foremost, Cox was not a disparate impact case at all –

rather it was a conventional claim of intentional reverse discrimination. According

to the Sixth Circuit, the plaintiffs alleged that most of the top officials for the

Memphis Police Department were black males, and that after the City

administered a written promotional exam and oral assessment center for the rank

for "major," of the top 18 candidates in rank order, five of six black female

applicants were among the top 18 and were promoted on May 30, 1996, while

none of the white female plaintiffs was ranked as high.  230 F.3d at 201-202.

However, the plaintiffs did not file their EEOC charges until November of 1998,

almost two and a half years after the five black females were promoted, and

more than 180 days after that promotional list had expired.  The Sixth Circuit,

applying cases related to intentional discrimination, held simply that the discrete

discriminatory act/adverse action occurred when the Memphis Police Department

was alleged to have "gerrymandered" the promotional rankings by intentionally

placing the black females at the top of the list, not when the list expired years

later.  Id. at 204-205.  This is in sharp contrast to those cases involving a

33

disparate impact challenge where the list is promulgated based upon a pen and paper examination, the plaintiffs pass such examination, and have a real chance of being promoted prior to the expiration of the list.

Recent cases from the various circuits confirm that Cox and Lewis do not control the present facts. Only several weeks ago, this very argument was directly addressed in United States, et al. v. City of New York, 2009 WL 212154 (E.D. N.Y. January 28, 2009.). In that case, the City administered a written examination for firefighter in 1999 that it used to generate a rank order list of eligible entry level firefighters. This list was utilized from 2001 until the end of 2004, with the City hiring firefighters from the list in descending order of ranking. See id. at *1. In August 2002, the plaintiff class filed EEOC charges on behalf on black applicants for the position of firefighter, charging that the examination had a disparate impact upon minority takers. Id. at *1. The City of New York moved to dismiss arguing that the plaintiff interveners did not file timely charges because it was more than 300 days after the establishment of the rank order list. In response, the plaintiffs argued that the filing period "begins on the last date that the City used the eligibility list to hire new firefighters." Id. at *2.

Recognizing the longstanding Second Circuit precedent holding that in disparate impact cases the time for filing EEOC claims continue through the duration of the eligibility list, Guardians Association v. Civil Service Commission, 633 F.2d 232 (2d Cir. 1980); Association Against Discrimination in Employment, Inc. v. the City of Bridgeport, 647 F.2d 256, 274-75 (2d Cir. 1981), the court denied the motion. As in the present case, the City argued that the recent

34

Supreme Court decisions in Ledbetter, and Morgan "largely curtailed the

continuing violations theory when applied to discrete discriminatory acts."

However, the court disagreed with this argument stating:

> The Court declines to reach this conclusion. Although Ledbetter and
> Morgan take a narrow view of when the Title VII charge.....those cases
> address claims distinct from those presented here. Ledbetter involved
> one....."disparate treatment" claim based on discrete compensation
> decisions, while Morgan involved an individuals' disparate treatment
> claims for various discrete discriminatory acts. Neither involved a
> pattern or practice or disparate impact claim.

Id. at *5.[11]

The district court went on to hold that disparate treatment cases, unlike

disparate impact cases, require two elements "an adverse employment practice

and discriminatory intent." Id. at *5, and that the plaintiff is normally aware of the

discriminatory intent at the time it is carried out. The court held however that

"that concern is not implicated by interveners complaint, which does not allege

disparate treatment based on discrete acts." Id. at *5. For that reason, the court

refused to apply Ledbetter and Morgan to the disparate impact claims involved in

the fire department lawsuit. Many other courts have agreed that neither

Ledbetter nor Morgan control the timely filing question in pattern and practice

cases. See, e.g., Carpinteria Valley Farms Ltd., v. County of Santa Barbara, 344

F.3d 822, 829 (9th Cir. 2003); Milani v. IBM Corp., 322 F.Supp. 2nd 434, 452-453

(S.D.N.Y. 2004); Employees Committed for Justice v. Eastman Kodak Co., 407

F.Supp 2nd 423, 442 (W.D.N.Y. 2005); EEOC v. Kovacevich Farms, 2007 WL

174444, at *19 (E.D.Cal. 2007); Anderson v. Boeing Co., 222 F.R.D. 521, 547

---

[11] The district court also noted that in Morgan, 536 U.S. at 115 n. 9, the Supreme Court specifically held "we have no occasion here to consider the time ly filing question with respect to pattern or practice claims brought by private litigants as none are issued here."

(N.D. Okla. 2004); see also Moore v. Chertoff, 437 F.Supp 2nd 156 (D.D.C.

2006) (challenge to promotional system at the Secret Service not governed by

Morgan, where plaintiffs alleged pattern and practice of discrimination).

### C.    The Significant Differences Between Disparate Impact and Disparate Treatment Cases Require the Conclusion That Morgan and Ledbetter Are Not Controlling.

42 U.S.C. § 2000e-2(k) provides that the burden of proof in a disparate

impact case is the following:

> "a complaining party demonstrates the respondent's use of a particular employment practice that causes a disparate impact on the basis of race…and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with this necessity…"

Any person subject to such a practice must file a charge of discrimination with

the EEOC "within 300 days after the alleged unlawful employment practice

occurred." 42 U.S.C. § 2000e-5(e)(1). Under the rule argued here by the

Commonwealth, a discriminatory employment practice that is not challenged

within the short charge filing period after its initial adoption would be immunized

from subsequent challenge by applicants or employees, even if that practice (in

this case the promotional exam taken by hundreds or thousands of police

officers) continues to result in continued promotion of non-minority employees

over subsequent years. Thus, the Commonwealth's view would undermine

Congress' intent to authorize civil actions by private litigants as an important

means of eradicating employment discrimination. Alexander v. Gardner-Denver

Co., 415 U.S. 36, 45 (1997) ("Congress gave private individuals a significant role

in the enforcement process of Title VII…to vindicate the important congressional policy against discriminatory employment practices").

At bottom, the Supreme Court has continued to make it clear that where there are recurring present violations of the statute, even if those violations may be related to an earlier act of discrimination, the new charge filing period commences each time a subsequent act occurs that satisfies all elements of a Title VII violation.  As explained in National Railroad Passenger Corp., v. Morgan:

> Each discrete discriminatory act starts a new clock for filing charges…..
> The charge, therefore, must be filed within…..the 300 day time period
> after the discrete discriminatory act occurred.  The existence of past acts
> and the employee's prior knowledge of their occurrence, however, does
> not bar employees from filing charges about related discriminatory acts so
> long as the acts are independently discriminatory…..

536 U.S. at 113.

Applying these principles to claims of disparate impact discrimination, a charge should be considered timely if filed within the charge filing period after any use of or application of a selection process that adversely affects protected groups.  Lorance v. AT&T, Inc., 490 U.S. at 908.  Thus, a disparate impact violation is established when the employer "uses a particular employment practice that causes a disparate impact on the basis of race."  See 42 U.S.C. § 2000e-2(k)(1)(A).  Id.

At the very least, in cases where police officers have passed the sergeants exam and are on the promotional list, the discrete discriminatory act cannot have occurred at the time the officers received their scores because 1) they would have no idea or way of knowing that they would not be reached for

37

promotion and 2) the promotions have yet to made from the list, and therefore there has been no "discrete discriminatory act."

For all these reasons, the motion to dismiss plaintiffs' claims regarding the 2005 examination should be denied.

Respectfully submitted,

PEDRO LOPEZ, et al.,

By their attorneys,

Dated:  February 26, 2009

s/Harold L. Lichten
Harold L. Lichten, BBO #549689
Shannon Liss-Riordan, BBO #640716
Leah M. Barrault, BBO # 661626
Pyle, Rome, Lichten, Ehrenberg
        & Liss-Riordan, P.C.
18 Tremont St., Ste. 500
Boston, MA 02108
(617) 367-7200

## CERTIFICATE OF SERVICE

I hereby certify that a copy of plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment was served upon the Court and counsel of record via the Court's ECF filing system on February 26, 2009.

s/Harold L. Lichten
Harold L. Lichten

38

EXHIBIT C

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| PEDRO LOPEZ, et al.,<br><br>               Plaintiffs,<br><br>     v.<br><br>CITY OF LAWRENCE, et al.,<br><br>               Defendants. | CIVIL ACTION<br>NO. 07-11693-JLT |

## LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF STATE DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Pursuant to Local Rule 56.1, the State defendants, the Commonwealth of Massachusetts and Paul Dietl, in his capacity as Chief Human Resources Officer of its Human Resources Division (together, "HRD"), submit this statement of undisputed material facts in support of their motion to dismiss or, in the alternative, for summary judgment:

*HRD and its role in the promotional process*

1.  HRD is charged by statute with certain responsibilities in implementing the civil-service system, including the preparation and administration of civil-service examinations. Mass. Gen. Laws ch. 31, § 5.

2.  HRD is empowered to make and amend rules which shall regulate recruitment, selection, training and employment of persons for civil service positions. Mass. Gen. Laws ch. 31, § 3.

3.  The Civil Service Commission is a distinct state agency from HRD that has different responsibilities within the civil-service system, primarily involving adjudicating disputes between employees and their employers. Mass. Gen. Laws, ch. 31, § 2.

4.   The Commission also has the right to disapprove rules proposed, or other actions taken, by HRD.  Mass. Gen. Laws, ch. 31, § 3.

