No. 09-1664

# United States Court of Appeals
## for the First Circuit

————————

PEDRO LOPEZ, ET AL.,
*Plaintiffs-Appellees*,

*v.*

COMMONWEALTH OF MASSACHUSETTS, ET AL.,
*Defendants-Appellants.*

————————

APPEAL FROM A DECISION OF THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

————————

**BRIEF OF COMMONWEALTH OF MASSACHUSETTS AND
PAUL DIETL, IN HIS CAPACITY AS CHIEF HUMAN RESOURCES
OFFICER OF THE HUMAN RESOURCES DIVISION**

————————

MARTHA COAKLEY
*Attorney General
of Massachusetts*
Sookyoung Shin
*Assistant Attorney General*
Government Bureau
One Ashburton Place
Boston, Massachusetts 02108
(617) 963-2052
1st Cir. No. 108199

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................... iii

JURISDICTIONAL STATEMENT .................................................. 1

STATEMENT OF THE ISSUE ............................................................ 2

STATEMENT OF CASE ..................................................................... 3

STATEMENT OF FACTS ................................................................... 5

     I.     THE PROMOTIONAL PROCESS UNDER THE
          MASSACHUSETTS CIVIL-SERVICE SYSTEM ............................. 5

          A.     HRD's Role is One of Oversight and Regulation, Not
                 Making Personnel Decisions or Acting as an Employer. .......... 5

          B.     Municipal Appointing Authorities May Use Other
                 Testing Components in Addition to, or in Lieu of, the
                 Sergeant Promotional Examination Administered by
                 HRD. ....................................................................................... 7

          C.     HRD Does Not Make Promotional Decisions or
                 Otherwise Control Any Aspect of Municipal Police
                 Officers' Employment. ............................................................ 8

     II.    UNDISPUTED FACTS ESTABLISHING LACK OF
          EMPLOYMENT RELATIONSHIP BETWEEN PLAINTIFFS
          AND HRD ...................................................................................... 10

SUMMARY OF ARGUMENT ......................................................... 11

STANDARD OF REVIEW ................................................................ 12

ARGUMENT ...................................................................................... 13

     I.     THIS COURT HAS JURISDICTION OVER THIS APPEAL. ......... 13

          A.     A Ruling from this Court that the Commonwealth is
                 Immune from Title VII Liability Would Dispose of All
                 Claims, Including Those for Injunctive Relief, Against
                 Both State Defendants.............................................................. 14

B.  This Appeal Does Not Turn on any Disputed Issues of Material Fact. .................................................................18

C.  This Appeal Properly Raises a Question of Eleventh Amendment Immunity. ...........................................................20

II.  THE ELEVENTH AMENDMENT BARS ALL OF PLAINTIFFS' CLAIMS AGAINST THE STATE DEFENDANTS. ...................................................................21

A.  The Eleventh Amendment Bars Plaintiffs' Claims Because, as Plaintiffs Have Conceded, HRD is Not Their Employer .................................................................24

B.  The Eleventh Amendment Bars Plaintiffs' Alternative Theories of Liability .................................................31

1.  Congress Has Expressed No Intent to Expose States to Title VII Liability for Allegedly Interfering With an Individual's Employment Relationship With a Third Party. ...................................31

2.  Congress Has Expressed No Intent to Parse the Employment Relationship Such that a State Can Be Deemed an "Employer" With Respect to One Aspect of the Relationship Only ...................................39

C.  With the Exception of the Ninth Circuit's Decision in AMAE, Every Circuit-Court Case on This Issue Supports the State Defendants' Position ...................................43

CONCLUSION ...................................................................46

ii

## <u>TABLE OF AUTHORITIES</u>

**Cases**

Alberty-Velez v. Corporacion de Puerto Rico Para la Difusion Publica,
   361 F.3d 1 (1st Cir. 2004)................................................. 25, 26, 27, 42

Alden v. Maine, 527 U.S. 706 (1999) ......................................................21

Ass'n of Mexican-Am. Educators v. California,
   231 F.3d 572 (9th Cir. 2000) ................................................. 38, 44, 45

Atascadero State Hosp. v. Scanlon,
   473 U.S. 234 (1985)..................................................................... passim

Bd. of Trustees of Univ. of Ala. v. Garrett,
   531 U.S. 356 (2001)..............................................................................21

Bradley v. City of Lynn,
   403 F.Supp.2d 161 (D. Mass. 2005) ...................................... 39, 40, 42

Camacho v. Puerto Rico Ports Auth.,
   369 F.3d 570 (1st Cir. 2004)........................................................ passim

Carparts Distrib. Ctr., Inc. v. Auto Wholesalers Ass'n of New England,
   37 F.3d 12 (1st Cir. 1994)............................................................ 39, 40

City of Cambridge v. Civil Serv. Comm'n,
   682 N.E.2d 923 (Mass. App. Ct. 1997) ...............................................33

Community for Creative Non-Violence v. Reid,
   490 U.S. 730 (1989)..............................................................................26

Conroy v. City of Phila.,
   421 F.Supp.2d 879 (E.D. Pa. 2006) .......................................... 30, 43

DeLarmi v. Borough of Fort Lee,
   334 A.2d 349 (N.J. Super. 1975) .........................................................32

Dellmuth v. Muth,
  491 U.S. 223 (1989)...................................................................................... passim

Donahue v. City of Boston,
  371 F.3d 7 (1st Cir. 2004)..................................................................................34

EEOC v. Illinois,
  69 F.3d 167 (7th Cir. 1995) ............................................................ 30, 34, 37, 44

Ex parte Young,
  209 U.S. 123 (1908)........................................................... 11, 15, 16, 18

Fields v. Hallsville Indep. Sch. Dist.,
  906 F.2d 1017 (5th Cir. 1990) .................................................................. 30, 44

Fitzpatrick v. Bitzer,
  427 U.S. 445 (1976)............................................................................. 22, 25, 31

Fitzpatrick v. Bitzer,
  390 F.Supp. 278 (D. Conn. 1974) ....................................................................25

Garcia v. Akwesasne Housing Auth.,
  268 F.3d 76 (2d Cir. 2001)................................................................................15

Garrett v. Univ. of Ala.,
  531 U.S. 356 (2001)..........................................................................................16

George v. N.J. Bd. of Veterinary Med. Examiners,
  635 F. Supp. 953 (D.N.J. 1985) aff'd 794 F.2d 113 (3d Cir. 1986).............. 30, 44

Gulino v. N.Y. State Educ. Dep't,
  460 F.3d 361 (2d Cir. 2006)...................................................................... passim

Haddock v. Bd. of Dental Examiners of Cal.,
  77 F.2d 462 (9th Cir. 1985) ...................................................................... 30, 35, 44

Hancock v. Comm'r of Educ.,
  822 N.E.2d 1134 (Mass. 2005) .........................................................................38

iv

Kimel v. Fla. Bd. of Regents,
    408 U.S. 62 (2000) ...............................................................................16

Lavender-Cabellero v. Dep't of Consumer Affairs,
    458 F. Supp. 213 (S.D.N.Y. 1978) .....................................................35

Mills v. State of Maine,
    118 F.3d 37 (1st Cir. 1997)...................................................................18

Mullins v. Dep't of Labor,
    2009 WL 1059208 (D. Puerto Rico Mar. 9, 2009)..............................16

Nat'l Org. for Women v. Waterfront Comm'n of N.Y. Harbor,
    468 F. Supp. 317 (S.D.N.Y. 1979) ......................................... 30, 35, 36

Nationwide Mutual Ins. Co. v. Darden,
    503 U.S. 318 (1992)..............................................................................41

Neal v. East Tenn. State Univ.,
    2008 WL 4065933 (E.D. Tenn. 2008) ..................................................16

Negron-Almeda v. Santiago,
    528 F.3d 15 (1st Cir. 2008)...................................................................18

Papasan v. Allain,
    478 U.S. 265 (1986)....................................................................... 16, 18

Pennhurst State Sch. & Hosp. v. Halderman,
    465 U.S. 89 (1984)........................................................................... 4, 21

Puerto Rico Aqueduct & Sewer Authority v. Metcalf & Eddy,
    506 U.S. 139 (1993)................................................................... passim

Redondo Const. Corp. v. Puerto Rico Highway & Transp. Auth.,
    357 F.3d 124 (1st Cir. 2004).................................................................11

Ricci v. DeStefano,
    129 S.Ct. 2658 (2009) .................................................................. 24, 31

Seminole Tribe of Fla. v. Florida,
    517 U.S. 44 (1996)................................................................22

Sibley Memorial Hosp. v. Wilson,
    488 F.2d 1338 (D.C. Cir. 1973).........................................35

Sullivan v. City of Springfield,
    561 F.3d 7 (1st Cir. 2009)..................................................32

Sunshine Dev., Inc. v. FDIC,
    33 F.3d 106 (1st Cir. 1994)................................................36

Toledo v. Sanchez,
    454 F.3d 24 (1st Cir. 2006)................................................13

Town of Falmouth v. Civil Service Comm'n,
    857 N.E.2d 1052 (Mass. 2006) ........................................ 6-7

Town of Falmouth v. Civil Serv. Comm'n,
    814 N.E.2d 735 (Mass. App. Ct. 2004) ........................... 6, 7, 9, 32, 33

United States v. Bass,
    404 U.S. 336 (1971) .........................................................22

United States v. Mendoza,
    464 U.S. 154 (1984)..........................................................40

United States v. Bd. of Educ. for the Sch. Dist. of Phila.,
    911 F.2d 882 (3d Cir. 1990)........................................... 36, 44

United States v. N.Y. State Dep't of Motor Vehicles,
    82 F.Supp.2d 42 (E.D.N.Y. 2000) ....................................30

Whalen v. Mass. Trial Court,
    397 F.3d 19 (1st Cir. 2005).............................................. 15, 16, 18

Woodard v. Bd. of Bar Examiners,
    598 F.2d 1345 (4th Cir. 1979) ..........................................44

**Federal Statutes**

28 U.S.C. § 1331 ...................................................................................1

42 U.S.C. § 2000e .................................................................1, 24, 34

42 U.S.C. § 2000e-2 ...........................................................................24

42 U.S.C. § 2000e-6 ...........................................................................36

**Massachusetts Statutes**

Mass. Gen. Laws ch. 31, § 1 ..........................................................6, 7

Mass. Gen. Laws ch. 31, § 2 ........................................................6, 10

Mass. Gen. Laws ch. 31, § 3 ..........................................................5, 6

Mass. Gen. Laws ch. 31, § 5 ..............................................................5

Mass. Gen. Laws ch. 31, § 6C ..........................................................10

Mass. Gen. Laws ch. 31, § 7 ..............................................................8

Mass. Gen. Laws ch. 31, § 9 ..............................................................7

Mass. Gen. Laws ch. 31, § 10 ............................................................7

Mass. Gen. Laws ch. 31, § 11 ........................................................3, 7

Mass. Gen. Laws ch. 31, § 24 ..........................................................10

Mass. Gen. Laws ch. 31, § 27 ............................................................9

Mass. Gen. Laws ch. 31, § 35 ..........................................................10

Mass. Gen. Laws ch. 31, § 41 ....................................................10, 33

Mass. Gen. Laws ch. 31, § 42 ............................................................... 10, 33

Mass. Gen. Laws ch. 31, § 43 ............................................................... 10, 33

Mass. Gen. Laws ch. 31, § 44 ....................................................................... 33

Mass. Gen. Laws ch. 31, § 53 ......................................................................... 7

Mass. Gen. Laws ch. 31, § 54 ......................................................................... 7

Mass. Gen. Laws ch. 31, § 55 ......................................................................... 7

Mass. Gen. Laws ch. 31, § 59 .................................................................... 7, 42

Mass. Gen. Laws ch. 31, § 61A ..................................................................... 33

Mass. Gen. Laws ch. 41, § 96B ..................................................................... 34

Mass. Gen. Laws ch. 112, § 3 ........................................................................ 38

Mass. Gen. Laws ch. 112, § 24 ...................................................................... 38

Mass. Gen. Laws ch. 112, § 45 ...................................................................... 38

Mass. Gen. Laws ch. 112, § 74 ...................................................................... 38

Mass. Gen. Laws ch. 151B, § 4 ....................................................................... 4

Mass. Gen. Laws ch. 221, § 37 ...................................................................... 38

## Legislative Materials

86 Stat. 103 .................................................................................................. 24

H.R. Rep. 92-238 (1972), 1972 U.S.C.C.A.N. 2137 ................................... 36

**Court Rules**

United States District Court Local Rule 56.1 .....................................................5, 10

**Massachusetts Administrative Decisions**

Boston Police Superior Officers Fed'n v. Boston Police Dep't & HRD,
    Civil Serv. Comm'n case nos. G-02-143 (2005) and I-02-606 (2008)..................6

## JURISDICTIONAL STATEMENT

Plaintiffs brought this action under Title VII, 42 U.S.C. § 2000e, claiming

that sergeant promotional examinations administered by the Massachusetts Human

Resources Division ("HRD") had a disparate impact on minorities. The district

court had subject-matter jurisdiction under 28 U.S.C. § 1331.