5.   Basic merit principles include "assuring fair treatment of all applicants and employees in all aspects of personnel administration without regard to political affiliation, race, color, age, national origin, sex, marital status, handicap, or religion and with proper regard for privacy, basic rights outlined in this chapter and constitutional rights as citizens."  Mass. Gen. Laws ch. 31, § 1.

6.   Municipal police officers hold civil service positions if their municipal employer has accepted the applicability of the civil-service law and rules.  Mass. Gen. Laws ch. 31, § 1; see id. §§ 53-55.

7.   Promotional appointments of police officers shall be made only after competitive examination with some exceptions not applicable here.  Mass. Gen. Laws, ch. 31, §§ 59, 65.  The form and content of the examination is not specified in the General Laws, see generally M.G.L. c. 31, but Mass. Gen. Laws, ch. 31, § 7 states:  "An appointing authority [i.e., municipal employer] desiring to make a promotional appointment shall recommend the type of examination to be utilized."

8.   HRD prepares, administers, and scores a written promotional examination for police sergeants every year and then releases rank-ordered eligible lists of all passing candidates.  McNeely Aff. ¶ 2.

9.   Municipalities may elect to use HRD's examination or may conduct their own alternative police sergeant promotional examination.  Mass. Gen. Laws ch. 31, §§ 9-11; see also McNeely Aff. ¶ 3.   With respect to those communities, HRD does not necessarily receive notification regarding promotions that are ultimately made.  Id.

2

10.    By contrast, municipalities must use HRD's examination for entry-level positions. <u>See</u> Mass. Gen. Laws ch. 31, §§ 6, 16; McNeely Aff. ¶ 4.

11.    As authorized by state law, several municipalities (including defendants City of Boston and City of Springfield) have entered into delegation agreements with HRD, allowing them to use other testing components in addition to, or in lieu of, HRD's written police sergeant examination and/or their own promotional processes. McNeely Aff. ¶ 5; <u>see</u> Mass. Gen. Laws ch. 31, § 5(*l*).

12.    With the aid of a municipality-retained consultant, the municipality is then responsible for developing, validating, administering, and scoring any non-HRD testing component or exam.  McNeely Aff. ¶ 7.  These municipalities can select the weights to be accorded to the different testing components.  McNeely Aff. ¶ 5.

13.    In 2007, Leominster and Salem supplemented HRD's sergeant written exam with "assessment centers," in which candidates are evaluated based on their performance in job simulations and/or work-related exercises.  McNeely Aff. ¶ 6.  Massachusetts municipalities have sent their police sergeant candidates to independent assessment centers at least seven times in the past seven years.  <u>Id.</u>

14.    In 2002, Boston hired a testing consultant and prepared and administered its own promotional exam.  <u>Id.</u> at ¶ 8.

15.    In 2005, Boston, in conjunction with HRD, prepared and administered an exam that differed from the one given to all other participating municipalities in that year.  <u>Id.</u> at ¶ 9.

16.    HRD has long encouraged the municipalities to use these types of supplementary or alternative testing components in the promotional process.  <u>Id.</u>, ¶ 6.

3

17.  When a municipality wishes to make a promotional appointment, if it has not entered into a full delegation agreement with HRD, it will submit a requisition to HRD, which will in turn issue a certification list ranking the persons eligible for promotion.  Mass. Gen. Laws ch. 31, § 7; McNeely Aff. ¶ 10.

18.  For municipalities that have entered into a full delegation agreement, technical assistance and oversight might be HRD's only role with regard to the promotional process.   McNeely Aff. ¶ 11.   HRD does not receive any information from some delegated communities with respect to promotions that those communities ultimately choose to make.  Id.

19.  For municipalities that have not entered into delegation agreements, HRD's role after scoring the exam papers is also largely ministerial -- it creates a rank-ordered eligible list for each community based on scores, issues certification lists upon request, and records the fact of the promotions decided upon by municipal authorities, checking only to confirm that no eligible candidate was bypassed for unlawful reasons. McNeely Aff. ¶ 12.

20.  HRD does not ever take the race, color, religion, sex, or national origin of candidates into account when scoring exams.  McNeely Aff. ¶ 10.  In connection with the examinations plaintiffs challenge in this case, HRD did not take into account the candidates' race, color, religion, sex, or national origin when creating or issuing eligible or certification lists.  Id.

21.  Even absent a delegation agreement, it is the responsibility of the municipality, not HRD, to make the actual promotion decisions.  McNeely Aff. ¶ 13.  In making such decisions, the municipality may consider not only an individual's standing on a

4

certification list but also his/her job performance, interview performance, education, specialized skills, criminal history, and disciplinary history. Id.

22. A municipality may bypass a person on the certification list and select someone with a lower score, so long as it submits a written statement of reasons for the bypass to HRD. Mass. Gen. Laws ch. 31, § 27; McNeely Aff. ¶ 14.

23. HRD will review the statement but will not substitute its judgment about a valid exercise of discretion based on merit or policy considerations by a municipality. McNeely Aff. ¶ 15.

24. HRD will generally approve as sound and sufficient, for example, any request by a municipality to bypass a candidate based on a legitimate arrest or pending criminal charges. McNeely Aff. ¶ 16.

25. As plaintiffs acknowledge, the municipalities, not HRD, are "responsible for promotional appointments" of their police officers. 6th Am. Compl. ¶¶ 51, 53, 55, 71.

26. The municipality, not HRD, hires and pays its officers. McNeely Aff. ¶ 18.

27. Municipalities control all relevant aspects of their police officers' employment. McNeely Aff. ¶ 19.

28. HRD does not exercise any day-to-day control over plaintiffs' work activities and plaintiffs obtain no financial benefit from HRD. McNeely Aff. ¶ 20.

29. HRD does not train, transfer, assign work to, set work schedules for, supervise, discipline, or fire municipal police officers, and does not pay them fringe benefits, worker's compensation insurance, or ERISA benefits. McNeely Aff. ¶ 21.

30. HRD also has no authority to discipline plaintiffs or to terminate their employment. McNeely Aff. ¶ 22.

31.   Disputes between police officers and their municipal employers are adjudicated by

the Civil Service Commission, not by HRD.  See Mass. Gen. Laws ch. 31, §§ 2, 6C,

24, 35, 41-43; McNeely Aff. ¶ 23.

*Plaintiffs' Participation in the 2005, 2006, and 2007 Police-Sergeant Examinations*

32.   Plaintiffs are Hispanic or African-American police officers for the cities of Boston,

Lawrence, Lowell, Methuen, Springfield, or Worcester, or for the Massachusetts Bay

Transportation Authority ("MBTA") who took HRD's police-sergeant examination in

2005, 2006 or 2007, but have not, of date, been selected for promotion.  6th Am.

Compl. ¶¶ 1, 3-48.

33.   All of the Plaintiffs work for one of the municipal defendants, their respective

employers, not HRD.  6th Am. Compl. ¶¶ 3-48.

34.   Of the municipal defendants, only Springfield and the MBTA participated in the 2005

statewide sergeant's exam, which was administered in October of 2005.  McNeely

Aff. ¶ 24.

35.   HRD mailed the Springfield and MBTA candidates their scores on December 27,

2005, and made public the rank-ordered eligible lists for those police departments on

March 24, 2006.  McNeely Aff. ¶ 25.

36.   Those eligible lists expired on March 29, 2008, after which they were no longer used

to make promotions.  McNeely Aff. ¶ 26.  The last promotion to sergeant that

Springfield made based on the March 2006 eligible list occurred on March 25, 2007,

and the last promotion to sergeant that the MBTA Police Department made based on

its March 2006 eligible list occurred on August 13, 2007.  Id.

37.   The Springfield and MBTA plaintiffs did not file charges with the Equal Employment

Opportunity Commission ("EEOC") or the Massachusetts Commission Against

6

Discrimination ("MCAD") until September 24, 2008.  See Pls.' Reply Mem. to Defs.'

Opp. to Sixth Mot. to Amend Compl. (Paper No. 116), Exh. A.

38.   The examination unique to Boston was administered in October 2005.  McNeely Aff.

¶ 27.

39.   HRD mailed Boston sergeant candidates their scores on December 16, 2005, and

publicly released the rank-ordered certification list on February 13, 2006.  McNeely

Aff. ¶ 28.

40.   The first four Boston plaintiffs who joined this case filed charges with the EEOC and

MCAD on March 5, 2008.  Affidavit of Iraida Alvarez, Exhibits B – E.  The

remaining Boston plaintiffs did not file charges until September 24, 2008.  See Pls.'

Reply Mem. to Defs.' Opp. to Sixth Mot. to Amend Compl. (Paper No. 116), Exh. A.

41.   The eligible list for Boston sergeant promotions will remain in existence until

February 12, 2009, or until the list from the October 2008 Boston Police Department

sergeant exam is established shortly thereafter.  McNeely Aff. ¶ 29.

42.   HRD is a Title VII employer only of its own employees, none of whom are charged

with the supervision of municipal police officers.  McNeely Aff. ¶ 30.

43.   Angela Williams-Mitchell, a Boston police officer and president of the Massachusetts

Association of Minority Law Enforcement Officers ("MAMLEO"), a plaintiff in this

case, testified that even before the release of the exam scores in December 2005, and

shortly afterwards, MAMLEO consulted with an attorney from the Lawyers'

Committee for Civil Rights Under Law regarding the potentially discriminatory

nature of Boston's 2005 exam.  Williams-Mitchell Transcript (Tr.) at 8, 56-59

(attached to Alvarez Aff. as Ex. A).