The state defendants, the Commonwealth of Massachusetts and Paul Dietl in

his capacity as Chief Human Resources Officer of HRD, moved to dismiss for lack

of jurisdiction or in the alternative for summary judgment, arguing in part that the

claims against them are barred by the Eleventh Amendment. Record Appendix

("R.A.") 52-85. The district court denied the motion on April 7, 2009. District Ct.

Order (Apr. 7, 2009) (attached in Addendum). On May 4, 2009, the state

defendants filed a timely notice of appeal from that part of the court's order that

denied their motion to dismiss under the Eleventh Amendment. R.A. 178-79. The

appeal was permitted as of right under Puerto Rico Aqueduct & Sewer Authority v.

Metcalf & Eddy, 506 U.S. 139, 142-45 (1993), which holds that States and state

entities may take immediate appeals from a district court order denying a claim of

Eleventh Amendment immunity.

On May 18, 2009, plaintiffs filed a motion to dismiss the appeal on grounds

that it is "patently meritless." Plaintiffs-Appellees' Mot. to Dismiss Appeal (May

18, 2009) ("Pl.'s Mot."). On July 1, 2009, this Court ordered that plaintiffs'

motion be deferred to the panel scheduled to hear oral argument and further directed the parties "to address both the jurisdictional issue and the merits in their briefing." Order (July 1, 2009). Accordingly, further discussion of this Court's jurisdiction is set forth in Part I of the Argument section below.

## STATEMENT OF THE ISSUE

In order to abrogate the States' Eleventh Amendment immunity, Congress must make its intent to do so "unmistakably clear in the language of the statute." Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 242 (1985). Plaintiffs here are police officers employed by various civil-service municipalities across the Commonwealth. They concede that HRD does not hire, pay, train, transfer, assign work to, set work schedules for, supervise, discipline, or terminate municipal police officers or otherwise exercise any day-to-day control over their work activities. The issue on appeal is:

Whether plaintiffs' Title VII claims against the state defendants are barred under the Eleventh Amendment, where the statute only imposes liability on States and their agencies for prohibited discrimination against their own employees and makes no mention of non-employer States acting in a regulatory capacity.

## <u>STATEMENT OF CASE</u>

Plaintiffs—Hispanic and African-American police officers employed by the cities of Boston, Lawrence, Methuen, Springfield, and Worcester, and by the Massachusetts Bay Transportation Authority ("MBTA")—brought this Title VII action against the state defendants, claiming that sergeant promotional exams administered by HRD in 2005, 2006 and 2007 were not job-related and had an adverse impact on minorities. R.A. 38-51. Plaintiffs also named as defendants their respective municipal employers,[1] claiming that, "although any municipality covered by the civil service law, M.G.L. ch. 31, has the right under M.G.L. ch. 31, § 11 to conduct its own alternative police sergeant promotional examination which could be professionally validated and have significantly less discriminatory impact[,] in virtually all civil service municipalities which are covered by this lawsuit, the HRD examination was used without modification." R.A. 49 ¶ 82.

In January 2009 the state defendants filed a motion to dismiss for lack of jurisdiction or in the alternative for summary judgment, arguing in part that the

---

[1] For simplicity, this brief will refer to the other defendants, including the MBTA, collectively as the "municipalities" or the "municipal" defendants.

claims against them are barred by the Eleventh Amendment.  R.A. 61-73.[2]  On

April 7, 2009, the district court (Tauro, J.) denied the motion in its entirety without

hearing, in a one-sentence order stating: "After reviewing Parties' submissions,

this court hereby orders the following: 1. State Defendants' Motion to Dismiss

[#142] is DENIED."  District Ct. Order (Apr. 7, 2009).[3]  The court thereafter

issued a pre-trial order setting the case for trial as early as June 15, 2009.  R.A. 32;

see Pre-Trial Order (April 21, 2009) (Paper No. 172).

On May 4, 2009, the state defendants appealed from that part of the court's

order that denied their motion to dismiss under the Eleventh Amendment.  R.A.

178-79.  The state defendants then moved the district court to stay all proceedings

until the immunity question was resolved on appeal, arguing that the filing of the

notice of appeal divested the court of jurisdiction to proceed to trial.  R.A. 33; see

State Defs.' Mot. to Stay Proceedings Pending Appeal (May 12, 2009) (Paper No.

---

[2]  The state defendants also argued that some of plaintiffs' claims were barred by
the statute of limitations.  R.A. 73-83.

[3]  In addition to their claims under Title VII, plaintiffs had alleged violations of
state anti-discrimination law, Mass. Gen. Laws ch. 151B, § 4.  The state defendants
moved to dismiss that claim on grounds that the Eleventh Amendment bars federal
courts from instructing state officials on how to conform their conduct to state law.
R.A. 83-84 (citing Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 106
(1984)).  In response plaintiffs consented to dismissal and refiled their state-law
claim in Superior Court.  Pls.' Reply to Defendants-Appellants' Opp. to Mot. to
Dismiss Appeal (June 5, 2009) ("Pls.' Reply") at 4 n.1.

4

175).  On May 13, 2009, the district court granted the state defendants' motion and ordered that all proceedings be stayed until 30 days after the mandate issues from this Court.  R.A. 34.

## STATEMENT OF FACTS

## I.    THE PROMOTIONAL PROCESS UNDER THE MASSACHUSETTS CIVIL-SERVICE SYSTEM

### A.    HRD's Role is One of Oversight and Regulation, Not Making Personnel Decisions or Acting as an Employer.

HRD is charged by statute with certain responsibilities in implementing the civil-service system, including the preparation and administration of civil-service examinations.  <u>See</u> Mass. Gen. Laws ch. 31, § 5; R.A. 110 ¶ 1, 174.[4]  In addition, HRD is empowered to "make and amend rules which shall <u>regulate</u> recruitment, selection, training and employment of persons for civil service positions."  Mass. Gen. Laws ch. 31, § 3 (emphasis added); R.A. 110 ¶ 2, 174.

The Massachusetts Civil Service Commission ("Commission"), not named as a defendant in this action, is a distinct state agency from HRD that has different responsibilities within the civil-service system, primarily involving the

_____

[4]  Citations to plaintiffs' Local Rule 56.1 statement are included to demonstrate that the facts are not in dispute.  Under District Court Local Rule 56.1, facts set forth in the moving party's statement "will be deemed for purposes of the motion to be admitted by opposing parties unless controverted by the statement required to be served by opposing parties."

adjudication of disputes between employees and their employers.  See Mass. Gen. Laws ch. 31, § 2; R.A. 110 ¶ 3, 174.  In the past the Commission has specifically adjudicated disputes regarding the content or administration of police promotional examinations.  See, e.g., Boston Police Superior Officers Fed'n v. Boston Police Dep't & HRD, Civil Serv. Comm'n case nos. G-02-143 (2005) and I-02-606 (2008), located at R.A. 86-101.  The Commission also has the authority to disapprove rules proposed, or other actions taken, by HRD.  See Mass. Gen. Laws ch. 31, § 3; R.A. 111 ¶ 4, 174.

The fundamental purpose of the civil-service system is "to guard against political considerations, favoritism, and bias in governmental employment decisions."  Town of Falmouth v. Civil Service Comm'n, 857 N.E.2d 1052, 1059 (Mass. 2006) (quotation marks omitted).  By focusing on "basic merit principles" as defined in Mass. Gen. Laws ch. 31, § 1,[5] the system encourages employers— referred to as "appointing authorities," id.—to make personnel decisions free of "overtones of political control or objectives unrelated to merit standards or neutrally applied public policy."  Town of Falmouth v. Civil Service Comm'n, 814

_____

[5]  Section 1 defines "basic merit principles" to include "assuring fair treatment of all applicants and employees in all aspects of personnel administration without regard to political affiliation, race, color, age, national origin, sex, marital status, handicap, or religion and with proper regard for privacy, basic rights outlined in this chapter and constitutional rights as citizens."

N.E.2d 735, 739 (Mass. App. Ct. 2004).  It is not within the authority of HRD or

the Commission to "substitute [their] judgment about a valid exercise of discretion

based on merit or policy considerations by an appointing authority."  Id.  Thus,

both agencies' role in the system is one of oversight and regulation, not of

personnel decision-making.  See id.

### B.     Municipal Appointing Authorities May Use Other Testing Components in Addition to, or in Lieu of, the Sergeant Promotional Examination Administered by HRD.

Municipal police officers, such as plaintiffs in this case, are hired and paid

wages not by HRD, but by the various municipal appointing authorities across the

Commonwealth.  R.A. 105 ¶ 18, 114 ¶ 26, 175.  These officers hold "civil service

position[s]" if their municipal employer has accepted the applicability of the civil-

service law and rules.  Mass. Gen. Laws ch. 31, § 1; see id. §§ 53-55.  Promotional

appointments of police officers "shall be made only after competitive

examination," with some exceptions not applicable here.  Id. § 59.

HRD prepares, administers, and scores a written promotional examination

for police sergeants every year and then releases rank-ordered eligible lists of all

passing candidates.  R.A. 102 ¶ 2, 111 ¶ 8, 174.  Municipalities may elect to use

HRD's examination or, as plaintiffs concede in their complaint, may "conduct

[their] own alternative police sergeant promotional examination."  R.A. 49 ¶ 82;

Mass. Gen. Laws ch. 31, §§ 9-11.  In fact, several municipalities (including

7

defendant Springfield) have entered into delegation agreements with HRD,
allowing them to use other testing components in addition to, or in lieu of, HRD's
written exam, and/or to institute their own promotional processes.  R.A. 103 ¶ 5,
112 ¶ 11, 174.  For example, in 2007, Leominster and Salem supplemented HRD's
exam with "assessment centers," in which candidates are evaluated based on their
performance in job simulations.  R.A. 103 ¶ 6, 112 ¶ 13, 175.  Further, in 2002,
defendant Boston hired a testing consultant and prepared and administered its own
promotional examination.  R.A. 103 ¶ 8, 112 ¶ 14, 175.

### C. HRD Does Not Make Promotional Decisions or Otherwise Control Any Aspect of Municipal Police Officers' Employment.

When a municipality wishes to make a promotional appointment, it will
submit a requisition to HRD, which will in turn issue a certification list ranking the
persons eligible for promotion.  Mass. Gen. Laws ch. 31, § 7; R.A. 104 ¶ 10, 113
¶ 17, 175.[6]  For municipalities that have entered into full delegation agreements,
technical assistance and oversight might be HRD's only role with regard to the
promotional process.  R.A. 104 ¶ 11, 113 ¶ 18, 175.  Typically, HRD does not
receive any information from delegated communities with respect to promotions
that those communities ultimately choose to make.  R.A. 104 ¶ 11, 113 ¶ 18, 175.