7

44.  Williams-Mitchell testified that MAMLEO raised concerns about the exam with

Boston's Police Commissioner both before and after the results were released.

Williams-Mitchell Tr. at 48.

45.  The eligibility lists created from the 2007 exam are not likely to expire until October

2009 at the earliest.  McNeely Aff. ¶ 31.

46.  When plaintiffs amended their complaint on January 15, 2008, to include the 2007

claims, the eligible lists for the 2007 exam had not yet been released.  McNeely Aff.

¶ 32.

                                                         Respectfully submitted,

                                                         COMMONWEALTH OF MASSACHUSETTS and
PAUL DIETL, in his capacity as Chief Human
Resources Officer of the Human Resources
Division,

By their attorney,

MARTHA COAKLEY
ATTORNEY GENERAL


 /s/ Robert L. Quinan, Jr.
Robert L. Quinan, Jr. BBO #553010
Sookyoung Shin, BBO # 643713
Assistant Attorneys General
One Ashburton Place, Room 2019
Boston, MA 02108-1698
(617) 963-2554 (Quinan)
(617) 963-2052 (Shin)

Dated:  January 26, 2009

8

## CERTIFICATE OF SERVICE

I hereby certify that the above document will be served on January 26, 2009, by electronic notice for registered counsel and a copy will be served by first-class mail, postage pre-paid, for non-registered counsel.

/s/ Sookyoung Shin
Sookyoung Shin, BBO # 643713
Assistant Attorney General

EXHIBIT D

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| PEDRO LOPEZ, et. al. | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | |
| | ) | **Case No.** |
| CITY OF LAWRENCE, et. al. | ) | **07-CA-11693-JLT** |
| | ) | |
| Defendants | ) | |

## PLAINTIFFS' STATEMENT OF MATERIAL FACTS AND OPPOSITION TO DEFENDANTS' STATEMENT OF MATERIAL FACTS

### PLAINTIFF'S STATEMENT OF MATERIAL FACTS

**A.** **Facts Relating To The 2005 Examination And The Plaintiffs' Knowledge of the Likelihood of Their Being Promoted.**

1.      On October 22, 2005, the Commonwealth of Massachusetts administered a statewide police sergeants' promotional exam.  See Exhibits A and B.

2.      A number of cities and towns throughout the Commonwealth, including the City of Springfield, the City of Boston, and the Massachusetts Bay Transportation Authority ("MBTA") utilized the exam for the purposes of making promotions.  Id.

3.      The Springfield police officer plaintiffs taking the exam were James Jackson, Juan Rosario, Louis Rosario, Julio Toledo, Devon Williams, and Obed Almeyda.  See Exhibit A.

4.       The MBTA police officer plaintiffs taking the exam were Lynn Davis and Royline Lamb.  Id.

1

5.      The City of Boston police officer plaintiffs taking the exam were
Shumeane Benfold, Angela-Williams Mitchell, Gwendolyn Brown, Lynette
Praileau, Tyrone Smith, Eddy Chrispin, David E. Melvin, Steven Morgan, William
E. Iraolo, Jose Lozano, Courtney A. Powell, James L. Brown, George Cardoza,
Larry Ellison, David Singletary, Charisse Brittle-Powell, Cathenia D. Cooper-
Paterson, Molwyn A. Shaw, Lamont Anderson, Gloria Kinkead, Kenneth Gaines,
Murphy Gregory, Julian Turner, Neva Grice, Delores E. Facey, Lisa Venus,
Rodney O. Best, Karen VanDyke, and Robert C. Young.  See Exhibit B.

6.      Police officers in the City of Springfield, the City of Boston, and the
MBTA received written notice of their examination scores in late December of
2005 or early January of 2006.  See Affidavits of Gwendolyn Brown, Shumeane
Benford, Kenneth Gaines, Juan Rosario, Louis Rosario, and Julio Toledo
attached hereto as Exhibits C-H; see also deposition of transcript of Gwendolyn
Brown p. 62, attached hereto as Exhibit I;  deposition transcript of Shumeane
Benford pp. 37-38, attached hereto as Exhibit J.

7.      The eligibility list- listing the rankings for the City of Boston– were
not made public on the Commonwealth's Human Resource Division (HRD)
website until February 13, 2006.  See Exhibit B.

8.      The eligibility lists – listing the rankings for the City of Springfield
and the MBTA - were not made public on the HRD website until March 24, 2006.
See Exhibit A.

9.      While the rank ordered eligibility lists for the City of Boston, City of
Springfield, and the MBTA were released publicly on the HRD website on

2

February 13, 2006 and March 24, 2006 respectively, those eligibility lists were not sent to any of the Plaintiffs. <u>See</u> Affidavits of Gwendolyn Brown, Shumeane Benford, Kenneth Gaines, Juan Rosario, Louis Rosario, and Julio Toledo, attached hereto as Exhibits C-H.

10.    Several of the named Plaintiffs did not immediately view the rank order eligibility list on HRD's website and several others have no recollection of when they first saw these lists.   <u>See</u> Affidavits of Gwendolyn Brown, Shumeane Benford, Kenneth Gaines, Juan Rosario, and Louis Rosario attached hereto as Exhibits C, D, E, F and G; <u>see also</u> deposition of transcript of Gwendolyn Brown pp. 42-43, & 62-63, attached hereto as Exhibit I;  deposition transcript of Shumeane Benford pp. 37-40, attached hereto as Exhibit J.

11.    The rank order eligibility lists made publicly available through the HRD website included lists for the City of Boston, Springfield and the MBTA. Scores are not provided and the race and ethnicity of the test taker is also not provided on the eligibility lists that were publicly available through HRD's website. Additionally, a test taker was not able to access any information about who failed the test, or how someone scored in any city or town other than their own.   <u>See</u> Affidavits of Gwendolyn Brown, Shumeane Benford, Kenneth Gaines, Juan Rosario, Louis Rosario, and Julio Toledo, attached hereto as Exhibits C-H.

12.    The rank order eligibility lists did not provide information as to how the examination was scored, what the overall statistics demonstrated with respect to the disparate impact, or relative scores received by minority and non-minority test takers.   HRD provided absolutely no information to any of the

3

Plaintiffs as to any job-relatedness studies demonstrating the validity of the examination under EEOC standards.  See Affidavits of Gwendolyn Brown, Shumeane Benford, Kenneth Gaines, Juan Rosario, Louis Rosario, and Julio Toledo, attached hereto as Exhibits C-H; see also Exhibit J (2005 rank order eligibility list for Boston).

13.    While a few of the Plaintiffs in these cities or towns received failing scores on these examinations, the vast majority of the named Plaintiffs from these cities and towns received passing scores and therefore had no way of knowing whether or not they would be reached for promotion during the duration of such eligibility lists.  See Affidavits of Gwendolyn Brown, Shumeane Benford, Kenneth Gaines, Juan Rosario, Louis Rosario and Julio Toledo, attached hereto as Exhibits C-H; see also deposition of transcript of Gwendolyn Brown pp. 49-50, & 62-63, attached hereto as Exhibit I; deposition transcript of Shumeane Benford pp. 43-45, attached hereto as Exhibit J; deposition transcript of Lynette Praileau p. 68, attached hereto as Exhibit L.

14.    Plaintiff Gwendolyn Brown believed that as "long as the [2005] list was active, [she] always had an opportunity to be promoted" to the position of police sergeant for the Boston Police Department.   Minorities were promoted to sergeant off the previous 2002 eligibility list and when that list expired Ms. Brown was ranked number 9 and was close to being promoted.  Additionally, Boston Police Commissioners frequently request and have been granted extensions on rank order eligibility lists which according to HRD rules typically expire after 2 years, and have requested and have been granted the right for diversity reasons

4

to reach down on rank ordered eligibility lists and promote female supervisors in favor of male candidates with higher scores and rankings.  See Affidavit of Gwendolyn Brown, attached hereto as Exhibit C; see also deposition of transcript of Gwendolyn Brown pp. 49-50 & 62-63, attached hereto as Exhibits I.

15.    Plaintiff Shumeane Benford believed that "it was a fair expectation that [Boston] would get to [him]" for promotion to sergeant off the 2005 eligibility list despite the fact that he was ranked low on the list as compared to other candidates.  The Boston Police Department recently extended their detective promotion eligibility list for 8 years, 4 years beyond the normal shelf life for such a list, and promoted each and every police officer candidate on that list to detective.   See Affidavit of Shumeane Benford, attached hereto as Exhibit D see also deposition transcript of Shumeane Benford pp. 43-45, attached hereto as Exhibit J.

16.    Plaintiff Louis Rosario believed that the Springfield Police Department would reach him for a promotion to sergeant because he was ranked number 12 out of 27 on the rank order eligibility list, and in March of 2006 when HRD established the rank order eligibility list he was aware of at least 10 vacancies in the rank of sergeant and thus at least 10 possible promotions. According to HRD's 2N + 1 hiring formula, described below, he was almost certain that he would be reached for promotion to sergeant during the life of the civil service list created by the 2005 civil service exam.  See Affidavit of Louis Rosario, attached hereto as Exhibit G.

17.    This case was originally filed as a class action on September 11,
2007.  See Complaint (Docket No. 1).   Prior to that, Plaintiffs Pedro Lopez, Able
Cano, Richard Brooks, Charles Dejesus, and Kevin Sledge filed EEOC and
MCAD complaint forms with those administrative agencies as of May 29, 2007.
See EEOC and MCAD filings attached hereto as Exhibit M.   According to
Supreme Court precedent, while this case remained filed as a class action, the
time for class plaintiffs to file claims were "tolled."  See Crown Cork and Seal
Company v. Parker, 462 US 345, 353-54 (1993); see also Plaintifffs' Sixth Motion
to Amend Complaint (Docket No. 110.)