---

[6]  HRD never takes the race, color, or national origin of candidates into account
when scoring exams and, with respect to the exams being challenged here, race,
color, and national origin played no role in the establishment or certification of the
eligible lists.  R.A. 104 ¶ 10, 113 ¶ 20, 175.

Even absent a delegation agreement, it is the municipality's responsibility, not HRD's, to make the actual promotion decisions.  R.A. 105 ¶ 13, 113-14 ¶ 21, 175.  In so doing, the municipality may consider not only an individual's standing on a certification list but also his/her job performance, interview performance, education, specialized skills, criminal history, and disciplinary history.  R.A. 105 ¶ 13, 113-14 ¶ 21, 175.  Further, under Mass. Gen. Laws ch. 31, § 27, an appointing authority may bypass a person on the list and select someone with a lower score, so long as it submits a written statement of reasons for the bypass to HRD.  R.A. 105 ¶ 14, 114 ¶ 22, 175.  HRD will review the statement but will not "substitute its judgment about a valid exercise of discretion based on merit or policy considerations by an appointing authority."  Town of Falmouth, 814 N.E.2d at 739; see R.A. 105 ¶ 15, 114 ¶ 23, 175.  Thus, for example, HRD generally will approve as sound and sufficient any request by a municipality to bypass a candidate based on a legitimate arrest or pending criminal charges.  R.A. 105 ¶ 16, 114 ¶ 24, 175.

In addition to promotion decisions, municipalities control all other relevant aspects of their police officers' employment.  As mentioned, the municipality, not HRD, hires and pays its officers.  R.A. 105 ¶ 18, 114 ¶ 26, 175.  HRD also does not train, transfer, assign work to, set work schedules for, supervise, discipline, or fire municipal police officers, and does not pay them fringe benefits, worker's

9

compensation insurance, or ERISA benefits.  R.A. 105-06 ¶ 21, 114 ¶ 29, 175.

Moreover, disputes between officers and their municipal employers relating to

application of the civil-service laws are adjudicated by the Commission, not by

HRD.  See Mass. Gen. Laws ch. 31, §§ 2, 6C, 24, 35, 41-43; R.A. 106 ¶ 23, 115

¶ 31, 175.

## II.    UNDISPUTED FACTS ESTABLISHING LACK OF EMPLOYMENT RELATIONSHIP BETWEEN PLAINTIFFS AND HRD

According to the complaint, each of the plaintiffs took HRD's sergeant

promotional examination in 2005, 2006 or 2007, but has not, of date, been selected

for promotion.  R.A. 39 ¶ 1.  The complaint concedes that plaintiffs work for the

respective municipal defendants, not HRD.  R.A. 40-44 ¶¶ 3-48.  The complaint

further concedes that the municipalities, not HRD, "are responsible for the

promotional appointments of" their police officers.  R.A. 44 ¶ 49, 45 ¶ 51, 45 ¶ 53,

45 ¶ 55, 46 ¶ 71.

In opposing the state defendants' motion to dismiss or for summary

judgment, plaintiffs conceded several additional facts that were set out in the state

defendants' Local Rule 56.1 statement.  Specifically, plaintiffs did not dispute that:

(1) the municipal appointing authority, not HRD, "hires and pays" its police

officers; (2) "HRD does not exercise any day-to-day control over plaintiffs' work

activities"; (3) "plaintiffs obtain no financial benefit from HRD"; (4) "HRD does

10

not train, transfer, assign work to, set work schedules for, supervise, discipline, or

fire municipal police officers, and does not pay them fringe benefits, worker's

compensation insurance, or ERISA benefits"; and (5) HRD "has no authority to

terminate [plaintiffs'] employment."  R.A. 114 ¶ 26, 114 ¶¶ 28-30, 175.

## **SUMMARY OF ARGUMENT**

This is a proper interlocutory appeal under <u>Puerto Rico Aqueduct</u>, which

entitles States and state entities to immediate review of a district court's denial of

Eleventh Amendment immunity.  506 U.S. at 147.  Were the state defendants to

prevail on appeal, the doctrine of <u>Ex parte Young</u>, 209 U.S. 123 (1908), would not

preserve any of plaintiffs' claims for injunctive relief because, if HRD cannot be

sued here under Title VII, there would be no ongoing violation of federal law for

the district court to enjoin.  Further, contrary to plaintiffs' assertions, this appeal

does not involve any disputed issues of material fact and properly raises a question

of Eleventh Amendment immunity.  <u>See</u> pp. 13-21.

In order to abrogate Eleventh Amendment immunity, Congress must

specifically and unequivocally state its intention in the language of the statute.  The

plain language of Title VII only imposes liability on States and their agencies for

prohibited discrimination against their own employees, and plaintiffs here have

conceded that they have no employment relationship with HRD.  Their claims thus

11

do not fall within Title VII's limited abrogation of the States' Eleventh

Amendment immunity.  See pp. 21-31.

The Eleventh Amendment forecloses plaintiffs' reliance on alternative

theories of Title VII liability that, plaintiffs say, arise outside of a traditional

employer-employee relationship.  In particular, HRD cannot be held liable on

grounds that it "interfered" in plaintiffs' employment relationships with the

municipal defendants, or that it so extensively controlled one aspect of the

employment relationship that it can be deemed to be an employer with respect to

that aspect only.  Title VII contains no hint of Congressional intent to expand the

States' liability in such a manner.  See pp. 31-43.

This Court's decision in Camacho v. Puerto Rico Ports Auth., 369 F.3d 570,

573 (1st Cir. 2004), compels the conclusion that the state regulatory activities in

question here are insufficient to give rise to Title VII liability.  With one exception,

every circuit court to have addressed the issue concurs with Camacho.  See pp. 43-

46.

## STANDARD OF REVIEW

This Court's review of a district court's denial of Eleventh Amendment

immunity is de novo.  Redondo Const. Corp. v. Puerto Rico Highway & Transp.

Auth., 357 F.3d 124, 126 (1st Cir. 2004).

## <u>ARGUMENT</u>

## I.    THIS COURT HAS JURISDICTION OVER THIS APPEAL.

As noted above, this interlocutory appeal is permitted as of right under

<u>Puerto Rico Aqueduct</u>, which holds that "States and state entities that claim to be

'arms of the State' may take advantage of the collateral order doctrine to appeal a

district court order denying a claim of Eleventh Amendment immunity."  506 U.S.

at 147; <u>accord</u> <u>Toledo v. Sanchez</u>, 454 F.3d 24, 29-30 (1st Cir. 2006).

Nevertheless, plaintiffs moved to dismiss the appeal on grounds that it is "patently

meritless."  Their motion appeared to raise two jurisdictional arguments: (1) the

interlocutory appeal is improper because plaintiffs are seeking injunctive relief,

and so, regardless of how this Court rules on the immunity question, plaintiffs'

claims against the state defendants will still go forward to trial, Pl.'s Mot. at 2-5;

and (2) the appeal is improper because it turns on disputed issues of material fact,

<u>id.</u> at 7-10.  Further, in their reply memorandum, plaintiffs claimed that this Court

lacks jurisdiction because the issue on appeal involves a question of statutory

interpretation, not sovereign immunity.  Pls.' Reply at 2-5.  These arguments are

all meritless.  Accordingly, this Court should proceed to reach the immunity

question properly raised by the state defendants in this appeal.

A. **A Ruling from this Court that the Commonwealth is Immune from Title VII Liability Would Dispose of All Claims, Including Those for Injunctive Relief, Against Both State Defendants.**

Plaintiffs' primary argument in support of dismissal is that, because their complaint seeks injunctive relief, the state defendants are not entitled to Eleventh Amendment immunity. Pls.' Mot. at 2-5. Regardless of how this Court rules on the immunity question, plaintiffs argue, "there is still going to be a trial in District Court on whether or not the examinations at issue here are discriminatory, and whether the Commonwealth must remedy those unlawful acts." Id. at 5. This is incorrect. If the state defendants prevail in this appeal, none of plaintiffs' claims against them can go forward to trial—a point that the district court recognized when it stayed all proceedings below.

As an initial matter, absent a valid abrogation or waiver of immunity, the Commonwealth, specifically named as a defendant in this action, cannot be sued "regardless of the relief sought." Puerto Rico Aqueduct, 506 U.S. at 146. Thus, were this Court to find that Title VII does not extend to non-employer States acting in a regulatory capacity, this action could not proceed to trial against the Commonwealth, despite plaintiffs' assertion that injunctive relief is the primary focus of their case.

14

Nor could this action proceed to trial against the other state defendant, HRD's Chief Human Resources Officer Paul Dietl, in the event this Court rules that the claims against the Commonwealth are barred by the Eleventh Amendment. In an effort to identify a claim that could survive such a ruling, plaintiffs apparently seek to rely on the doctrine of Ex parte Young, 209 U.S. 123, which carves out a "narrow" exception to Eleventh Amendment immunity. Puerto Rico Aqueduct, 506 U.S. at 146; see Pls.' Mot. at 3-5. Specifically, Ex parte Young renders the Eleventh Amendment inapplicable to suits seeking to enjoin a state official from committing an "ongoing" "violation of federal law." Whalen v. Mass. Trial Court, 397 F.3d 19, 29 (1st Cir. 2005). This narrow exception would not preserve plaintiffs' Title VII claims against Dietl for two principal reasons.

First, Ex parte Young does not allow plaintiffs to avoid the Eleventh Amendment bar by suing a state official under a federal statute that imposes no obligations on him. Rather, common sense dictates that, to successfully invoke the exception, the "law under which [the plaintiff] seeks injunctive relief must apply substantively to the agency" that the official represents. Garcia v. Akwesasne Housing Auth., 268 F.3d 76, 88 (2d Cir. 2001) (plaintiff "would not be permitted to pursue injunctive relief" against officer of tribal housing authority "if she had sued the [authority] under Title VII of the Civil Rights Act, because that law

15

specifically exempts 'an Indian tribe' from its prohibitions"). Here, if the Court rules that HRD is not plaintiffs' "employer" under Title VII, neither it nor Dietl would have any obligations under that statute. And in such a case, Ex parte Young would not preserve any of plaintiffs' claims for injunctive relief because there simply would be no "violation of federal law" for the district court to enjoin. Whalen, 397 F.3d at 29. Thus, contrary to plaintiffs' assertions, a favorable ruling for the Commonwealth on the Eleventh Amendment issue would likewise bar all claims in this case from proceeding to trial against Dietl.[7]

Second, the Ex parte Young exception applies only where "the relief 'serves directly to bring an end to a present violation of federal law.'" Whalen, 397 F.3d at 29 (quoting Papasan v. Allain, 478 U.S. 265, 278 (1986)) (emphasis added). The exception "does not permit judgments against state officers declaring that they violated federal law in the past." Puerto Rico Aqueduct, 506 U.S. at 146. This is precisely the type of judgment that plaintiffs are asking the district court to enter in this case. Their complaint only challenges the exams that HRD administered in

---

[7] The cases cited on pages 3-4 of plaintiffs' motion are all distinguishable because there was no dispute in those cases that the State was the actual, direct employer of the respective plaintiffs. See Garrett v. Univ. of Ala., 531 U.S. 356, 362 (2001); Kimel v. Fla. Bd. of Regents, 408 U.S. 62, 69 (2000); Mullins v. Dep't of Labor, 2009 WL 1059208, at *1 (D. Puerto Rico Mar. 9, 2009); Neal v. East Tenn. State Univ., 2008 WL 4065933, at *1 (E.D. Tenn. 2008).

16

2005, 2006 and 2007; it does not challenge the 2008 exam or any future HRD

exam. R.A. 38-51. Further, in their request for relief, plaintiffs expressly state that

they are seeking relief to "remedy[] Defendants' <u>past</u> acts of discrimination." R.A.