18.    On March 17, 2008, four Boston Plaintiffs, Lynette Praileau,
Gwendolyn Brown, Shumeane Benford, and Angela Williams Mitchell joined the
class action lawsuit.  See Fourth Amended Complaint (Docket No. 62).

19.    Prior to that, Lynette Praileau, Gwendolyn Brown, Shumeane
Benford and Angela Williams Mitchell filed EEOC and MCAD complaint forms
with those administrative agencies as of March 5, 2008.  See EEOC and MCAD
filings attached hereto as Exhibit N.

20.    On June 9, 2008 and June 26, 2008, this Court denied class
certification. See June 9, 2008 & June 26, 2008 Orders (Docket Nos. 86 & 92).

21.    On January 7, 2009, 25 additional Boston plaintiffs, 6 Springfield
plaintiffs, and 2 MBTA plaintiffs who took the 2005 sergeant examination joined
this lawsuit.  The Boston plaintiffs included Tyrone Smith, Eddy Chrispin, David
E. Melvin, Steven Morgan, William E. Iraolo, Jose Lozano, Courtney A. Powell,
James L. Brown, George Cardoza, Larry Ellison, David Singletary, Charisse

Brittle-Powell, Cathenia D. Cooper-Paterson, Molwyn A. Shaw, Lamont
Anderson, Gloria Kinkead, Kenneth Gaines, Murphy Gregory, Julian Turner,
Neva Grice, Delores E. Facey, Lisa Venus, Rodney O. Best, Karen VanDyke,
and Robert C. Young.   The 6 Springfield plaintiffs included James Jackson, Juan
Rosario, Louis Rosario, Julio Toledo, Devon Williams, and Obed Almeyda.  The
2 MBTA plaintiffs included Lynn Davis and Royline Lamb.   See Sixth Amended
Complaint (Docket No.  139).

22.    Prior to that, these 25 additional Boston plaintiffs, 6 Springfield
plaintiffs and 2 MBTA plaintiffs filed EEOC and MCAD complaint forms with those
administrative agencies as of September 24, 2008.   See EEOC and MCAD
filings attached hereto as Exhibit O.

23.    Promotions from these lists for Boston, Springfield and the MBTA
did not begin until, at the earliest, March 24, 2006, and continued to be made in
Springfield and the MBTA until the list expired in the beginning part of 2008 and
are continuing to be made in Boston where the list has not yet expired.   See
Affidavit of Joel Wiesen attached hereto as Exhibit P.   During this time the
Plaintiffs who took that examination believed that they might be reached for
promotion, they hoped that they would be reached for promotion, and they had
no way of knowing that they would not be reached.  See Affidavits of Gwendolyn
Brown, Shumeane Benford, Kenneth Gaines, Juan Rosario, Louis Rosario and
Julio Toledo, attached hereto as Exhibits C-H; see also deposition of transcript of
Gwendolyn Brown pp. 49-50, & 62-63, attached hereto as Exhibit I; deposition

transcript of Shumeane Benford pp. 43-45, attached hereto as Exhibit J;

deposition transcript of Lynette Praileau p. 68, attached hereto as Exhibit L.

24.      According to Dr. Joel Wiesen, who has conducted *thousands* of

adverse impact analyses of employment decisions, it was impossible for an

adversely affected minority applicant for promotion to sergeant in the City of

Boston, Springfield and MBTA to notice and evaluate the overall level of possible

adverse impact of the Commonwealth's 2005 sergeant examination in the case

of appointments *prior to* the completion of all hiring and/or expiration of the

eligibility lists created by that examination.  Additionally, the data needed to

conduct an adverse impact analyses relative to the number of applicants passing

and failing the exams and in the case of the grades on the written exams was not

made available to applicants by HRD and absent such necessary data it was and

remains impossible for applicants to evaluate the level of possible adverse

impact of the written tests.  See Affidavit of Dr. Joel Wiesen attached hereto as

Exhibit P.

25.      There are three types of adverse impact analyses.  An adverse

impact analysis of bottom line hiring requires knowledge of the number of people

who applied and the number hired, broken down by racial/ethnic group.  An

adverse impact analysis of the written test scores requires knowledge of the

written test scores for all applicants, broken down by racial/ethnic group.   An

adverse impact analysis of the pass/fail decisions of the written test requires

knowledge of the number of applicants that took the test and the number that

passed and failed.  Id.

26.    The data required to conduct an adverse impact analysis of the bottom line hiring is only available after all of the hiring based on the examination is completed and/or the eligibility list has expired.    For BPD, the plaintiffs could not have had this data until *at least* 10/24/2008, the date of the last appointments so far off the 2005 eligible list (which has not yet expired).    For Springfield and the MBTA, the plaintiffs could not have had this data until *at least* 3/24/2008, when the eligible Lists based on the 2005 exam were replaced by eligible Lists based on the 2007 sergeant exam.    The data required to conduct an adverse impact analysis of the written test scores requires knowledge of the written scores for all applicants, broken down by racial/ethnic group, and the data required to conduct an adverse impact analysis of the pass/fail decisions of the written test requires knowledge of the number of applicants that took the test and the number that passed.    This data was not made available to applicants therefore it was and is impossible for applicants to have conducted this type of analysis. Id.

**B.    Facts Relating To The Commonwealth's Pervasive Control Over The Employment Of Police Officers And Fire Fighters In The Commonwealth Of Massachusetts.**

27.    In Massachusetts, municipalities have the option of accepting the civil service law, M.G.L. Chapter 31.  If a municipality accepts Chapter 31, the Commonwealth assumes much of the responsibility for not only for hiring, but also determining qualifications, addressing layoffs, recalls, promotions, discipline, et cetera. See M.G.L c. 31, et al., see 2008 HRD Re-Employment List, attached hereto as Exhibit Q.

9

28.    The Commonwealth of Massachusetts has elected through its civil service statutes to retain extensive control over the careers of municipal police officers and fire fighters starting from their hiring, continuing through their employment, and ending with their retirement.  This control is exhaustively described by Judge Saris in <u>Bradley, et al. v. City of Lynn</u>, 403 F.Supp.2d 161 (D. Mass. 2005), and <u>Bradley et al v. City of Lynn</u>, 443 F.Supp.2d 145 (D. Mass. August 8, 2006).

29.    As Judge Saris found in her two published opinions in <u>Bradley, et al. v. City of Lynn</u>, 403 F.Supp.2d 161 (D. Mass. 2005), and 443 F.Supp.2d 145 (D. Mass. August 8, 2006), HRD effectively controls the entry level hiring process for all civil service police officers and firefighters in the Commonwealth.

30.    HRD's website expressly provides that is has been charged with the task of "recruit[ing] and evaluat[ing] current and potential employees to ensure fair and equal access to careers in public service and to provide qualified candidates to the agencies and municipalities of the Commonwealth." To that end HRD expressly claims "oversight of appointment/hiring process." <u>See</u> Exhibit R.

31.    In order to become a police officer in a civil service town or city, including all of the towns and cities in this case, an individual interested in such position must apply for and take an examination devised, administered, scored, and promulgated by HRD.  <u>See</u> M.G.L. Chapter 31, §§ 5, 16, 21, 48, and 59.

10

32.    After those exam scores are issued, applicants may appeal their scores to HRD, and not to the municipality. See Chapter 31, §§ 22 -24. It is HRD, and not the municipality, that decides all such appeals of the scoring and of the test questions given. Id.

33.    It is then HRD that determines how to rank the candidates in order of their exam scores while giving certain absolute preferences to certain individuals such as veterans or the sons and daughters of deceased police officers who died in the line of duty. See Chapter 31, §§ 6 and 26. See also Quinn, et al. v. City of Boston, 325 F.3d 18 (1st Cir. 2003) (describing such statutory preferences); see also Affidavit of Sally McNeeley in Support of State Defendants' Motion to Dismiss/Summary Judgment, ¶¶2, 12, 25 and 28.

34.    In response to the Bradley, et al. v. City of Lynn case, the Commonwealth has taken to "banding" candidates for initial hire such that people within a point or two of another are banded as having the same score. See Exhibit S.

35.    Recently, HRD made sudden and significant changes to scoring and establishment of eligibility lists for the 2008 sergeant promotional examinations. HRD established a new passing point for the written component of the 2008 Boston sergeant examination and similar to candidates for initial hire is issuing the exam results in score "bands" such that people within a range of certain test scores are banded and treated as though they had the same score. The cities or towns have no role in the determination of the bands. This is dramatic change from HRD's previous issuance of sergeant exam results to

11

municipalities in strict rank order by whole numbers. HRD states that its changes

were recommended by HRD's experts because they believe that the sergeants'

examination does meet the reliability standards that are to be expected for a

knowledge test to serve as a basis for strict rank-ordered appointment. See HRD

Memorandum dated February 12, 2009, attached hereto as T.

36.    It is the Commonwealth that sets the initial medical standards which

each candidate for police officer must meet in order to be hired.  See Carlton v.

Commonwealth of Massachusetts, 447 Mass. 791 (2006).

37.    It is the Commonwealth which is responsible for setting ongoing

fitness and medical standards which police officers must adhere to during the

course of their employment.  See M.G.L. Chapter 31, § 61.