50-51 (emphasis added).

It is flatly untrue, as plaintiffs represent to this Court, that their complaint

"specifically describe[s] that they are seeking injunctive relief . . . which would

include both a declaration that the 2005 – 2008 promotional exams were

discriminatory, and then will include requests for 'prospective' relief, placing

officers whose Title VII rights were violated back at the top of promotional lists so

their names can be reached for promotion." Pls.' Reply at 6. As an initial matter,

the complaint does not challenge the 2008 examination. R.A. 38-51. Moreover,

nowhere in their complaint do plaintiffs seek "prospective" relief, and nowhere do

they specifically request that the officers be placed "back at the top of the lists so

their names can be reached for promotion." R.A. 38-51. In fact, during a hearing

on April 28, 2008, the district court expressly observed that plaintiffs "[hadn't]

made clear what injunctive relief [they] wanted" and therefore ordered them to

amend their complaint to clarify the nature of their requests. R.A. 36-37. In

response plaintiffs amended their complaint by adding the vague request that the

17

court award them "appropriate injunctive and declaratory relief remedying Defendants' past acts of discrimination."  R.A. 50-51.

Thus, despite plaintiffs' current assertions that this action is primarily one for prospective relief, their own complaint plainly establishes that what they are seeking is to be compensated for alleged past injuries.  See Negron-Almeda v. Santiago, 528 F.3d 15, 24 (1st Cir. 2008) (plaintiffs were barred from arguing that their complaint "impliedly" pleaded a cause of action under Ex parte Young; "a litigant cannot freely reinvent his case as he goes along").  Their claims against Dietl therefore do not fall within the Ex parte Young exception to Eleventh Amendment immunity.  See Whalen, 397 F.3d at 29-30 (despite "forward-looking nature" of plaintiff's request for seniority credit, Ex parte Young did not apply and Eleventh Amendment barred plaintiff's claims because seniority credit would "'in essence serve[] to compensate' him for past injury") (quoting Papasan, 478 U.S. at 278); cf. Mills v. State of Maine, 118 F.3d 37, 54 (1st Cir. 1997) (no declaratory or injunctive relief could issue under Ex parte Young where plaintiffs agreed that there was no continuing violation of federal law).

### B.    This Appeal Does Not Turn on any Disputed Issues of Material Fact.

Plaintiffs next claim that this appeal is improper because the question of immunity turns on unresolved issues of material fact.  See Pls.' Mot. at 7-10.  But

18

in opposing the state defendants' motion to dismiss or for summary judgment,

plaintiffs did not dispute the critical facts that (1) the municipal appointing

authority, not HRD, "hires and pays" its police officers; (2) "HRD does not

exercise any day-to-day control over plaintiffs' work activities"; (3) "plaintiffs

obtain no financial benefit from HRD"; (4) "HRD does not train, transfer, assign

work to, set work schedules for, supervise, discipline, or fire municipal police

officers, and does not pay them fringe benefits, worker's compensation insurance,

or ERISA benefits"; and (5) HRD "has no authority to terminate [plaintiffs']

employment."  R.A. 114 ¶ 26, 114 ¶¶ 28-30, 175.  Instead, plaintiffs turned to the

Massachusetts General Laws in an attempt to show that the Commonwealth as a

whole exercises "pervasive control over the employment of police officers."  R.A.

124-29.  As discussed below in Part II.B.1, plaintiffs' statutory characterizations

establish only that, as a matter of law, the Commonwealth regulates certain

functions relating to police officers, either to further the purposes of the civil-

service system or to protect public safety.  And as also discussed, Title VII does

not reach these regulatory activities because Congress did not unequivocally

declare its intent to extend the statute's scope to sovereign States in such a manner.

Accordingly, further factual findings are not necessary for the Court to

resolve this appeal.  Indeed, were further findings required, the district court would

19

presumably have retained jurisdiction instead of staying all proceedings pending

resolution of the appeal.  The immunity question is thus properly subject to

immediate review by this Court.

### C.    This Appeal Properly Raises a Question of Eleventh Amendment Immunity.

Finally, plaintiffs assert, with no supporting citations, that this is not a

proper interlocutory appeal because "the issue is not one of 'sovereign immunity'

but rather is one of the proper statutory interpretation of Title VII."  Pls.' Reply at

4.  This argument is baseless.  In any given case, resolving a claim of Eleventh

Amendment immunity will necessarily involve statutory interpretation because the

relevant inquiry is whether Congress has made its intent to abrogate "unmistakably

clear in the language of the statute."  Atascadero State Hosp. v. Scanlon, 473 U.S.

234, 242 (1985).  Here, as explained below in Part II.A, plaintiffs have conceded

facts demonstrating that HRD is not their employer; the remaining question they

seek to raise is whether HRD can nonetheless be held liable under Title VII

because it is engaging in regulatory activities that may affect plaintiffs'

employment with a third party.  In answering, the Court must look at the text of

Title VII to see if Congress has made its intent to abrogate the States' immunity to

such an extent "unmistakably clear."  Id.  This analytical framework is no different

than what has been applied in other cases involving claims of Eleventh

Amendment immunity; plaintiffs' unsupported argument otherwise should be rejected.  See, e.g., id. at 245-46 (determining whether State could be sued under provision of Rehabilitation Act authorizing remedies against "any recipient of Federal assistance").

## II.    THE ELEVENTH AMENDMENT BARS ALL OF PLAINTIFFS' CLAIMS AGAINST THE STATE DEFENDANTS.

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI.[8]  The Amendment's "ultimate guarantee" is "that nonconsenting States may not be sued by private individuals in federal court."  Bd. of Trustees of Univ. of Ala. v. Garrett, 531 U.S. 356, 363 (2001); see Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100 (1984).  This guarantee applies equally to any agency or department of the State.  Pennhurst, 465 U.S. at 100.

---

[8]  Although first incorporated in the Constitution by amendment, the canon of state sovereign immunity was implied within the very core of the constitutional document.  Alden v. Maine, 527 U.S. 706, 728-29 (1999) ("The Eleventh Amendment confirmed, rather than established, sovereign immunity as a constitutional principle; it follows that the scope of the States' immunity from suit is demarcated not by the text of the Amendment alone but by fundamental postulates implicit in the constitutional design.").

When acting pursuant to the enforcement provisions of § 5 of the Fourteenth Amendment, Congress may abrogate Eleventh Amendment immunity without the States' consent.  Fitzpatrick v. Bitzer, 427 U.S. 445, 456 (1976).  But because the Eleventh Amendment serves to maintain "the fundamental constitutional balance between the Federal Government and the States," Atascadero, 473 U.S. at 238, "it is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides the guarantees of the Eleventh Amendment."  Id. at 243.  This certainty is ensured through a "simple but stringent test: 'Congress may abrogate the States' constitutionally secured immunity from suit in federal court only by making its intention unmistakably clear in the language of the statute.'"  Dellmuth v. Muth, 491 U.S. 223, 228 (1989) (quoting Atascadero, 473 U.S. at 242); accord Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 55 (1996); see also United States v. Bass, 404 U.S. 336, 349 (1971) ("In traditionally sensitive areas, such as legislation affecting the federal balance, the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision.").

In applying this test, courts must bear in mind three settled principles.  First, evidence of Congress' intent to abrogate Eleventh Amendment immunity must be "textual"; intent cannot be inferred from the legislative history or the overall statutory purpose or structure.  Dellmuth, 491 U.S. at 230 ("If Congress' intention

22

is unmistakably clear in the language of the statute, recourse to legislative history will be unnecessary; if Congress' intention is not unmistakably clear, recourse to legislative history will be futile, because by definition the rule of <u>Atascadero</u> will not be met."). Second, the evidence of Congress' intent must be "specific[]." <u>Atascadero</u>, 473 U.S. at 246. Thus, "[a] general authorization for suit in federal court is not the kind of unequivocal statutory language sufficient to abrogate the Eleventh Amendment." <u>Id.</u> Third, the evidence must be "manifest," such that the court can say "with perfect confidence" that Congress intended to abrogate the States' Eleventh Amendment immunity. <u>Dellmuth</u>, 491 U.S. at 230-31; <u>see</u> <u>Atascadero</u>, 473 U.S. at 243 (federal courts must "rely only on the clearest indications in holding that Congress has enhanced" their jurisdiction).

These requirements are not met in this case. As explained below, nowhere in Title VII did Congress state—much less state clearly—its intent to subject States and their agencies to private actions brought by individuals with whom the State has no employment relationship. Rather, the plain language of Title VII only imposes liability on States for prohibited discrimination against their <u>own</u> employees, and plaintiffs here have conceded facts showing that HRD is not their employer under the controlling common-law agency test. Although plaintiffs try to overcome this hurdle by relying on alternative theories of liability that they say do not require the existence of an employment relationship, those arguments

23

cannot be squared with the requirement that Congress "specifically" and

"unequivocal[ly]" state when and to what extent it is intending to abrogate the

States' sovereign immunity.  <u>Dellmuth</u>, 491 U.S. at 230-31.  Thus, because it

cannot be said "with perfect confidence" that Congress intended for Title VII

liability to attach in these circumstances, plaintiffs' claims against the state

defendants must be dismissed.  <u>Id.</u> at 231.

### A.    The Eleventh Amendment Bars Plaintiffs' Claims Because, as Plaintiffs Have Conceded, HRD is Not Their Employer.

The text of Title VII's "principal nondiscrimination provision," <u>Ricci v.

DeStefano</u>, 129 S.Ct. 2658, 2672 (2009), makes it unlawful for an "employer"—

defined as "a person engaged in an industry affecting commerce who has fifteen or

more employees," 42 U.S.C. § 2000e(b)—"to limit, segregate, or classify his

employees[9] or applicants for employment in any way which would deprive or tend

to deprive any individual of employment opportunities or otherwise adversely

affect his status as an employee, because of such individual's race, color, religion,

sex, or national origin."  <u>Id.</u> § 2000e-2(a)(2).  In 1972 Congress amended the

definition of "person" to include "governments" and "governmental agencies."  86

Stat. 103, codified at 42 U.S.C. § 2000e(a).  This amendment effected a limited

abrogation of the States' Eleventh Amendment immunity such that public

---

[9]  "Employee" is defined as "an individual employed by an employer."  <u>Id.</u> § 2000e(f).

employees are now authorized to bring disparate-treatment claims against "the State <u>as employer</u>." <u>Fitzpatrick</u>, 427 U.S. at 452 (emphasis added).[10]  In order for Title VII liability to attach, however, it remains a threshold requirement that there be an "employment relationship" between the plaintiff and the entity that is allegedly discriminating against him.  <u>Camacho</u>, 369 F.3d at 573;[11] <u>see</u> <u>Alberty-Velez v. Corporacion de Puerto Rico Para la Difusion Publica</u>, 361 F.3d 1, 6 (1st Cir. 2004).

Here, plaintiffs have conceded facts demonstrating that HRD is not their employer, and so their claims do not fall within Title VII's limited override of the States' Eleventh Amendment immunity.  In determining whether an entity meets Title VII's definition of "employer," courts uniformly apply the traditional common-law agency test.  <u>Alberty-Velez</u>, 361 F.3d at 6-7; <u>see</u> <u>Camacho</u>, 369 F.3d at 574 & n.3 (applying same test in ADEA context); <u>see</u> <u>also</u> <u>Gulino v. N.Y. State Educ. Dep't</u>, 460 F.3d 361, 374 (2d Cir. 2006) ("An expansive definition of

---

[10]  The plaintiffs in <u>Fitzpatrick</u> were all current or former employees of the State, 427 U.S. at 448, and the lower court decision cited by the Court establishes that they were pressing only a disparate-treatment claim under Title VII.  <u>Fitzpatrick v. Bitzer</u>, 390 F.Supp. 278, 279-81 (D. Conn. 1974).