38.    Even if a police officer passes the entry-level exam and all other

requirements, he or she will not be reached for an appointment as a police officer

in a Massachusetts civil service city or town unless his or her rank order score

places them among the top three (3) candidates.  See M.G.L. Chapter 31, § 7.

39.    If a municipality attempts to bypass the highest ranked candidate

without good and sufficient reason, HRD will not approve such bypass, and the

individual is entitled to a hearing before the state Civil Service Commission.  See

M.G.L. Chapter 31, § 27; see also Cotter v. City of Boston, 323 F.Supp.3d 160

(D. Mass. 2003).

40.    Even after a candidate has been approved for hire, he or she is

subject to all of the training and academy requirements set by the

Commonwealth of Massachusetts and not the city or town.  Thus, the

Commonwealth's Criminal Justice Training Council (see M.G.L. Chapter 6, §116, et. seq.) sets all of the requirements and training which a police officer candidate must go through in order to become a police officer.  Further, the Mass Criminal Justice Training Council, a state agency decides the medical standards for persons entering such local police academies.  See also, Chapter 41, § 96B.  Before an individual can even go to and be hired as a police officer, or attend a Criminal Justice Training Council approved police academy, they must pass a physical agility test that is designed and administered by the Commonwealth of Massachusetts.  See Chapter 31, §61A; see also Commonwealth's Police Department Initial Hire Physical Abilities Test, attached hereto as Exhibit U.

41.     The Commonwealth and HRD set the procedures for how layoffs and recalls occur, should that become necessary.  See M.G.L. Chapter 31, §§ 42 - 44.  See also Boston Chapter NAACP v. Beecher et al., 679 F.2d 965 (1982).

42.     Leaves of absence and discipline are regulated by the Commonwealth and not the municipality.  See M.G.L. Chapter 31, §§7-15, 39, and 41-43.

43.     While it is true that a municipality can request from HRD the right to administer its own promotional examination, if it does so, it must have that alternative examination reviewed and approved by HRD, and in any event it is rare that any community ever opts out of the Commonwealth's promotional exam system.   See M.G.L. c. 31, §§9-11.  For example, according to HRD, for the years 2005, 2006, and 2007, every civil service promotional exam for police officers has been devised, created, and administered by HRD with two small

13

exceptions, one year in the City of Leominster and one year in the City of Salem.
See Affidavit of Sally McNeeley in Support of State Defendants' Motion to
Dismiss/Summary Judgment, ¶¶ 5-6.  Every other community has simply utilized
HRD's promotional examination system and, in this case, all of the communities
involved and all of the named Plaintiffs are from communities which relied upon
the HRD promotional examination system and nothing else.  Id.  HRD has done
nothing to require such communities to utilize their own examination processes
for promotion.  See October 29, 2008 Deposition of Sally McNeeley p. 151,
attached hereto as Exhibit V.

44.    While it is true that the City of Boston has on two prior occasions
created its own alternative examination, the last time it did so was in 2002 (and
that was in response to a consent decree in which HRD was involved), and in the
years since then Boston has simply utilized HRD's promotional exam.  See
Affidavit of Sally McNeeley in Support of State Defendants' Motion to
Dismiss/Summary Judgment, ¶¶ 8-9.

45.    When HRD administers a police promotional exam, it devises the
exam entirely on its own utilizing its in-house staff.  See October 29, 2008
deposition of Sally McNeeley pp. 127- 139 attached hereto as Exhibit V; HRD
exam development steps and HRD 2005 Boston sergeant examination outline
attached hereto as Exhibit W.  HRD creates the format for the exam and it alone
determines how grading will be carried out.  Id.; see also Affidavit of Sally
McNeeley in Support of State Defendants' Motion to Dismiss/Summary
Judgment, ¶¶2.

14

46.    HRD determines all issues on appeal as to whether a question should be thrown out or credit given for more than one answer, et cetera. *See* M.G.L. c. 31, §§ 22-24; see also April 4, 2008 Deposition of Sally McNeeley pp. 24-25 attached hereto as Exhibit X.

47.    Moreover, it is HRD that tracks whether the exam has disparate impact on minority officers. See HRD 2005 Boston Police Sergeant examination Disparate Impact Analysis attached hereto as Exhibit Y.

48.    HRD notifies the candidates of their score and ranks the candidates on their respective municipality eligibility list.  HRD then provides those eligibility lists to the municipalities and to the candidates. See Affidavit of Sally McNeeley in Support of State Defendants' Motion to Dismiss/Summary Judgment ¶¶ 2, 25, and 28.

49.    It is the Commonwealth which requires that if there is one vacancy for a police promotional opportunity, the person hired must be among the top three on the list.  This is known as the "2N plus one" rule.  Thus, if there are three vacancies for police sergeant, those three must be picked from the top seven candidates.  Thus, even if a municipality wanted to hire more minority police officers, it normally could not do so because it must hire from the top of the list. See HRD Personnel Administration Rules, PAR.09 Civil Service Appointments, attached hereto as Exhibit Z.   Moreover, if the top ranked candidate is not hired, that candidate can appeal such bypass first to HRD and then to the state Civil Service Commission which reviews all such bypasses.  HRD may not approve a

bypass that is not for just and sufficient cause.  See generally Cotter v. City of Boston, 323 F.Supp.3d 160 (D. Mass. 2003).

**C.    Facts Relating To the Commonwealth's Involvement In Police Hiring And Promotional Exam Litigation.**

50.    In Cotter, et al. v. City of Boston and James Hartnett, Director of Department of Personnel Administration, 73 F.Supp.2d 62 (D. Mass. 1999) Judge Young exhaustively listed the obligations of the Commonwealth Human Resource Division under the civil service law. [1] See Id. at 65.  He noted that:

> As the Personnel Administrator of the Human Resources Division, Hartnett is charged with providing eligible lists based on test scores … when, however, the police department awards a promotional appointment to an individual other than the qualified person whose name appears highest on the list … the police department must immediately file with Hartnett a written statement of reasons for appointing the person whose name was not highest … Hartnett has the power to accept or reject the reasons given by the police department for the bypass….  Hartnett relied on this power of rejection when it prevented the police department's attempt to promote the Black police officers to the exclusion of White candidates with test scores.

Id. at 65-66.

The court went on to hold:

> Since the allegations illustrate that Hartnett was aware of and disapproved of the police department's attempt to promote the Black officers on basis of race, his failure to require the police department to justify the eventually promotion of the Black officers to the exclusion of the equally scoring White officers does not comport with basic merit principles.  Hartnett failed to assure 'fair treatment … without regard to race' and protect the White officers from arbitrary and capricious action.

---

[1] There are several other court decisions that address the Commonwealth's involvement in police hiring and promotional exam litigation.   These cases are cited and discussed in Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss or in the Alternative for Summary Judgment at pages 12-17.

16

> Second, Hartnett has the authority to approve or disapprove
> specifications and qualifications submitted by an appointing
> authority…. Hartnett was required to disapprove and
> establish satisfactory qualifications and specifications.
>
> Third, Hartnett has the authority to evaluate the qualifications
> of applicants for civil service positions. This broad grant of
> discretion … is triggered when, as is the case here, Hartnett
> knows that the race is the primary qualification of a selected
> applicant. In light of the three general statutory obligations,
> Hartnett's attempt to shrug off his authority to prevent what is
> alleged to be a known and admittedly race-based
> appointment policy, one that is clearly violative of basic merit
> principles – is unacceptable.

Id. at 66-67.

51.    In William Brackett, et al. v. Civil Service Commission, et al., 447

Mass. 233 (Mass. 2006), white police officers challenged, among other things,

the actions of the Commonwealth Human Resources Division creating

regulations and policies providing for so-called "special certifications" permitting

the promotion of minority and female candidates to police positions, and

authorizing same, even where higher scoring non-minority candidates were

ranked higher on such eligibility lists. HRD was a party to that case and argued

vigorously that it could authorize municipalities to engage in such race-based

promotional decisions where there was evidence of a significant under-

representation by minorities in supervisory law enforcement positions. In its brief

to the Supreme Judicial Court, HRD extolled the extensive authority it had to

determine such promotional issues in civil service communities. See Brief of the

Appellee Human Resources Division of the Commonwealth of Massachusetts in

Bracket v. Civil Service Commission, 2005 WL 3954113 (Mass.).  In that brief,

the same counsel for HRD as in this case wrote:

> As both the Commission and the Superior Court determined,
> HRD acted within its statutory authority in adopting Rule 10
> … civil service law gives HRD broad power to make rules
> governing the appointment and promotion of candidates for
> civil service positions.  G.L. Chapter 31, Sections 3 and 4.
> Section 3 provides that HRD's administrator shall make and
> amend rules which shall regulate the recruitment, selection,
> training, and employment of persons for civil service
> positions.  Rule 10 is within this grant of authority.

Id. at 38-39.

HRD went on to argue in its brief;

> In addition to this general grant of rule making authority, the
> legislature specifically instructed HRD to promulgate rules
> regarding:  promotional appointments, on the basis of merit
> as determined by examination, performance evaluation,
> seniority of service or any combination of factors which fairly
> test the applicant's ability to perform the duties of the
> position as determined by the administrator.  Chapter 31,
> Section 3(e).  By setting up a procedure to remedy
> discrimination based on race or gender, Rule 10
> accomplishes this goal of fairly testing the applicant's ability.
> There is no statutory requirement that HRD restricts
> consideration for promotion to examination scores alone.