[11]  <u>Camacho</u> involved a claim under the Age Discrimination in Employment Act ("ADEA"), not Title VII.  369 F.3d at 571-72.  The ADEA and Title VII are analogous statutes, however, and so "judicial precedents interpreting one such statute [are] instructive in decisions involving [the other]."  <u>Id.</u> at 578 n.5 (quotation marks omitted).

'employer' [in Title VII context] contravenes Supreme Court precedent and fundamental canons of statutory interpretation."), cert. denied 128 S.Ct. 2986 (2008). Under that test the Court must consider the following, so-called Reid factors[12]:

> the hiring party's right to control the manner and means by which the product is accomplished[;] . . . the skills required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

Alberty-Velez, 361 F.3d at 7. Although no one factor is decisive, in most cases, the first factor—the common-law element of "control"—"will be the most important . . . in the analysis." Id.; accord Gulino, 460 F.3d at 371.

Here, none of the traditional hallmarks of an employment relationship are present, and so HRD cannot be deemed plaintiffs' employer under the common-law test. Most fundamentally, it is undisputed that HRD does not pay plaintiffs wages or afford them any other financial benefit. R.A. 114 ¶ 26, 114 ¶ 28, 175. Thus, because "no financial benefit is obtained by" plaintiffs from HRD, "no plausible employment relationship of any sort can be said to exist." Gulino, 460

---

[12] Community for Creative Non-Violence v. Reid, 490 U.S. 730, 751-52 (1989).

F.3d at 372 (quotation marks omitted).  HRD may be a Title VII employer of its

own employees (none of whom are charged with the supervision of police officers,

R.A. 107 ¶ 30, 116 ¶ 42, 176), but it is simply not the employer of municipal police

officers who are all hired and compensated by the respective municipal appointing

authorities.

Moreover, plaintiffs concede that HRD "does not train, transfer, assign work

to, set work schedules for, supervise, discipline, pay benefits to, or fire municipal

police officers" and "does not exercise any day-to-day control over plaintiffs' work

activities."  R.A. 114 ¶ 29, 175.  This concession additionally defeats any claim of

an employment relationship.  The Reid factors set forth above require a level of

control that is "direct, obvious, and concrete, not merely indirect or abstract."

Gulino, 460 F.3d at 379; see Alberty-Velez, 361 F.3d at 7; Camacho, 369 F.3d at

574.  HRD exercises no such control over plaintiffs and thus cannot, under any

reasonable characterization, be deemed plaintiffs' employer under Title VII.

This result is consistent with this Court's holding in Camacho that, while "a

state licensing and regulatory agency" such as HRD "may qualify as an employer

of those individuals it hires and supervises," it "does not become an employer of

those individuals whom it neither hires, compensates, nor supervises day-to-day

even though it licenses and regulates them."  369 F.3d at 578.  Camacho had sued

the Puerto Rico Ports Authority under the ADEA after it revoked his harbor pilot's

27

license when he turned 70, the maximum age allowed by the Puerto Rico licensing

statute.  This Court acknowledged that pilotage was a "heavily regulated

profession" in that the Authority had the power to issue, renew, suspend, and

revoke licenses; to limit licenses to certain ports; to fine or otherwise discipline

pilots for improper conduct; to fix rates for pilotage services; and to establish

standard procedures to guide pilots in boarding and taking command of ships.  Id.

at 576.  The Court further acknowledged that the Authority had set up a retirement

plan for the benefit of harbor pilots and that such plan was funded entirely by

contributions at rates determined by the Authority.  Id.  Nevertheless, and despite

Camacho's claim that the Authority's regulations evidenced "an unusually high

level of control over the pilots' day-to-day activities," the Court held that these

"regulations [fell] far short of evincing the degree of control and supervision

traditionally considered sufficient to create an employer-employee relationship."

Id.  Importantly, in a discussion that applies equally here, the Court found it

dispositive that all the traditional hallmarks of an employment relationship were

missing:

> In practice, [the Authority] simply does not act like an employer vis-à-
> vis the harbor pilots.  After all, it does not hire or fire harbor pilots,
> withholds no taxes from their earnings (which come wholly from the
> shipowners), pays no F.I.C.A. premiums, carries no workers'
> compensation insurance referable to them, affords them no paid
> vacations or other fringe benefits, . . . furnishes them no gear, . . . [and]
> is not engaged either in selling pilotage services or in contracting with

28

others to make such services available.  These attributes militate
strongly against a finding that the Authority functions as the de facto
employer of the harbor pilots.

Id. at 577.

Similarly, in the recent <u>Gulino</u> decision, the Second Circuit held that city

school teachers could not sue the State of New York under Title VII for creating

and administering an allegedly discriminatory teacher's certification examination.

460 F.3d at 370-79.  Applying the "traditional indicators of employment under the

common law of agency," the court found it dispositive that the State (1) did not

hire or compensate the teachers; (2) did not promote, demote, or fire them; (3) did

not decide issues of tenure, pay, and benefits; and (4) while "control[ling] basic

curriculum and credentialing requirements," did "not exercise the workaday

supervision necessary to an employment relationship."  Id. at 379.  Based on these

factors, the court found it "plain[]" that the State was "not [the teachers'] employer

for the purposes of Title VII liability."  Id.

Numerous other courts have likewise held that state regulatory and licensing

agencies are not liable as "employers" under Title VII or under analogous statutes,

absent evidence that they hired, compensated, and exercised day-to-day control

29

over the worker's activities.[13]  The same conclusion is compelled in this case.  As

in Camacho and the other cited decisions, HRD "[i]n practice . . . simply does not

act like an employer vis-à-vis" municipal police officers.  Camacho, 369 F.3d at

577.  It "does not hire or fire" them, "withholds no taxes from their earnings,"

"pays no F.I.C.A. premiums," "carries no workers' compensation insurance

referable to them," "affords them no paid vacations or other fringe benefits," and

---

[13] E.g., EEOC v. Illinois, 69 F.3d 167, 171 (7th Cir. 1995) (State was not
"employer" of local school teachers where powers of "hiring and firing" were in
hands of school district); Fields v. Hallsville Indep. Sch. Dist., 906 F.2d 1017,
1020 (5th Cir. 1990) (State's administration of teacher's certification exam did not
create employment relationship where State "played [no] role in the general hiring
or firing of teachers" and was not "involved in the daily supervision of
[t]eachers"); Haddock v. Bd. of Dental Examiners of Cal., 777 F.2d 462, 464 (9th
Cir. 1985) (state dentistry board's administration of dental exam did not create
employment relationship where board "neither pa[id] the wages nor engage[d] the
services of the examinees"); George v. N.J. Bd. of Veterinary Med. Examiners,
635 F. Supp. 953, 955-56 (D.N.J. 1985) (state veterinary board was not
"employer" of license applicant where board did not pay wages or "control the
day-to-day operations of veterinarians"), aff'd 794 F.2d 113 (3d Cir. 1986);
Conroy v. City of Phila., 421 F.Supp.2d 879, 888-90 (E.D. Pa. 2006) (State was
not "employer" of city police officers despite its control over hiring and
certification process, where it did not tell city when to hire or fire officers or how
much to pay them and where city could add own eligibility requirements with
respect to hiring); United States v. N.Y. State Dep't of Motor Vehicles, 82
F.Supp.2d 42, 54 (E.D.N.Y. 2000) (state agencies were not "employers" of school
bus drivers where they had "no authority to hire or fire drivers, to supervise
drivers' work or the conditions of their employment, to determine their rate or
method of pay, or to maintain records of their employment"); Nat'l Org. for
Women v. Waterfront Comm'n of N.Y. Harbor, 468 F. Supp. 317, 320 (S.D.N.Y.
1979) ("NOW") (state waterfront commission was not "employer" where it
"neither pa[id] the wages nor engage[d] the services of persons it register[ed]").

"furnishes them no gear." Id. Further, plaintiffs here have conceded that HRD

exercises no control whatsoever over their daily work activities. Cf. id. at 576

(Camacho claimed that Authority exercised "an unusually high level of control

over the pilots' day-to-day activities"). Given the "absence of that degree of

control," plaintiffs have no argument that HRD is their employer under the

controlling common-law agency test. Id. at 577 (Authority was not employer

because it did not "superintend[] or otherwise attempt[] to control the pilot's

actions" on his vessel). Their claims thus do not fall within Title VII's limited

abrogation of the States' Eleventh Amendment immunity, see Fitzpatrick, 427 U.S.

at 452, and must be dismissed.[14]

**B.    The Eleventh Amendment Bars Plaintiffs' Alternative Theories of Liability.**

**1.    Congress Has Expressed No Intent to Expose States to Title VII Liability for Allegedly Interfering With an Individual's Employment Relationship With a Third Party.**

Unable to offer any evidence to the district court that HRD meets the

traditional hallmarks of an employer, plaintiffs argued instead that a State can be

held liable under Title VII if it merely "affect[s]" a plaintiff's "employment

---

[14]  The Supreme Court's recent decision in Ricci is not inconsistent with this result
because, there, the plaintiff firefighters had sued their direct employer, the City of
New Haven.  129 S.Ct. at 2664.

relationship, even if it is not the employer of the particular individual bringing

suit." R.A. 142. In support of this argument, plaintiffs turned to the Massachusetts

General Laws in an attempt to show that the Commonwealth as a whole exercises

"pervasive control over the employment of police officers." R.A. 124-29.

Plaintiffs' statutory characterizations, however, show only that the Commonwealth

regulates certain functions relating to police officers, either to further the purposes

of the civil-service system or to protect public safety. For example, plaintiffs

pointed out that HRD administers and scores the entry-level and promotional

exams in non-delegated communities, R.A. 125, 127-28, but those exams go to the

heart of the civil-service system and are intended to "guard against political

considerations, favoritism, and bias in governmental employment decisions."

Town of Falmouth v. Civil Serv. Comm'n, 814 N.E.2d 735, 739 (Mass. App. Ct.

2004); see also DeLarmi v. Borough of Fort Lee, 334 A.2d 349, 352 (N.J. Super.

1975) ("The purpose of requiring [a civil-service] examination is to ensure that

appointments and promotions will be made on merit and not on favoritism.").

Moreover, the ultimate hiring and promotion decisions are within the discretion of

the appointing authority, which may consider factors in addition to the applicant's

exam score. R.A. 105 ¶ 13, 113-14 ¶ 21, 175; see Sullivan v. City of Springfield,

561 F.3d 7, 11 (1st Cir. 2009) (noting in hiring context that "HRD [has] delegated

32

to the local appointing authorities most of the responsibility for determining . . . eligibility criteria other than the examination"). Plaintiffs also alleged that the Commonwealth exercises control over leaves of absence and discipline, layoffs and recalls, and bypasses. R.A. 127, 129. The statutes they cite, however, simply provide for a right of appeal within the civil-service system if an appointing authority has discharged, removed, suspended for more than five days, or laid off a tenured employee without just cause. See Mass. Gen. Laws ch. 31, §§ 41-44. In reviewing such decisions, the Commonwealth's role is again to "focus on the fundamental purposes of the civil service system"; it may not "substitute its judgment about a valid exercise of discretion based on merit or policy considerations by an appointing authority." Falmouth, 814 N.E.2d at 739; City of Cambridge v. Civil Serv. Comm'n, 682 N.E.2d 923, 926 (Mass. App. Ct. 1997).

The remainder of plaintiffs' discussion focused on statutory provisions that authorize the Commonwealth to set minimum medical and fitness standards and training requirements for police officers. R.A. 126. These provisions are classic examples of regulation designed to protect public safety. See Mass. Gen. Laws ch. 31, § 61A ("health and physical fitness standards shall be rationally related to the duties of [the] positions and shall have the purpose of minimizing health and safety risks to the public, fellow workers and the police officers . . . themselves"); cf.