Id. at 41-42.

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' STATEMENT OF MATERIAL FACTS [2]

7.    Denied. See Pl's SOF ¶¶ 30, 31, 43, 44, and 45.

9.    Denied. See Pl's SOF ¶¶ 30, 31, 43, 44, and 45.

11.   Denied. See Pl's SOF ¶¶ 1, 2, 30, 31, 43, 44, and 45.

12.   Denied. See Pl's SOF ¶¶ 30, 31, 43, 44, and 45.

---

[2] Plaintiffs here addresses only Defendants' facts which they dispute for the purposes of summary judgment.  With respect to Defendants' facts that Plaintiffs do not dispute for purposes of summary judgment, Plaintiffs reserve the right to dispute them later in this proceeding or at trial.

18

15.    Denied. The 2005 Boston exam did *not* differ from the exam given to all other participating municipalities that year. See Affidavit of Joel Wiesen, Pl's SOF, Exhibit P.

16.    Denied. HRD has done absolutely nothing to require municipalities to utilize their own examination process.  See Pl's SOF ¶43.

19.    Denied.  HRD's role after scoring the exam papers is far from "ministerial." See Pl's SOF ¶¶31-49.

21.    Denied.  HRD has significant control over promotional decisions made by municipalities.  See Pl's SOF ¶¶31-49.

25.    Denied. HRD has significant control over promotional appointments made by municipalities.  See Pl's SOF ¶¶31-49.

27.    Denied. HRD has significant control of all aspects of police officers employed in civil service city or town.   See Pl's SOF ¶¶27, 28, 29, 30, 35, 37, 40, 41, 42, 48, and 49.

30.    Denied. Discipline *is* regulated by HRD.  See Pl's SOF ¶42.

33.    Denied. HRD *is* a Title VII employer.  See Pl's SOF ¶50-51, Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment pp. 12-16, and 17-27; see also Bradley v. City of Lynn, 403 F.Supp.161 (D. Mass. 2005), Bradley v. City of Lynn, 443 F.Supp.2d 145 (D. Mass. August 8, 2006.)

34.    Denied.  Springfield, MBTA *and Boston* participated in the 2005 statewide sergeants' examination. See Pl's SOF ¶¶1-5.

36.    Denied.  The eligible list created for the 2005 Boston sergeants'

examination *has not expired* and promotions were made off this list well after

March 29, 2008.  <u>See</u> Pl's SOF¶23; <u>see</u> <u>also</u> Affidavit of Joel Wiesen attached to

Pl's SOF, Exhibit P.

    37.    Denied.  <u>See</u> Pl's SOF¶¶17-22.

    38.    Denied.  The 2005 examination taken by Boston plaintiffs was

*not* unique to Boston.  <u>See</u> Affidavit of Joel Wiesen, Pl's SOF, Exhibit P.

    40.    Denied.  <u>See</u> Pl's SOF¶¶17-22.

    42.    HRD *is* a Title VII employer.  <u>See</u> Pl's SOF ¶50-51, Plaintiffs'

Memorandum of Law in Opposition to Defendants' Motion to Dismiss or, in the

Alternative, for Summary Judgment pp. 12-16, and 17-27; <u>see</u> <u>also</u> <u>Bradley v.</u>

<u>City of Lynn</u>, 403 F.Supp.161 (D. Mass. 2005), <u>Bradley v. City of Lynn</u>, 443

F.Supp.2d 145 (D. Mass. August 8, 2006.).

        Respectfully submitted

        PEDRO LOPEZ, et al.

        By their attorneys,

Dated:  February 26, 2009        s/Harold L. Lichten
        Harold L. Lichten, BBO #549689
        Shannon Liss-Riordan, BBO #640716
        Leah M. Barrault, BBO # 661626
        Pyle, Rome, Lichten, Ehrenberg
           & Liss-Riordan, P.C.
        18 Tremont St., Ste. 500
        Boston, MA 02108
        (617) 367-7200

## CERTIFICATE OF SERVICE

I hereby certify that a copy of Plaintiffs' Statement Of Material Facts and Opposition to Defendants' Statement of Material Facts was served upon the Court and counsel of record via the Court's ECF filing system on February 26, 2009.

s/Harold L. Lichten
Harold L. Lichten



EXHIBIT E

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

PEDRO LOPEZ, et al.                         *
                                            *
              Plaintiffs,                   *
                                            *
        v.                                  *        Civil Action No. 07-11693-JLT
                                            *
CITY OF LAWRENCE, et al.                    *
              Defendants.                   *

ORDER

April 6, 2009

TAURO, J.

    After reviewing Parties' submissions, this court hereby orders the following:

    1.    State Defendants' Motion to Dismiss [#142] is DENIED.

IT IS SO ORDERED.

                                    _____
                                        /s/ Joseph L. Tauro
                                    United States District Judge

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

Pedro Lopez, et al.,

                                Plaintiffs,

v.                                                          CIVIL ACTION
                                                            NO. 07-11693-JLT
City of Lawrence, et al.,

                                Defendants.

**PLANTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO STAY**
**PROCEEDS:**

**I.    INTRODUCTION:**

Having now been unsuccessful on several dispositive motions which it

filed, and now with trial scheduled soon, the Commonwealth has purported to file

an interlocutory appeal based upon 11th Amendment immunity and has argued

that this filing deprives this Court of jurisdiction to proceed further.

As described herein, the Commonwealth's Motion borders on the frivolous

for two critical reasons: 1) plaintiffs seek significant injunctive relief correcting and

remedying the Commonwealth's administration of discriminatory examinations,

and thus 11th Amendment immunity is simply inapplicable to claims for injunctive

relief, and, 2) the law is clear beyond doubt that Congress has waived 11th +-

Amendment immunity for states who are subject to actions brought under Title

VII of the Civil Rights Act.

1

Because the Supreme Court has made clear that a stay pending appeal of the denial of 11th Amendment immunity is not permitted where the complaint seeks "injunctive" relief, and because the District Court is required to make a preliminary analysis as to whether or not the interlocutory appeal is "patently meritless", the Court should deny the requested stay.[1]

## II.    WHERE AN ACTION SEEKS INJUNCTIVE RELIEF, THE 11TH AMENDMENT DOES NOT CONFER A GRANT OF IMMUNITY ON THE STATE:

In this lawsuit, the Plaintiffs primarily seek injunctive relief remedying and correcting the effects of the discriminatory promotional exams created and administered by HRD over the last several years. (See Plaintiff's Sixth Amended Complaint at pp. 13 – 14.) If the Plaintiffs are successful, they will seek several forms of injunctive relief similar, but not identical, to the injunctive relief granted by Judge Saris in <u>Bradley v. City of Lynn</u> 443 F. Sup. 2nd 145 (D. Mass. 2006) (Final injunctive order as attached hereto as Exhibit A. See also <u>Massachusetts Association of African-American Police Officers v. City of Boston</u> 973 F. Supp. 2nd 18, 19 – 21 (1st Cir. 1992).)  While Plaintiffs will also seek back pay and benefits as ancillary relief to the injunctive remedy, monetary damages are not the primary focus of the case.[2] Since the Commonwealth has been defending discriminatory entry level and promotional police and fire exams for over 30 years and has itself has agreed to several consent decrees, it is obviously aware that

---

[1] At the same time, Plaintiffs will be filing a Motion to Dismiss the Interlocutory Appeal in the 1st Circuit. The arguments will be essentially the same.
[2] Indeed, in their initial Motion to Dismiss, the Commonwealth correctly pointed out that the 11th Amendment bars state law claims for damages against the State in Federal Court.  Plaintiffs agreed with this legal analysis, and refiled their state law Ch. 151B claims in state court.

2

injunctive relief would be a primary component of the remedies sought by Plaintiffs. Castro v. Beecher 679 F. 2nd 956 (1st Cir. 1982), Massachusetts Association of African-Americans v. City of Boston, supra, Bradley v. City of Lynn, supra.

The United States Supreme Court has made clear that even where Congress has not abrogated a state's 11th Amendment immunity from a federal discrimination statute, such immunity does not bar an action to "enjoin state officials to conform their…conduct to the requirements of federal law" See Garrett v. University of Alabama 531 U.S. 35, 368 (2001), Kimel v. Florida Board of Regents 508 U.S. 62, 80 (2000), Mullins v. Department of Labor, 2009 WL 1059208 (D. Puerto Rico 2009). (In light of Supreme Court precedent, actions seeking money damages under the ADA and ADEA will not be dismissed to the extent that the action seeks equitable relief). Furthermore, the law is clear that actions seeking instatement or reinstatement are considered claims for equitable relief, which are not barred by 11th Amendment immunity. Thus in Garrett v. University of Alabama, the court stated;

> Our holding here that Congress did not validly abrogate the states' sovereign immunity from suit by private individuals for money damages under Title I does not mean that persons with disabilities have no federal recourse against discrimination. … Those standards can be enforced by the United States in actions for money damages, as well as by private individuals in actions for injunctive relief.

Id at section 9  See also Neal v. East Tennessee State University 2008 WL 4065933 (E.D. Tenn. 2008)

Ironically, the very cases which the Commonwealth relies on in its Motion for Stay support the Plaintiffs' position here that a stay is not permitted when injunctive relief constitutes part of Plaintiffs' claims.  For example the Commonwealth relies on Hegarty v. Somerset County 25 F.3rd. 17, 18 (1st Cir. 1994) for the proposition that where the court denies qualified immunity, it is error for the District Court not to stay proceedings pending appeal.  Yet Hegerty was an action solely for monetary damages and the First Circuit. properly pointed out that:

> We also point out that the underlying case is one for monetary damages only and does not request injunctive relief, as to which a defense of qualified immunity is immaterial.  cf. Lugo v. Alvarado 8 19 F. 2nd 5 (1st Cir. 1987)(concluding that equitable claims stand on a different footing than damage claims…).