Donahue v. City of Boston, 371 F.3d 7, 16 (1st Cir. 2004) (age requirement was

rationally related to legitimate state interest in that it ensured physical fitness of

police officers).  Indeed, the training requirements apply to "[e]very person"

appointed to a police-officer position, whether in a civil-service community or

otherwise.  Mass. Gen. Laws ch. 41, § 96B (emphasis added).

　　　Plaintiffs' argument therefore reduces to the following: even though HRD is

not their employer under the controlling common-law agency test, it is nonetheless

liable to them under Title VII because the Commonwealth as a whole maintains

civil-service and public-safety regulations that may "affect" plaintiffs' work

relationships with their municipal employers.  R.A. 142.  This argument is, in

essence, an iteration of the "interference" theory of liability, under which some

courts have found Title VII employers—persons having fifteen or more employees,

42 U.S.C. § 2000e(b)—liable for interfering with an individual's employment with

a third party.  This Court has called the theory a "dubious" one, Camacho, 369

F.3d at 574 n.3, and for good reason:  if Congress had intended to create liability

for interfering with third-party employment relationships, it makes "very little

sense" that it would "confine that liability to . . . employers," i.e., persons who

happen to have fifteen of their own employees.  EEOC v. Illinois, 69 F.3d at 169

(finding it "implausible" that Congress intended to "create a blanket liability to

34

employees of <u>other</u> employers for interference with <u>their</u> employment
relationships").

Moreover, whatever the theory's viability in cases involving only private
parties, the States, "given their constitutional role," are "not like any other class of
[defendants]." <u>Atascadero</u>, 473 U.S. at 246.[15]  An "unequivocal" and "specific[]"
statement of Congressional intent is required to extend Title VII liability in the
manner urged by plaintiffs, <u>id.</u>, and no such statement exists.  When Congress
amended Title VII in 1972 to remove the exemption for state employers, it "in no
way suggest[ed]," let alone clearly state, that it "intended to benefit anyone other
than those <u>actually</u> employed by state governments or their subdivisions."
<u>Haddock</u>, 777 F.2d at 464 (emphasis added).  Although the absence of a clear
statement ends the inquiry, <u>Dellmuth</u>, 491 U.S. at 230, the legislative history also
supports the state defendants' position in that it repeatedly refers to the ten million
then-existing state and local employees that would benefit from the expanded

---

[15]  The interference theory originated with <u>Sibley Memorial Hosp. v. Wilson</u>, 488
F.2d 1338 (D.C. Cir. 1973), which involved solely private parties.  <u>See</u> <u>NOW</u>, 468
F. Supp. at 320 (<u>Sibley</u> "had nothing to do with state police power"); <u>Lavender-
Cabellero v. Dep't of Consumer Affairs</u>, 458 F. Supp. 213, 215 (S.D.N.Y. 1978)
(<u>Sibley</u> did not involve a "state or city licensing agency performing a separate, and
presumably necessary public, as opposed to private function, separate and apart
from employment itself"); <u>see also</u> <u>Gulino</u>, 460 F.3d at 373-76 (rejecting <u>Sibley</u>'s
reading of Title VII on grounds that it is not authorized by the statutory text and
thus raises constitutional concerns under the clear-statement rule).

35

coverage, H.R. Rep. 92-238 (1972), 1972 U.S.C.C.A.N. 2137, 2152, but is "barren of any reference" to state licensing and regulatory activities.  NOW, 468 F.Supp. at 320-21.  Further, Congress expressly extended Title VII to certain parties that are not traditional common-law employers—labor unions and employment agencies—thereby "obviously" intending that "only [those] two additional groups would be included within the reach of" private actions.  Gulino, 460 F.3d at 375; see Sunshine Dev., Inc. v. FDIC, 33 F.3d 106, 116 (1st Cir. 1994) ("legislature's affirmative description of certain powers or exemptions implies denial of nondescribed powers or exemptions").[16]  It defies reason to think "that a Congress that had before it such a meticulous enumeration of the categories of entities covered by the Act would have left to speculation and conjecture any desire to subject to federal regulation city and state licensing activities of which it was obviously aware."  NOW, 468 F.Supp. at 320-21.

In any event, "speculation and conjecture" are not sufficient to impute to Congress an intent to abrogate the States' Eleventh Amendment immunity.  An unequivocal statement is required, and it was for lack of such a statement that this

---

[16]  This reading is further supported by 42 U.S.C. § 2000e-6(a), which gives the Attorney General the authority to seek an injunction against "any person" "engaged in a pattern or practice of resistance to the full enjoyment of rights secured by this subchapter."  Id. (emphasis added); see United States v. Bd. of Educ. for the Sch. Dist. of Phila., 911 F.2d 882, 892 (3d Cir. 1990).

36

Court concluded in <u>Camacho</u> that the Authority was not an ADEA employer of those individuals "whom it neither hires, compensates, nor supervises day-to-day even though it licenses and regulates them." 369 F.3d at 578. Otherwise, the Court held, it would be "rewrit[ing] the ADEA despite the utter absence of any hint that Congress intended to extend liability to state agencies that merely exercise licensing and regulatory authority pursuant to a state's police power." <u>Id.</u> This holding directly controls here. Although plaintiffs tried to distinguish <u>Camacho</u> below on grounds that the Authority's involvement in the regulated activity was less extensive than what is alleged in this case, R.A. 140-42, that is a baseless distinction. The Authority exercised at least <u>some</u> control over the pilots' "day-to-day activities," <u>Camacho</u>, 369 F.3d at 576, whereas plaintiffs concede that HRD has no such control. Nevertheless, and even though pilotage is a "heavily regulated profession," <u>id.</u>, this Court had no trouble finding that the Authority was not an employer given that none of the traditional hallmarks of employment were present. <u>Id.</u> at 577; <u>see also</u> <u>EEOC v. Illinois</u>, 69 F.3d at 171 (State was not ADEA employer of public school teachers, even though it "exert[ed] more control over public school teachers than over any private employees in the state and probably over any other persons formally employed by local governments in the state" by "fix[ing] not only a minimum salary for all teachers . . . but also the number of

37

days a teacher must work, what holidays he gets off, the amount of sick leave he is

entitled to, his eligibility for and length of sabbatical leave, the minimum lunch

period, the terms of teachers' tenure, the rights of recalled teachers, and much else

besides").

Plaintiffs' attempt to distinguish Camacho only highlights the inherent flaw

in their position:  it invites "arbitrary application of Title VII depending on each

court's interpretation and assessment of the scope of state regulatory control in

varied fields."  Ass'n of Mexican-Am. Educators v. California, 231 F.3d 572, 608

(9th Cir. 2000) ("AMAE") (Gould, J., concurring in part & dissenting in part).

There are many Commonwealth agencies that engage in regulatory activities

affecting employment prospects or relationships to varying degrees.  For example,

the Commonwealth regulates teachers, requiring them to comply with "stringent

initial and renewal certification requirements."  Hancock v. Comm'r of Educ., 822

N.E.2d 1134, 1144 (Mass. 2005).  It also regulates and is authorized to administer

qualification exams in the professions of medicine, Mass. Gen. Laws ch. 112, § 3,

pharmacy, id. § 24, dentistry, id. § 45, nursing, id., § 74, and law, id. ch. 221, § 37,

among many others.  Under plaintiffs' approach the Commonwealth could be

deemed a Title VII employer in any one of these fields, depending on each court's

individual assessment of the extent of regulation and "despite the utter absence of

any hint that Congress intended to extend liability" to such regulatory activities. Camacho, 369 F.3d at 578.

This is the "slippery slope" that this Court warned against in Camacho. Id. The short of the matter is that Title VII contains no statement—let alone a "specific" and "unequivocal" one, Atascadero, 473 U.S. at 246—of Congress' intent to expose the States and their agencies to private suits brought by any individuals other than their own employees. The Eleventh Amendment thus forecloses plaintiffs' reliance on the interference theory of liability.

>    **2.    Congress Has Expressed No Intent to Parse the Employment Relationship Such that a State Can Be Deemed an "Employer" With Respect to One Aspect of the Relationship Only.**

In opposing the state defendants' motion to dismiss, plaintiffs relied heavily on Carparts Distrib. Ctr., Inc. v. Auto Wholesalers Ass'n of New England, 37 F.3d 12 (1st Cir. 1994), and Bradley v. City of Lynn, 403 F.Supp.2d 161 (D. Mass. 2005). In Carparts, which involved only private parties, this Court acknowledged the "possibility" that, in some circumstances, a defendant who has enough control over an aspect of a plaintiff's employment can be deemed an employer with regard to that aspect only. 37 F.3d at 17-18. Seizing on this language, the district court in Bradley held that HRD was a de facto employer of municipal police officers (and firefighters) solely "with respect to . . . entry-level hiring" because of HRD's

39

"control" over that particular aspect of the officers' employment.  403 F.Supp.2d at 169.[17]

Plaintiffs may renew their reliance on <u>Carparts</u> and <u>Bradley</u> and argue that, even though none of the traditional indicators of employment are met, HRD exercises enough control over the promotional process to be an employer with regard to that single aspect of plaintiffs' employment.  Any such argument would be foreclosed by the Eleventh Amendment, however, because Title VII does not contain a specific and unequivocal statement allowing the employment relationship to be parsed in such a manner.  As this Court held in <u>Camacho</u>, in determining whether an employment relationship exists under the traditional common-law test, "one swallow does not a summer make."  369 F.3d at 577.  That is, even if HRD has some role in the promotional process, <u>Camacho</u>, and numerous other cases applying the common-law test, make clear that no one factor is dispositive.  Thus, in <u>Camacho</u>, even though the Authority was in charge of administering a retirement plan for the harbor pilots and determined the rates for contributions, this

---

[17]  Plaintiffs are incorrect to suggest that HRD is estopped from raising its current arguments because it did not appeal <u>Bradley</u>. Pls.' Mot. at 2; R.A. 119-20.  The <u>Bradley</u> court made clear that its holding was limited to "entry-level hiring," observing that HRD had "little control over other aspects of the employment relationship."  403 F.Supp.2d at 168.  Further, any claim of estoppel necessarily fails because non-mutual offensive collateral estoppel cannot be asserted against the government.  <u>United States v. Mendoza</u>, 464 U.S. 154 (1984).

Court held that those acts were not enough, standing alone, to justify treating the

Authority as the pilots' employer for ADEA purposes.  Id.

Similarly, here, all of the traditional common-law factors—including the

critical element of "control" over work activities—must be analyzed in

determining whether HRD is plaintiffs' employer under Title VII.  If Congress

intended a different test to govern the meaning of "employer," it had to say so

specifically and unequivocally.  Cf. Nationwide Mutual Ins. Co. v. Darden, 503

U.S. 318, 322-23 (1992) (even against private defendant, term "employee" cannot

be liberally construed to advance remedial purposes of a statute; in absence of

statutory definition of "employee," it must be assumed that "Congress intended to

describe the conventional master-servant relationship as understood by common-

law agency doctrine").  A "general authorization" to sue the State as an

"employer" is simply not the "unequivocal statutory language sufficient" to

authorize parsing the employment relationship in the manner suggested by

plaintiffs.  Atascadero, 473 U.S. at 246; see id. at 245-46 (even though statute

authorized suit against "any recipient of Federal assistance" and there was no

dispute that State was such a recipient, Congress did not abrogate Eleventh

Amendment immunity because it did not "do so specifically").

For this reason the state defendants respectfully submit that the district court

erred in Bradley by holding that HRD was an employer of municipal firefighters

41

and police officers "with respect to . . . entry-level hiring." 403 F.Supp.2d at 169.