Id. at 18. In short, the defendants' request for a stay must be denied because it is patently meritless.  As the Commonwealth itself says in its Motion, the granting of a stay pending appeal is necessary where the claim is for damages only because "whether Plaintiffs' claims should proceed to trial is precisely the aspect of the case over which this Court now lacks jurisdiction" (See Commonwealth's motion at pp 1-2). Yet, where a significant part of the case is for injunctive relief as is here, even if there were 11th Amendment immunity (which there is not as discussed below) over Plaintiffs' claims for back pay and benefits under Title VII, there is still going to be a trial before this court on whether or not the examinations at issue here are discriminatory, and whether the Commonwealth must remedy those unlawful acts.  Thus, it is not a question of "jurisdiction" at all,

but simply a question about whether Plaintiffs will be limited to injunctive relief or can proceed with their back pay claims.  Therefore the very purpose for granting a stay pending an interlocutory appeal from the denial sovereign immunity simply does not exist. This point alone requires the motion to be denied. Since trial will occur anyway, the question of whether or not damages may be awarded by the Court on remedy (in the form of back pay and benefits) is an issue which can be appealed by the Commonwealth in due course, especially in this case where the court has bifurcated the trial on liability from any trial on damages. (See this court's order of June 8, 2008.)

**III.     BECAUSE THE LAW IS CLEAR THAT THE COMMONWEALTH IS SUBJECT TO LIABILITY UNDER TITLE VII AND BECAUSE THE ISSUE RAISED BY THE COMMONWEALTH IS NOT ONE THAT CAN BE DECIDED AS A MATTER OF LAW, THE REQUEST FOR STAY PENDING INTERLOCUTORY APPEAL MUST BE DENIED:**

In its motion for summary judgment, the Commonwealth spent only a few pages arguing that even if it were held to be an employer for Title VII purposes under the facts of this case, there was no clear intent by Congress to waive the state's immunity for this type of case where the state is designing and administering a promotional exam that is discriminatory.  With all due respect this argument lacks any merit. First, it is simply beyond dispute that acting pursuant to Section 5 of the 14th Amendment, Congress specifically intended to waive a state's sovereign immunity when it is sued for race discrimination under Title VII of the Civil Rights Act of 1964.  See In Re: Employment Discrimination Against the State of Alabama 198 F.3rd 1305 (11th Cir. 1999). (Noting that in Fitzpatrick v.

5

<u>Bitzer</u> 427 US 445, 449 (1976), Supreme Court specifically noted that Congress had expressly waived a state's 11th Amendment immunity for violations of the race discrimination provisions of Title VII). While this should be dispositive of the Commonwealth's interlocutory appeal, it appears to make a more refined argument that given the type of case at issue here – the Commonwealth creating and administering promotional exams which have a disparate impact – Congress did not expressively waive the sovereign immunity of the states. The short answer to this question is that the 11th Cir. specifically held in <u>In Re: Employment Discrimination Litigation against the State of Alabama</u> *supra* that disparate impact – promotional and entry level examination claims can be brought against a state under Title VII and that the abrogation of 11th Amendment immunity is no different for the state in such instances then are claims for intentional discrimination.  Id at 1317-1320.  Indeed, the Commonwealth cites no case in its brief, and Plaintiffs can locate no case, which stands for the proposition that for some race discrimination cases under Title VII, Congress did not abrogate a state's sovereign immunity.

In addition, as Plaintiffs pointed out in their Opposition to the Commonwealth's Motion for Summary Judgment, the question of who is an employer for Title VII purposes is at best a mixed question of fact and law, and the Plaintiffs presented overwhelming and persuasive evidence as to why under the facts of this case the Commonwealth was an employer for Title VII purposes and should be treated as such.  They relied in significant part upon the detailed

findings made by Judge Saris in <u>Bradley v. City of Lynn</u> 403 F. Sup. 2nd 161 (D. Mass. 2005).

This Circuit has made clear that where the question of whether immunity applies requires factual findings and those findings are disputed, it is not appropriate to stay litigation and trial of a case pending appeal to the First Circuit. This issue was extensively analyzed in <u>Rivera – Torres v. Ortiz Valez</u> 341 F.3rd 86 (1st Cir. 2003). There the First Circuit, relying on the Supreme Court decisions of <u>Griggs v. Provident Consumer Discount Company</u> 459 U.S. 56, 58 (1982), and <u>Mitchell v. Forsyth</u> 472 U.S. 511 (1985), delineated three exceptions to the automatic divestiture of jurisdiction when an interlocutory immunity appeal is filed. First, the Court made clear the claim of immunity must "turn on an issue of law". Thus, where the question of immunity may turn on an "unresolved issue of material fact" it is not immediately appealable. <u>Rivera – Torres</u> supra at 95. See also <u>Stella v. Kelley</u> 63 F.3rd 71, 74 (1st Cir. 1995) ("a District Court's…rejection of a qualified immunity defense is not immediately appealable to the extent that it turns on either an issue of fact or an issue perceived by the trial court to be an issue of fact").

Second, filing of such interlocutory appeal confers jurisdiction on the Court of Appeals and divests the District Court of control only "over those aspects of the case involved in the appeal". Id at 96. As demonstrated above, at best, since the only possible immunity which could even be asserted by the Commonwealth is immunity from damages, the injunctive aspects of this case must proceed unabated. Third, where the District Court finds that the filing of the interlocutory

appeal is "patently meritless" it may hold that it is not deprived of jurisdiction in the first instance.  See <u>Rivera – Torres v. Ortiz Valez</u> at p. 95-96, see also <u>United States v. Brooks</u> 145 F.3rd 446, 456 (1st Cir. 1998).

In the present case, the Plaintiffs can easily demonstrate that all three exceptions apply. First, as demonstrated above, the Commonwealth's interlocutory appeal is patently meritless because 1) Plaintiffs seek injunctive relief and there is no 11th Amendment immunity for the Plaintiff's claims for injunctive relief and 2) Congress has clearly waived the state's sovereign immunity for 11th Amendment purposes enacted Title VII and made states subject to Title VII in its 1972 Amendments. Independently, either of these arguments would be sufficient for the Court to deny a Stay of the Commonwealth's interlocutory appeal, but taken together, they destroy any claim by the Commonwealth that its interlocutory appeal has merit.

Moreover, even if the Commonwealth could get by the "patently meritless" problem, it still cannot escape the fact that the question of the Commonwealth's 11th Amendment immunity here is necessarily tied up in the many facts surrounding the extensive command and control which the Commonwealth has over the civil service system in the Commonwealth of Massachusetts, and specifically the control which it exerts over entry level hirings and promotions of police officers and firefighters in the Commonwealth of Massachusetts.  Since the Commonwealth argued in its Summary Judgment brief that it had no such extensive control and Plaintiffs, relying on <u>Bradley v. City of Lynn</u>, argued to the

contrary, it is difficult to see how this questions turns on a purely legal question and therefore under Rivera-Torres, an interlocutory appeal is not appropriate.

### VI.    Conclusion

The Court should deny the Motion to Stay Proceedings.

Respectfully submitted,

Pedro Lopez, et al. on behalf of himself
and on behalf of a class of persons
similarly situated,

By their attorneys

Dated:  May 12, 2009

/s/ Harold L. Lichten
Harold L. Lichten, BBO #549689
Shannon Liss-Riordan, BBO # 640716
Pyle, Rome, Lichten, Ehrenberg &
 Liss-Riordan, P.C.
18 Tremont St., Ste. 500
Boston, MA 02108
(617) 367-7200

### CERTIFICATE OF SERVICE

I hereby certify that on May 12, 2009, I caused a copy of this document to be served by electronic filing on all counsel of record.

  /s/ Harold L. Lichten

9

**EXHIBIT F**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Pedro Lopez, et al.,

Plaintiffs,

v.

City of Lawrence, et al.,

Defendants.

CIVIL ACTION
NO. 07-11693-JLT

## PLANTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO STAY PROCEEDS:

### I.    INTRODUCTION:

Having now been unsuccessful on several dispositive motions which it filed, and now with trial scheduled soon, the Commonwealth has purported to file an interlocutory appeal based upon 11th Amendment immunity and has argued that this filing deprives this Court of jurisdiction to proceed further.

As described herein, the Commonwealth's Motion borders on the frivolous for two critical reasons: 1) plaintiffs seek significant injunctive relief correcting and remedying the Commonwealth's administration of discriminatory examinations, and thus 11th Amendment immunity is simply inapplicable to claims for injunctive relief, and, 2) the law is clear beyond doubt that Congress has waived 11th +-Amendment immunity for states who are subject to actions brought under Title VII of the Civil Rights Act.

1

injunctive relief would be a primary component of the remedies sought by Plaintiffs. Castro v. Beecher 679 F. 2nd 956 (1st Cir. 1982), Massachusetts Association of African-Americans v. City of Boston, *supra*, Bradley v. City of Lynn, *supra*.