By analyzing only one aspect of the relationship between the plaintiffs and HRD,

the Bradley court ran afoul of the settled principle that no one factor of the

common-law test is decisive.[18] Camacho, 369 F.3d at 577; Alberty-Velez, 361

F.3d at 7; Gulino, 460 F.3d at 371. Further, putting aside this error, Bradley is

factually distinguishable in a critical way. There, the court found that HRD

"extensively control[led]" the entry-level hiring of municipal firefighters and

police officers in that "Massachusetts civil service law reduces the role that

municipalities have in the [entry-level] hiring process to deciding yes or no to the

candidates that the HRD provides." Bradley, 403 F.Supp.2d at 169. In other

words, at the entry-level stage, municipalities have no choice but to use HRD's

examination. Id.; R.A. 103 ¶ 4, 112 ¶ 10, 174. Here, in contrast, plaintiffs concede

that the municipalities may conduct their own promotional examinations, R.A. 49

---

[18] Although the court noted in passing that "HRD plays an extensive role in the promotion process," Bradley, 403 F.Supp.2d at 169, that was not a factual determination. Rather, in support of its statement, the court relied solely on Mass. Gen. Laws ch. 31, § 59, which is the general provision outlining the process for original and promotional appointments of municipal police officers and firefighters. HRD is barely mentioned in that provision, and only in relation to administrative acts that it must perform when a municipal appointing authority wishes to offer its promotional examination to someone other than a full-time member of the regular force. Mass. Gen. Laws ch. 31, § 59, ¶ 3. Moreover, elsewhere in the decision, the court makes the contrary observation that HRD "exercise[d] extensive control over hiring but little control over other aspects of the employment relationship." Bradley, 403 F.Supp.2d at 168.

¶ 82, and several have in fact done so.  R.A. 103 ¶¶ 5-6, 103 ¶ 8, 112 ¶ 11, 112

¶¶ 13-14, 174-75.  Thus, even were it proper to disregard all the other common-law

agency factors, which it is not, HRD's alleged influence over the promotional

process is not enough, given the municipalities' ultimate control over the process,

to give rise to Title VII liability.  See Conroy, 421 F.Supp.2d at 890 ("City's ability

to place its own requirements upon the hiring process, its control over the rate of

hiring, and its authority vis à vis firings, all militate against finding that the

Commonwealth has an indirect or de facto employment relationship with [police

officer applicant]").

### C. With the Exception of the Ninth Circuit's Decision in AMAE, Every Circuit-Court Case on This Issue Supports the State Defendants' Position.

The state defendants' position in this appeal is supported by "a long line of

cases" holding that liability under Title VII (or under analogous statutes) cannot lie

against a state licensing or regulatory agency if the traditional common-law agency

factors are not met.  Camacho, 369 F.3d at 578.  Specifically, the Second, Third,

Fourth, Fifth, and Seventh Circuits all concur with Camacho that state licensing

and regulatory activities are not, on their own, sufficient to give rise to the requisite

employment relationship.[19]

---

[19]  Second Circuit:  Gulino, 460 F.3d at 370-79 (State not liable under Title VII for
administering allegedly discriminatory teacher's certification exam); Third Circuit:

(footnote continued)

The only circuit to hold otherwise is the Ninth Circuit in its fractured en banc decision in <u>AMAE</u>.  231 F.3d at 602 (Kleinfield, J., concurring in part & dissenting in part) (majority's decision "created a circuit split on a national issue of great importance," as "all the other circuits to have ruled on whether Title VII . . . applies to non-employers such as state licensing boards have gone the other way"). <u>But see</u> <u>Haddock</u>, 777 F.2d at 464 (California Board of Dental Examiners could not be held liable under Title VII for administering allegedly discriminatory licensing exam).  <u>AMAE</u>, however, rested on a flawed legal premise in that it assumed, without analyzing the constitutional implications, that the "interference" theory of liability could be applied to the State.  231 F.3d at 580-81, 583

---

(footnote continued)

<u>Bd. of Educ. for the Sch. Dist. of Phila.</u>, 911 F.2d at 891 (Commonwealth was not Title VII employer of public-school teachers where its "control over the terms of employment" was "exercised exclusively in its regulatory capacity rather than in the course of a customary employer-employee relationship"); <u>George</u>, 635 F. Supp. at 955 (state veterinary board was not Title VII employer of license applicant; "where a governmental organization is exercising its police power, the control it exerts over a person's access to the job market does not render the governmental organization an 'employer' . . . within the meaning of Title VII"), <u>aff'd</u> 794 F.2d 113; Fourth Circuit:  <u>Woodard v. Bd. of Bar Examiners</u>, 598 F.2d 1345, 1346 (4th Cir. 1979) (state board not liable under Title VII for administering allegedly discriminatory bar examination); Fifth Circuit:  <u>Fields</u>, 906 F.2d at 1020 (State's role in administering allegedly discriminatory teacher's certification exam was "wholly insufficient" to create employment relationship under Title VII and ADEA); Seventh Circuit:  <u>EEOC v. Illinois</u>, 69 F.3d at 170-71 (State was not ADEA employer of public-school teachers where challenged actions were taken in regulatory, not proprietary, capacity).

44

(distinguishing its earlier decision in Haddock on grounds that no claim of

"interference" was raised in that case).  That assumption was incorrect because, as

discussed above in Part II.B.1, Congress has not specifically and unequivocally

stated its intent to extend Title VII in such a manner.

    AMAE is also distinguishable on its facts.  There, the court found it

significant that "[t]he state's involvement . . . affect[ed] the day-to-day operations

of local public schools."  Id. at 581 (emphasis added).  For example, the State

controlled the schools' budgets and regulated "district organization, elections, and

governance; educational programs, instructional materials, and proficiency testing;

sex discrimination and affirmative action; admission standards; compulsory

attendance; school facilities; rights and responsibilities of students and parents;

holidays; school health, safety, and nutrition; teacher credentialing and

certification; rights and duties of public school employees; and the pension system

for public school teachers."  Id. at 581-82 (quotation marks omitted).  The State

also "dictate[d] when students may be expelled or suspended, and . . . exert[ed]

control over the textbooks that are used in public schools."  Id. at 582.  Here, in

contrast, it is undisputed that HRD does not control or even affect the day-to-day

activities of municipal police officers such as plaintiffs.

    The great weight of authority from other jurisdictions thus supports the state

defendants' position.  Accordingly, if Camacho does not already compel the result

45

in this appeal, this Court should follow the Second, Third, Fourth, Fifth, and Seventh Circuits and hold that plaintiffs' claims against the state defendants are barred under the Eleventh Amendment for lack of a traditional common-law employer-employee relationship.

## CONCLUSION

For the above reasons, this Court should hold that the state defendants are entitled to Eleventh Amendment immunity; reverse that portion of the district court's April 7, 2009 order denying the state defendants' motion to dismiss under the Eleventh Amendment; and remand with instructions to dismiss all claims against the state defendants for lack of jurisdiction.

Respectfully submitted,

COMMONWEALTH OF
MASSACHUSETTS and PAUL DIETL, in
his capacity as Chief Human Resources
Officer of the Human Resources Division,

By their attorneys,

MARTHA COAKLEY
ATTORNEY GENERAL

_____

Sookyoung Shin, 1st Cir. No. 108199
Robert L. Quinan, Jr., 1st Cir. No. 70454
Assistant Attorneys General
Government Bureau
One Ashburton Place
Boston, MA 02108
(617) 963-2052 (Shin)
(617) 963-2554 (Quinan)
(617) 727-5785 (fax)
Date: July 29, 2009              sookyoung.shin@state.ma.us

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)

1.      This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because this brief contains 11,045 words, excluding the parts of the

brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this

brief has been prepared in a proportionally spaced typeface using Microsoft Word

2003 in 14-point Times New Roman style.


_____

Sookyoung Shin, 1st Cir. No. 108199

Attorney for COMMONWEALTH OF
MASSACHUSETTS and PAUL DIETL, in
his capacity as Chief Human Resources
Officer of the Human Resources Division

<u>ADDENDUM</u>

1. District Court Order (Apr. 7, 2009) .........................................................................1

2. 42 U.S.C. § 2000e ...................................................................................................2

3. 42 U.S.C. § 2000e-2.................................................................................................5

## ADDENDUM

1. District Court Order (Apr. 7, 2009)........................................................................ 1

2. 42 U.S.C. § 2000e.................................................................................................. 2

3. 42 U.S.C. § 2000e-2 ............................................................................................. 5

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

PEDRO LOPEZ, et al.                    *
                                       *
          Plaintiffs,                  *
                                       *
     v.                                *          Civil Action No. 07-11693-JLT
                                       *
CITY OF LAWRENCE, et al.               *
          Defendants.                  *

ORDER

April 6, 2009

TAURO, J.

     After reviewing Parties' submissions, this court hereby orders the following:

     1.     State Defendants' Motion to Dismiss [#142] is DENIED.

IT IS SO ORDERED.

                                   _____/s/ Joseph L. Tauro_____
                                       United States District Judge

42 U.S.C.A. § 2000e

☞

**Effective:[See Text Amendments]**

United States Code Annotated <u>Currentness</u>
  Title 42. The Public Health and Welfare
    📖 <u>Chapter 21</u>. Civil Rights <u>(Refs & Annos)</u>
      📖 <u>Subchapter VI</u>. Equal Employment Opportunities <u>(Refs & Annos)</u>
        → **§ 2000e. Definitions**

For the purposes of this subchapter--

  **(a)** The term "person" includes one or more individuals, governments, governmental agencies, political subdivisions, labor unions, partnerships, associations, corporations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustees in cases under Title 11, or receivers.

  **(b)** The term "employer" means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person, but such term does not include (1) the United States, a corporation wholly owned by the Government of the United States, an Indian tribe, or any department or agency of the District of Columbia subject by statute to procedures of the competitive service (as defined in <u>section 2102 of Title 5</u>), or (2) a bona fide private membership club (other than a labor organization) which is exempt from taxation under <u>section 501(c) of Title 26</u>, except that during the first year after March 24, 1972, persons having fewer than twenty-five employees (and their agents) shall not be considered employers.

  **(c)** The term "employment agency" means any person regularly undertaking with or without compensation to procure employees for an employer or to procure for employees opportunities to work for an employer and includes an agent of such a person.

  **(d)** The term "labor organization" means a labor organization engaged in an industry affecting commerce, and any agent of such an organization, and includes any organization of any kind, any agency, or employee representation committee, group, association, or plan so engaged in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours, or other terms or conditions of employment, and any conference, general committee, joint or system board, or joint council so engaged which is subordinate to a national or international labor organization.

  **(e)** A labor organization shall be deemed to be engaged in an industry affecting commerce if (1) it maintains or operates a hiring hall or hiring office which procures employees for an employer or procures for employees opportunities to work for an employer, or (2) the number of its members (or, where it is a labor organization composed of other labor organizations or their representatives, if the aggregate number of the members of such other labor organization) is (A) twenty-five or more during the first year after March 24, 1972, or (B) fifteen or more thereafter, and such labor organization--

    **(1)** is the certified representative of employees under the provisions of the National Labor Relations Act, as amended [<u>29 U.S.C.A. § 151 et seq.</u>], or the Railway Labor Act, as amended [<u>45 U.S.C.A. § 151 et seq.</u>];

    **(2)** although not certified, is a national or international labor organization or a local labor organization recognized or acting as the representative of employees of an employer or employers engaged in an industry affecting

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

42 U.S.C.A. § 2000e

commerce; or

**(3)** has chartered a local labor organization or subsidiary body which is representing or actively seeking to represent employees of employers within the meaning of paragraph (1) or (2); or

**(4)** has been chartered by a labor organization representing or actively seeking to represent employees within the meaning of paragraph (1) or (2) as the local or subordinate body through which such employees may enjoy membership or become affiliated with such labor organization; or

**(5)** is a conference, general committee, joint or system board, or joint council subordinate to a national or international labor organization, which includes a labor organization engaged in an industry affecting commerce within the meaning of any of the preceding paragraphs of this subsection.