The United States Supreme Court has made clear that even where Congress has not abrogated a state's 11th Amendment immunity from a federal discrimination statute, such immunity does not bar an action to "enjoin state officials to conform their…conduct to the requirements of federal law" See Garrett v. University of Alabama 531 U.S. 35, 368 (2001), Kimel v. Florida Board of Regents 508 U.S. 62, 80 (2000), Mullins v. Department of Labor, 2009 WL 1059208 (D. Puerto Rico 2009). (In light of Supreme Court precedent, actions seeking money damages under the ADA and ADEA will not be dismissed to the extent that the action seeks equitable relief). Furthermore, the law is clear that actions seeking instatement or reinstatement are considered claims for equitable relief, which are not barred by 11th Amendment immunity. Thus in Garrett v. University of Alabama, the court stated;

> Our holding here that Congress did not validly abrogate the states' sovereign immunity from suit by private individuals for money damages under Title I does not mean that persons with disabilities have no federal recourse against discrimination. … Those standards can be enforced by the United States in actions for money damages, as well as by private individuals in actions for injunctive relief.

Id at section 9  See also Neal v. East Tennessee State University 2008 WL 4065933 (E.D. Tenn. 2008)

3

Ironically, the very cases which the Commonwealth relies on in its Motion for Stay support the Plaintiffs' position here that a stay is not permitted when injunctive relief constitutes part of Plaintiffs' claims. For example the Commonwealth relies on Hegarty v. Somerset County 25 F.3rd. 17, 18 (1st Cir. 1994) for the proposition that where the court denies qualified immunity, it is error for the District Court not to stay proceedings pending appeal. Yet Hegerty was an action solely for monetary damages and the First Circuit. properly pointed out that:

> We also point out that the underlying case is one for monetary damages only and does not request injunctive relief, as to which a defense of qualified immunity is immaterial. cf. Lugo v. Alvarado 8 19 F. 2nd 5 (1st Cir. 1987)(concluding that equitable claims stand on a different footing than damage claims…).

Id. at 18. In short, the defendants' request for a stay must be denied because it is patently meritless. As the Commonwealth itself says in its Motion, the granting of a stay pending appeal is necessary where the claim is for damages only because "whether Plaintiffs' claims should proceed to trial is precisely the aspect of the case over which this Court now lacks jurisdiction" (See Commonwealth's motion at pp 1-2). Yet, where a significant part of the case is for injunctive relief as is here, even if there were 11th Amendment immunity (which there is not as discussed below) over Plaintiffs' claims for back pay and benefits under Title VII, there is still going to be a trial before this court on whether or not the examinations at issue here are discriminatory, and whether the Commonwealth must remedy those unlawful acts. Thus, it is not a question of "jurisdiction" at all,

but simply a question about whether Plaintiffs will be limited to injunctive relief or can proceed with their back pay claims. Therefore the very purpose for granting a stay pending an interlocutory appeal from the denial sovereign immunity simply does not exist. This point alone requires the motion to be denied. Since trial will occur anyway, the question of whether or not damages may be awarded by the Court on remedy (in the form of back pay and benefits) is an issue which can be appealed by the Commonwealth in due course, especially in this case where the court has bifurcated the trial on liability from any trial on damages. (See this court's order of June 8, 2008.)

**III.    BECAUSE THE LAW IS CLEAR THAT THE COMMONWEALTH IS SUBJECT TO LIABILITY UNDER TITLE VII AND BECAUSE THE ISSUE RAISED BY THE COMMONWEALTH IS NOT ONE THAT CAN BE DECIDED AS A MATTER OF LAW, THE REQUEST FOR STAY PENDING INTERLOCUTORY APPEAL MUST BE DENIED:**

In its motion for summary judgment, the Commonwealth spent only a few pages arguing that even if it were held to be an employer for Title VII purposes under the facts of this case, there was no clear intent by Congress to waive the state's immunity for this type of case where the state is designing and administering a promotional exam that is discriminatory. With all due respect this argument lacks any merit. First, it is simply beyond dispute that acting pursuant to Section 5 of the 14th Amendment, Congress specifically intended to waive a state's sovereign immunity when it is sued for race discrimination under Title VII of the Civil Rights Act of 1964. See In Re: Employment Discrimination Against the State of Alabama 198 F.3rd 1305 (11th Cir. 1999). (Noting that in Fitzpatrick v.

5

Bitzer 427 US 445, 449 (1976), Supreme Court specifically noted that Congress had expressly waived a state's 11th Amendment immunity for violations of the race discrimination provisions of Title VII). While this should be dispositive of the Commonwealth's interlocutory appeal, it appears to make a more refined argument that given the type of case at issue here – the Commonwealth creating and administering promotional exams which have a disparate impact – Congress did not expressively waive the sovereign immunity of the states. The short answer to this question is that the 11th Cir. specifically held in In Re: Employment Discrimination Litigation against the State of Alabama supra that disparate impact – promotional and entry level examination claims can be brought against a state under Title VII and that the abrogation of 11th Amendment immunity is no different for the state in such instances then are claims for intentional discrimination.  Id at 1317-1320.  Indeed, the Commonwealth cites no case in its brief, and Plaintiffs can locate no case, which stands for the proposition that for some race discrimination cases under Title VII, Congress did not abrogate a state's sovereign immunity.

In addition, as Plaintiffs pointed out in their Opposition to the Commonwealth's Motion for Summary Judgment, the question of who is an employer for Title VII purposes is at best a mixed question of fact and law, and the Plaintiffs presented overwhelming and persuasive evidence as to why under the facts of this case the Commonwealth was an employer for Title VII purposes and should be treated as such.  They relied in significant part upon the detailed

findings made by Judge Saris in <u>Bradley v. City of Lynn</u> 403 F. Sup. 2nd 161 (D. Mass. 2005).

This Circuit has made clear that where the question of whether immunity applies requires factual findings and those findings are disputed, it is not appropriate to stay litigation and trial of a case pending appeal to the First Circuit. This issue was extensively analyzed in <u>Rivera – Torres v. Ortiz Valez</u> 341 F.3rd 86 (1st Cir. 2003). There the First Circuit, relying on the Supreme Court decisions of <u>Griggs v. Provident Consumer Discount Company</u> 459 U.S. 56, 58 (1982), and <u>Mitchell v. Forsyth</u> 472 U.S. 511 (1985), delineated three exceptions to the automatic divestiture of jurisdiction when an interlocutory immunity appeal is filed. First, the Court made clear the claim of immunity must "turn on an issue of law". Thus, where the question of immunity may turn on an "unresolved issue of material fact" it is not immediately appealable. <u>Rivera – Torres</u> *supra* at 95. See also <u>Stella v. Kelley</u> 63 F.3rd 71, 74 (1st Cir. 1995) ("a District Court's...rejection of a qualified immunity defense is not immediately appealable to the extent that it turns on either an issue of fact or an issue perceived by the trial court to be an issue of fact").

Second, filing of such interlocutory appeal confers jurisdiction on the Court of Appeals and divests the District Court of control only "over those aspects of the case involved in the appeal". Id at 96. As demonstrated above, at best, since the only possible immunity which could even be asserted by the Commonwealth is immunity from damages, the injunctive aspects of this case must proceed unabated. Third, where the District Court finds that the filing of the interlocutory

7

appeal is "patently meritless" it may hold that it is not deprived of jurisdiction in the first instance.  See <u>Rivera – Torres v. Ortiz Valez</u> at p. 95-96, see also <u>United States v. Brooks</u> 145 F.3rd 446, 456 (1st Cir. 1998).

In the present case, the Plaintiffs can easily demonstrate that all three exceptions apply. First, as demonstrated above, the Commonwealth's interlocutory appeal is patently meritless because 1) Plaintiffs seek injunctive relief and there is no 11th Amendment immunity for the Plaintiff's claims for injunctive relief and 2) Congress has clearly waived the state's sovereign immunity for 11th Amendment purposes enacted Title VII and made states subject to Title VII in its 1972 Amendments. Independently, either of these arguments would be sufficient for the Court to deny a Stay of the Commonwealth's interlocutory appeal, but taken together, they destroy any claim by the Commonwealth that its interlocutory appeal has merit.

Moreover, even if the Commonwealth could get by the "patently meritless" problem, it still cannot escape the fact that the question of the Commonwealth's 11th Amendment immunity here is necessarily tied up in the many facts surrounding the extensive command and control which the Commonwealth has over the civil service system in the Commonwealth of Massachusetts, and specifically the control which it exerts over entry level hirings and promotions of police officers and firefighters in the Commonwealth of Massachusetts.  Since the Commonwealth argued in its Summary Judgment brief that it had no such extensive control and Plaintiffs, relying on <u>Bradley v. City of Lynn</u>, argued to the

contrary, it is difficult to see how this questions turns on a purely legal question and therefore under Rivera-Torres, an interlocutory appeal is not appropriate.

**VI.    Conclusion**

The Court should deny the Motion to Stay Proceedings.

Respectfully submitted,

Pedro Lopez, et al. on behalf of himself and on behalf of a class of persons similarly situated,

By their attorneys

Dated:  May 12, 2009

/s/ Harold L. Lichten
Harold L. Lichten, BBO #549689
Shannon Liss-Riordan, BBO # 640716
Pyle, Rome, Lichten, Ehrenberg &
 Liss-Riordan, P.C.
18 Tremont St., Ste. 500
Boston, MA 02108
(617) 367-7200

**CERTIFICATE OF SERVICE**

I hereby certify that on May 12, 2009, I caused a copy of this document to be served by electronic filing on all counsel of record.

/s/ Harold L. Lichten

9