**(f)** The term "employee" means an individual employed by an employer, except that the term "employee" shall not include any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or any person chosen by such officer to be on such officer's personal staff, or an appointee on the policy making level or an immediate adviser with respect to the exercise of the constitutional or legal powers of the office. The exemption set forth in the preceding sentence shall not include employees subject to the civil service laws of a State government, governmental agency or political subdivision. With respect to employment in a foreign country, such term includes an individual who is a citizen of the United States.

**(g)** The term "commerce" means trade, traffic, commerce, transportation, transmission, or communication among the several States; or between a State and any place outside thereof; or within the District of Columbia, or a possession of the United States; or between points in the same State but through a point outside thereof.

**(h)** The term "industry affecting commerce" means any activity, business, or industry in commerce or in which a labor dispute would hinder or obstruct commerce or the free flow of commerce and includes any activity or industry "affecting commerce" within the meaning of the Labor-Management Reporting and Disclosure Act of 1959 [29 U.S.C.A. § 401 et seq.], and further includes any governmental industry, business, or activity.

**(i)** The term "State" includes a State of the United States, the District of Columbia, Puerto Rico, the Virgin Islands, American Samoa, Guam, Wake Island, the Canal Zone, and Outer Continental Shelf lands defined in the Outer Continental Shelf Lands Act [43 U.S.C.A. § 1331 et seq.].

**(j)** The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

**(k)** The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 2000e-2(h) of this title shall be interpreted to permit otherwise. This subsection shall not require an employer to pay for health insurance benefits for abortion, except where the life of the mother would be endangered if the fetus were carried to term, or except where medical complications have arisen from an abortion: *Provided*, That nothing herein shall preclude an employer from providing abortion benefits or otherwise affect bargaining agreements in regard to abortion.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

42 U.S.C.A. § 2000e

(*l*) The term "complaining party" means the Commission, the Attorney General, or a person who may bring an action or proceeding under this subchapter.

(m) The term "demonstrates" means meets the burdens of production and persuasion.

(n) The term "respondent" means an employer, employment agency, labor organization, joint labor-management committee controlling apprenticeship or other training or retraining program, including an on-the-job training program, or Federal entity subject to section 2000e-16 of this title.

CREDIT(S)

(Pub.L. 88-352, Title VII, § 701, July 2, 1964, 78 Stat. 253; Pub.L. 89-554, § 8(a), Sept. 6, 1966, 80 Stat. 662; Pub.L. 92-261, § 2, Mar. 24, 1972, 86 Stat. 103; Pub.L. 95-555, § 1, Oct. 31, 1978, 92 Stat. 2076; Pub.L. 95-598, Title III, § 330, Nov. 6, 1978, 92 Stat. 2679; Pub.L. 99-514, § 2, Oct. 22, 1986, 100 Stat. 2095; Pub.L. 102-166, Title I, §§ 104, 109(a), Nov. 21, 1991, 105 Stat. 1074, 1077.)

Current through P.L. 111-40 approved 7-1-09

Westlaw. (C) 2009 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

42 U.S.C.A. § 2000e-2

☛

**Effective:[See Text Amendments]**

United States Code Annotated <u>Currentness</u>
   Title 42. The Public Health and Welfare
      🗏 <u>Chapter 21</u>. Civil Rights <u>(Refs & Annos)</u>
         🗏 <u>Subchapter VI</u>. Equal Employment Opportunities <u>(Refs & Annos)</u>
         ➡ **§ 2000e-2. Unlawful employment practices**

(a) Employer practices

It shall be an unlawful employment practice for an employer--

    **(1)** to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

    **(2)** to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

(b) Employment agency practices

It shall be an unlawful employment practice for an employment agency to fail or refuse to refer for employment, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin, or to classify or refer for employment any individual on the basis of his race, color, religion, sex, or national origin.

(c) Labor organization practices

It shall be an unlawful employment practice for a labor organization--

    **(1)** to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin;

    **(2)** to limit, segregate, or classify its membership or applicants for membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, color, religion, sex, or national origin; or

    **(3)** to cause or attempt to cause an employer to discriminate against an individual in violation of this section.

(d) Training programs

It shall be an unlawful employment practice for any employer, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs to discrimi-

42 U.S.C.A. § 2000e-2

nate against any individual because of his race, color, religion, sex, or national origin in admission to, or employment in, any program established to provide apprenticeship or other training.

(e) Businesses or enterprises with personnel qualified on basis of religion, sex, or national origin; educational institutions with personnel of particular religion

Notwithstanding any other provision of this subchapter, (1) it shall not be an unlawful employment practice for an employer to hire and employ employees, for an employment agency to classify, or refer for employment any individual, for a labor organization to classify its membership or to classify or refer for employment any individual, or for an employer, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining programs to admit or employ any individual in any such program, on the basis of his religion, sex, or national origin in those certain instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise, and (2) it shall not be an unlawful employment practice for a school, college, university, or other educational institution or institution of learning to hire and employ employees of a particular religion if such school, college, university, or other educational institution or institution of learning is, in whole or in substantial part, owned, supported, controlled, or managed by a particular religion or by a particular religious corporation, association, or society, or if the curriculum of such school, college, university, or other educational institution or institution of learning is directed toward the propagation of a particular religion.

(f) Members of Communist Party or Communist-action or Communist-front organizations

As used in this subchapter, the phrase "unlawful employment practice" shall not be deemed to include any action or measure taken by an employer, labor organization, joint labor-management committee, or employment agency with respect to an individual who is a member of the Communist Party of the United States or of any other organization required to register as a Communist-action or Communist-front organization by final order of the Subversive Activities Control Board pursuant to the Subversive Activities Control Act of 1950 [50 U.S.C.A. § 781 et seq.].

(g) National security

Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to fail or refuse to hire and employ any individual for any position, for an employer to discharge any individual from any position, or for an employment agency to fail or refuse to refer any individual for employment in any position, or for a labor organization to fail or refuse to refer any individual for employment in any position, if--

   (1) the occupancy of such position, or access to the premises in or upon which any part of the duties of such position is performed or is to be performed, is subject to any requirement imposed in the interest of the national security of the United States under any security program in effect pursuant to or administered under any statute of the United States or any Executive order of the President; and

   (2) such individual has not fulfilled or has ceased to fulfill that requirement.

(h) Seniority or merit system; quantity or quality of production; ability tests; compensation based on sex and authorized by minimum wage provisions

Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of produc-

42 U.S.C.A. § 2000e-2

tion or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin, nor shall it be an unlawful employment practice for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex or national origin. It shall not be an unlawful employment practice under this subchapter for any employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid or to be paid to employees of such employer if such differentiation is authorized by the provisions of <u>section 206(d) of Title 29</u>.

(i) Businesses or enterprises extending preferential treatment to Indians

Nothing contained in this subchapter shall apply to any business or enterprise on or near an Indian reservation with respect to any publicly announced employment practice of such business or enterprise under which a preferential treatment is given to any individual because he is an Indian living on or near a reservation.

(j) Preferential treatment not to be granted on account of existing number or percentage imbalance

Nothing contained in this subchapter shall be interpreted to require any employer, employment agency, labor organization, or joint labor-management committee subject to this subchapter to grant preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race, color, religion, sex, or national origin employed by any employer, referred or classified for employment by any employment agency or labor organization, admitted to membership or classified by any labor organization, or admitted to, or employed in, any apprenticeship or other training program, in comparison with the total number or percentage of persons of such race, color, religion, sex, or national origin in any community, State, section, or other area, or in the available work force in any community, State, section, or other area.

(k) Burden of proof in disparate impact cases

(1)(A) An unlawful employment practice based on disparate impact is established under this subchapter only if--

(i) a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity; or

(ii) the complaining party makes the demonstration described in subparagraph (C) with respect to an alternative employment practice and the respondent refuses to adopt such alternative employment practice.

(B)(i) With respect to demonstrating that a particular employment practice causes a disparate impact as described in subparagraph (A)(i), the complaining party shall demonstrate that each particular challenged employment practice causes a disparate impact, except that if the complaining party can demonstrate to the court that the elements of a respondent's decisionmaking process are not capable of separation for analysis, the decisionmaking process may be analyzed as one employment practice.

(ii) If the respondent demonstrates that a specific employment practice does not cause the disparate impact, the respondent shall not be required to demonstrate that such practice is required by business necessity.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

42 U.S.C.A. § 2000e-2

**(C)** The demonstration referred to by subparagraph (A)(ii) shall be in accordance with the law as it existed on June 4, 1989, with respect to the concept of "alternative employment practice".

**(2)** A demonstration that an employment practice is required by business necessity may not be used as a defense against a claim of intentional discrimination under this subchapter.

**(3)** Notwithstanding any other provision of this subchapter, a rule barring the employment of an individual who currently and knowingly uses or possesses a controlled substance, as defined in schedules I and II of section 102(6) of the Controlled Substances Act (21 U.S.C. 802(6)), other than the use or possession of a drug taken under the supervision of a licensed health care professional, or any other use or possession authorized by the Controlled Substances Act [21 U.S.C.A. § 801 et seq.] or any other provision of Federal law, shall be considered an unlawful employment practice under this subchapter only if such rule is adopted or applied with an intent to discriminate because of race, color, religion, sex, or national origin.

(l) Prohibition of discriminatory use of test scores

It shall be an unlawful employment practice for a respondent, in connection with the selection or referral of applicants or candidates for employment or promotion, to adjust the scores of, use different cutoff scores for, or otherwise alter the results of, employment related tests on the basis of race, color, religion, sex, or national origin.

(m) Impermissible consideration of race, color, religion, sex, or national origin in employment practices

Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.

(n) Resolution of challenges to employment practices implementing litigated or consent judgments or orders

**(1)(A)** Notwithstanding any other provision of law, and except as provided in paragraph (2), an employment practice that implements and is within the scope of a litigated or consent judgment or order that resolves a claim of employment discrimination under the Constitution or Federal civil rights laws may not be challenged under the circumstances described in subparagraph (B).

**(B)** A practice described in subparagraph (A) may not be challenged in a claim under the Constitution or Federal civil rights laws--

(i) by a person who, prior to the entry of the judgment or order described in subparagraph (A), had--

**(I)** actual notice of the proposed judgment or order sufficient to apprise such person that such judgment or order might adversely affect the interests and legal rights of such person and that an opportunity was available to present objections to such judgment or order by a future date certain; and

**(II)** a reasonable opportunity to present objections to such judgment or order; or

(ii) by a person whose interests were adequately represented by another person who had previously challenged the judgment or order on the same legal grounds and with a similar factual situation, unless there has been an intervening change in law or fact.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

42 U.S.C.A. § 2000e-2

**(2)** Nothing in this subsection shall be construed to--

**(A)** alter the standards for intervention under rule 24 of the Federal Rules of Civil Procedure or apply to the rights of parties who have successfully intervened pursuant to such rule in the proceeding in which the parties intervened;

**(B)** apply to the rights of parties to the action in which a litigated or consent judgment or order was entered, or of members of a class represented or sought to be represented in such action, or of members of a group on whose behalf relief was sought in such action by the Federal Government;

**(C)** prevent challenges to a litigated or consent judgment or order on the ground that such judgment or order was obtained through collusion or fraud, or is transparently invalid or was entered by a court lacking subject matter jurisdiction; or

**(D)** authorize or permit the denial to any person of the due process of law required by the Constitution.

**(3)** Any action not precluded under this subsection that challenges an employment consent judgment or order described in paragraph (1) shall be brought in the court, and if possible before the judge, that entered such judgment or order. Nothing in this subsection shall preclude a transfer of such action pursuant to section 1404 of Title 28.

CREDIT(S)

(Pub.L. 88-352, Title VII, § 703, July 2, 1964, 78 Stat. 255; Pub.L. 92-261, § 8(a), (b), Mar. 24, 1972, 86 Stat. 109; Pub.L. 102-166, Title I, §§ 105(a), 106, 107(a), 108, Nov. 21, 1991, 105 Stat. 1074-1076.)

Current through P.L. 111-40 approved 7-1-09

Westlaw. (C) 2009 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT