09-1664

# United States Court of Appeals
## for the First Circuit

———————————————

### PEDRO LOPEZ, ET AL.,
*Plaintiffs-Appellees,*

*v.*

### COMMONWEALTH OF MASSACHUSETTS, ET AL.,
*Defendants-Appellants.*

———————————————

APPEAL FROM A DECISION OF THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

———————————————

**BRIEF THE PLAINTIFFS/APPELLEES, PEDRO LOPEZ, ET AL.**

———————————————

HAROLD LICHTEN, ESQ.  1st. Cir. No.: 22114
LEAH BARRAULT, ESQ.   1st. Cir. No.: 1120452
Lichten & Liss-Riordan, P.C.
100 Cambridge Street, 20th Floor
Boston, MA  02114
(617)-994-5800

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES …………………………………………….. iii

I.    STATEMENT OF THE CASE ………………………………………… 1

II.   QUESTIONS PRESENTED FOR APPEAL…………………………. 3

III.  STATEMENT OF FACTS …………………………………………….. 4

        A.  BACKGROUND – THE COMMONWEALTH'S
        HISTORICAL USE OF DISCRIMINATORY
        POLICE AND FIRE EXAMS……………………………… 4

        B. THE COMMONWEALTH'S PERVASIVE
        CONTROL OVER THE HIRING AND
        EMPLOYMENT OF CIVIL SERVICE POLICE
        OFFICERS…………………………………………………… 7

IV.   SUMMARY OF ARGUMENT………………………………………. 15

V.    ARGUMENT ………………………………………………………16
        A.    THIS COURT SHOULD GRANT PLAINTIFFS
          MOTION TO DISMISS THIS
          INTERLOCUTORY APPEAL, BECAUSE
          11TH AMENDMENT INTERLOCUTORY APPEALS
          DO NOT LIE WHERE THE PLAINTIFFS SEEK
          PROSPECTIVE RELIEF UNDER
          *EX PARTE  YOUNG* …………………............................ 16

        B.    THE CASES ARE CLEAR THAT
          WHERE THE QUESTION OF SOVEREIGN
          IMMUNITY/11TH AMENDMENT TURNS
          ON ISSUES OF FACT, AND NOT ONES
          SOLELY OF LAW, AN INTERLOCUTORY
          APPEAL IS NOT PERMITTED ……………………… 24

C.    CONGRESS CLEARLY AND UNEQUIVOCALLY
INTENDED TO WAIVE THE SOVEREIGN
IMMUNITY OF STATES AND MUNICIPALITIES
UNDER TITLE VII PURSUANT TO ITS POWERS
GRANTED BY THE 14TH AMENDMENT AND
CONGRESS SPECIFICALLY INTENDED
THAT SUCH WAIVER EXTEND TO
DISPARATE IMPACT CLAIMS………………….… 27

D.    BASED UPON THE COMMONWEALTH'S
EXTENSIVE INVOLVEMENT IN POLICE
HIRING, PROMOTIONS, TRAINING,
RETIREMENT, AND OTHER ASPECTS OF
EMPLOYMENT, THE DISTRICT COURT
WAS CORRECT IN DENYING THE
COMMONWEALTH'S MOTION FOR SUMMARY
JUDGMENT ……………………………………….. 32

VI.    CONCLUSION……………………………………… 48

ii

# TABLE OF AUTHORITIES

**Cases**

Alaska v. EEOC, 564 F.3rd 1062 (9th Cir. 2009)……………………………….. 27

Association of Mexican-American Educators v. California,
231 F.3d. 572, 581-583 (9th Cir. 2000)…………………………………………*passim*

Baranek v. Kelly, 630 F. Supp. 1107,1113 (D. Mass 1986)…………………. 45

Barone v. Hackett, 602 F.Supp. 41, 43 (D.R.I.  1984)……………………….. 45

Boston Chapter of NAACP v. Beecher, 371 F.Supp. 507 (D. Mass 1974)….*passim*

Boston Chapter of NAACP v. Beecher, 679 F.2d 965 (1982)………………. 5, 12

Brackett v. Civil Service Commission, 477 Mass 233 (2006)……………….. 13, 48

Bradley v. City of Lynn, 443 F. Supp 2d. 145 (D. Mass 2006) ……………. *passim*

Bradley, et al. v. City of Lynn, 403 F. Supp. 2d  161 (D. Mass 2005) …… . *passim*

Camacho v. Puerto Rico Ports Authority, 369 F.3d 570 (1st Cir. 2004) …….*passim*

Carlton v. Commonwealth of Massachusetts, 477 Mass 791 (2006) ……….. 8

Car Parts Distribution Center, Inc. v. Auto Wholesalers Association of New
England, 37 F.3d. 12 (1st Cir. 1994) ……………………………………… 16, 41

Castro v. Beecher, 459 F.2d. 725 (1st Cir. 1972) ……..……………………4, 31

Castro v. Beecher 365 F.Supp. 655 (D. Mass 1973)…………………………40

Castro v. Beecher, 679 F.2nd 956 (1st Cir. 1982) …………………………..22

Conroy v. City of Philadelphia, 421 F.Supp. 2d 879 (2006)………………… 43, 44

Cotter v. City of Boston, 323 F. Supp. 3d. 160, 163 (D. Mass) 2003 ………...11, 15

Cotter, et al. v. city of Boston and James Hartnett, Director of Department of Personnel Administration, 73 F. Supp. 2d. 62 (D.Mass 1999)………………. 34

Curran v. Portland Superintending School Committee, 435 F.Supp. 1063, 1072-1073 (D. Maine 1977)……………………………. 46

EEOC v. City of Evanston, 854 F. Supp. 534, 538 (N.D. Illinois 1994)…………………………………….. 46

EEOC v. Illinois, 69 F.3d. 167,171 (7th Cir. 1995)……………………………. *passim*

Ex Parte Young, 209 U.S. 123 (1908) …………………………………………… *passim*

Fields v. Hallsville School District, 906 F.2d. 1017 (5th Cir. 1990)…………*passim*

Fitzpatrick v. Bitzer, 427 US 455 (1976)………………………………… . . *passim*

Garrett v. University of Alabama, 531 US 352, 368 (2001)…………………. 20, 24

George v. New Jersey Board of Veterinary Medical Examiners, 794 F.2d. 113 (3rd Cir. 1986)……………………………………………………43

Griggs v. Duke Power Co., 401 US 424 (1971)……………………………28, 30

Guardians Association v. Civil Service Commission, 630 F.2d. 79, 104-105  (2nd Cir. 1980)………………………………………….46

Gulino v. New York State Education Department, 460 F.3d 361 (2nd Cir. 2006)………………………………………………… . *passim*

Haddock v. Board of Dental Examiners, 777 F.2d. 462 (9th Cir. 1985)………40, 43

Heggarty v. Somerset County, 25 F. 3d 17,18 (1st Cir. 1994)……………….. 21

*In Re*:  Employment Discrimination Litigation Against the State of Alabama, 198 F.3[rd] 1305(11th Cir, 1999)…………………………………………….. 27, 31

Kimmel v. Florida Board of Regents, 508 US 62, 80 (2000)……………...…  20

Lugo v. Alvardo, 819 F. 2nd 5 (1st Cir. 1987)…………………………………21

Massachusetts Association of African-American Police Officers v. Boston Police Department, et al., 106 F.R.D. 80 (D. Mass 1985) ………………………… 4, 33

Massachusetts Association of African-American Police Officers v. Boston Police Department, et al.,780 F.2d. 5,6-7 (1st Cir. 1985)……………………………… 33

Massachusetts Ass'n of African-American Police Officers v. City of Boston, 973 F.2nd 18,19 F.21 (1st Cir. 1992)………………………………………….. 22

Mullins v. Department of Labor, 2009 WL 1059208 (D. Puerto Rico 2009)………………………………… 20

Neal v. East Tennessee State University, 2008 WL 4065933 (E.D. Tenn 2008)………………………………..… 20

Okruhlik v. University of Arkansas, 255 F.3d 615, 23 (8th Cir. 2001) ………………………………………… 27, 31

Owens v. Rush, 636 F.2d. 283, 287 (10th Cir. 1980)…………………………46

Pratt, et al. v. Commonwealth of Massachusetts Human Resources Division, #09-1254 (Suffolk Superior 2009) ……………………………………….. 37

Puerto Rico Aqueduct and Sewer Authority v. Metcalf and Eddy, 506 US 139 (1993) …………………………………………………………. 17

Puntoillo v. New Hampshire Racing Commission, 375 F.Supp. 1089, 1091-92 (D.N.H. 1974)………………………………… 46

Quinn v. City of Boston, 325 F. 3rd 18 (1st Cir. 2003) ………………………. 5, 9

Rivera-Torres v. Ortiz Valez, 341 F.3rd 86 (1st Cir. 2003) ………………… 25, 26

Robert St. Peter v. Commonwealth of Massachusetts Public Employees Retirement Administration Commission (PERAC), Superior Court #02-5669-H (Suffolk Superior 2007) …………………………………………………………..13, 46

Spirit v. Teachers Insurance and Annuity Association, 691F.2d. 1054, 1063 (2nd Cir. 1982)………………………………………… 46

Stella v. Kelley, 63 F.3rd 71, 74 (1st Cir. 1995)…………………………………… 26

United States of American v. City of Yonkers,
 592 F.Supp. 570, 589-591 (S.D.N.Y. 1984)…………………………………*passim*

United States of America v. State of New Jersey,
 4736 F. Supp. 1199 (D.N.J. 1979)……………………………………………... 39

United States v. State of New Jersey Department of Personnel,
 1995 WL 1943013…………………………………………………………38, 46

US v. Brooks, 145 F. 3rd 446, 456 (1st Cir. 1996)……………………………… 26

Vulcan Pioneers v. New Jersey Department of Civil Service,
 832 F.2d. 811 (3rd Cir. 1987)……………………………………………………38, 46

William Brackett v. Civil service Commission, et al.,
 477 Mass 233 (2006)…………………………………………………………… 36

Wards Cove Packing Company v. Atonio, 490 US 642 (1989)………………28

**Federal Statutes**

28 U.S.C. § 1292(d)………………………………………………………….. 19

42 U.S.C. § 2000(e)(a)…………………………………………………………. 27

42 U.S.C. § 2000(e) …………………………………………………………… 1

42 U.S.C. § 2000e(f) …………………………………………………………… 27

**Massachusetts Statutes**

Mass. Gen. Laws. c. 6§ 116…………………………………………………….. 11

Mass. Gen. Laws. c. 31……………………………………………………………7

Mass. Gen. Laws. c. 31§ 3……………………………………………………… 36

Mass. Gen. Laws. c. 31§ 3e…………………………………………….. 37

Mass. Gen. Laws. c. 31§ 4………………………………………… 36

Mass. Gen. Laws. c. 31§ 5……………………………………… 9, 39

Mass. Gen. Laws. c. 31§ 6…………………………………… 9

Mass. Gen. Laws. c. 31§ 7……………………………………10

Mass. Gen. Laws. c. 31§ 7-15……………………………...12

Mass. Gen. Laws. c. 31§ 16………………………………… 9

Mass. Gen. Laws. c. 31§ 21………………………………… 9

Mass. Gen. Laws. c. 31§ 22-24…………………………… 9

Mass. Gen. Laws. c. 31§ 26………………………………... 9

Mass. Gen. Laws. c. 31§ 27………………………………... 11

Mass. Gen. Laws. c. 31§ 28………………………………... 9

Mass. Gen. Laws. c. 31§ 39………………………………… 12

Mass. Gen. Laws. c. 31§ 41-43…………………………… 12

Mass. Gen. Laws. c. 31§ 42-44…………………………… 12

Mass. Gen. Laws. c. 31§ 59……………………………… 9

Mass. Gen. Laws. c. 31§ 61……………………………… 8

Mass. Gen. Laws. c. 31§ 61A……………………………11

Mass. Gen. Laws. c. 32§ 8(2)……………………………13

Mass. Gen. Laws. c. 41§ 96b ……………………………11

Mass. Gen. Laws. c. 41§ 108L…………………………………………………. 12

Mass. Gen. Laws. c. 58§ 1……………………………………………… 12

Mass. Gen. Laws. c. 59§18……………………………………………... 12

Mass. Gen. Laws. c. 70 §1……………………………………………… 12

**Legislative Materials**

Equal Employment Opportunity Act of 1972 (June 2, 1972)………………... 29

Equal Employment Opportunity Act of 1972,
Pub. L. 922-16, 86 stat. 103 ……………………………………………… 27

H.R. Rep. 92-238, P.L. 92-261 …………………………………………….29

HRD Personnel Administration Rules at PAR.09 ……………………………14

P.L. 102-166 (November 21, 1991) 105 stat 1071……………………………28

## I.    STATEMENT OF THE CASE[1]

This lawsuit, originally brought as a class action, was filed on behalf of minority municipal police officers throughout the Commonwealth of Massachusetts who assert that the police sergeants promotional examination administered by the Commonwealth of Massachusetts, Human Resources Division [HRD] had an overwhelming disparate impact upon minority police officers, and could not be shown to be job-related under the standards required by Title VII.[2] After class certification was denied on June 8, 2008, Plaintiffs filed an amended complaint adding approximately 45 individual plaintiffs who had taken the police sergeants exam in Cities throughout the Commonwealth of Massachusetts including the City of Boston.  The municipalities where each plaintiff worked as a police officer were also added as Defendants (App. 41-52).

---

[1] In its Record Appendix, the Commonwealth failed to include any of the exhibits filed by Plaintiffs in support of their Statement of Material Facts, opposing the Commonwealth's Motion for Summary Judgment.  Accordingly, the Plaintiffs have been required to submit, herewith, a Supplemental Appendix adding these exhibits, and also including exhibits filed with the Court below relating to class certification.  Such exhibits are relevant to the factual issues involved in this interlocutory appeal.

[2] In June of 2008, this court denied Plaintiffs' Motion for Class Certification, as to liability, but permitted the Plaintiffs to raise the issue again "with respect to damages". Plaintiffs moved for permission to file an interlocutory appeal from this order, which this Court denied. (App. 24, Doc. #96, 42 U.S.C. § 2000(e)).

The Parties then engaged in extensive discovery and exchanged expert witness reports.  At the end of discovery, the defendants moved to dismiss or in the alternative for summary judgment arguing, 1) that the defendants were not the statutory employer of the Plaintiffs under Title VII, 2) that the state defendants enjoyed sovereign immunity under the 11th Amendment, and 3) that for some of the examinations challenged, the plaintiffs were beyond the statute of limitations and could not maintain their claims.  (App. 55) With respect to its first argument that the state is not an employer of the plaintiffs, the Commonwealth provided a Statement of Material Facts in which it detailed what it believed to be the facts supporting its lack of an employment relationship with the plaintiffs.  (App. 110) The plaintiffs fully responded to all of the issues set forth in Defendants' Motion for Summary Judgment and provided a voluminous counter-statement of facts with respect to the issue of employment status.   (App. 157-174 & Supl. App 1 to 76). In April of 2009, the Court denied Defendants' Motion for Summary Judgment on all grounds and set the matter for trial.  (App. 32 Doc. Nos.: 167, 172)

The state Defendants then filed this interlocutory appeal asserting that since the Court had denied their motion with respect to "11th Amendment sovereign immunity" they could appeal as a matter of right.  The Plaintiffs promptly filed a Motion to Dismiss the Interlocutory Appeal, claiming that such appeal was meritless because 1) under the *Ex Parte Young* doctrine, an interlocutory appeal

could not in any event dispose of the plaintiffs request for prospective and injunctive relief, thereby making an interlocutory appeal inappropriate; 2) that its 11th Amendment immunity claim was simply a disguised argument relating to the same Title VII statutory interpretation it had made and lost in the District Court ; and 3) that the 1972 amendment to Title VII so unmistakably waived immunity for state and local governments that this issue was not subject to legitimate dispute. On July 1, 2009, this Court consolidated the Motion to Dismiss Appeal with the merits of the case.

## II.    QUESTIONS PRESENTED FOR APPEAL:

The plaintiffs disagree with Defendants' characterization of the questions presented for this appeal.  Instead, the plaintiffs assert that the questions presented for appeal are as follows:

1) **Whether this appeal even involves an issue of sovereign immunity where Defendants are really appealing a decision of the District Court denying their assertion that as a matter of law they are not an employer of the plaintiffs under Title VII;**

2) **Whether *Ex Parte Young* bars an interlocutory appeal based on the guise of sovereign immunity where the plaintiffs are still seeking significant prospective injunctive relief;**

3) **Whether an interlocutory appeal based on sovereign appeal is permissible where the underlying question presented is not a pure one of law, but involves mixed questions of fact;**

4) **Assuming *arguendo* that this interlocutory appeal is properly before this Court, did Congress, acting pursuant to its powers under the 14th Amendment, clearly and unequivocally waive**

3

the sovereign immunity of the states with respect to
employment practices that have an unlawful, discriminatory
impact upon minorities in violation of Title VII of the Civil
Rights Act of 1964, when it enacted the 1972 and 1991
Amendments to Title VII;

5) Assuming *arguendo* that it is even permissible for the Court in
this interlocutory appeal to reach the merits of this question,
does the Commonwealth act as an employer or joint employer
of the plaintiffs, as a result of the pervasive control it exercises
over the employment of municipal police officers, and is
therefore properly subject to Title VII;

## III.    STATEMENT OF FACTS

### A.    BACKGROUND – THE COMMONWEALTH'S HISTORICAL USE OF DISCRIMINATORY POLICE AND FIRE EXAMS:

For more than forty years, the Commonwealth of Massachusetts has been

exclusively responsible for all statewide entry-level hiring and promotional exams

for civil service police and fire fighters throughout Massachusetts, and including

constructing and scoring such exams, and then determining rankings for all

candidates who pass such exams.  The Commonwealth is also exclusively

responsible for deciding all challenges to the use of exam questions or the resulting

scoring and ranking of each candidate.  See generally, Castro v. Beecher, 459 F.2d.

(1st Cir. 1972); Massachusetts Association of African-American Police Officers v.

Boston Police Department, et al., 106 F.R.D. 80 (D. Mass 1985); Boston Chapter

NAACP v. Beecher, 371 F.Supp. 507 (D. Mass 1974);  Bradley, et al. v. City of

Lynn, 403 F. Supp. 2d 161 (2005).  Since the early 1970s, the Commonwealth, has

4

been under order to require hiring preferences to remedy the fact that the

Commonwealth's entry-level police and fire examination was found to be

discriminatory and in violation of Title VII and the Civil Rights Act of 1964.  See

Quinn v. City of Boston, 325 F.3d 18 (1st Cir. 2003); Boston Chapter NAACP v.

Beecher, et al, 679 F.2d 965 (1982). Not only is there a long and sad history of

these entry-level examinations discriminating against minority candidates in

violation of Title VII, but the Commonwealth has for years understood that it's

promotional exams were likewise discriminatory and unlawful.  (Supl. App. 101-

134)  Indeed, as Plaintiffs pointed out in their Motion for Class Certification, and

as they alleged in their Complaint, the examination practices conducted by the

defendants have resulted in an overwhelming absence of qualified minority

individuals attaining the rank of sergeant in large city police departments.[3]  (App.

38-44)

    The reason for the shocking disparity of minority police sergeants is the

statewide examination created, administered, scored, and ranked by the

Commonwealth.  Unlike the promotional practices in almost every big city police

department outside of the Commonwealth, in every big city in Massachusetts,

_____

[3] In a recent Boston Globe article, which plaintiffs attached to their Motion for
Class Certification (Supl. App. 101), the Globe noted that in many big cities, there
may be as few as one or two minority police sergeants and in some cities, no
minority police sergeants.  This shocking failure to have minority police sergeants
is directly and inextricably the result of the examinations administered by the state
Defendants.

promotional lists are established by the Commonwealth by the use of a pen and

paper exam consisting of approximately 100 questions that are taken directly out of

textbooks relating to police practice.   (Supl. App. 53-86)  The test is simply a form

of memorization and as plaintiffs' experts have attested, has a significant and

overwhelming disparate impact to minority candidates and cannot be shown to be

job related.  Id.   More importantly, the test is then used as a rank order – not

pass/fail – hurdle.  This means that candidates are ranked based on their raw score

(from 100 down to a failing grade of 70).  While many minority candidates do pass

the exam, because they can only get hired if their scores are at the top of the rank

order list, minority scores are generally bunched together towards the bottom of the

passing list while non-minorities have the highest scores from which promotions

can be made.  (Supl. App. 94-128)  As demonstrated in the Motion for Class

Certification, this has resulted in minority candidates with excellent records, and

distinguished careers continually not being reached for promotion by less

experienced, non-minority officers.   Id.  The use of such exams has been roundly

criticized and even the Defendants have recently admitted that when used as a

rank-order device, the promotional exams are not valid and failed to distinguish

between the better candidate within significant point ranges.  (Supl. App. 6)

Thus, the plaintiffs demonstrated below that 1) the Commonwealth's police

sergeant examination has had an overwhelming disparate impact upon minority

candidates as used by the Commonwealth as a rank-order device and 2) it is not

job-related as required by Title VII standards and therefore is in direct violation of

Title VII of the Civil Rights Act of 1964.  The result is that in some large

Massachusetts cities there are few, if any, minority police sergeants.

B.    **THE COMMONWEALTH'S PERVASIVE CONTROL OVER THE HIRING AND EMPLOYMENT OF CIVIL SERVICE POLICE OFFICERS**

The Commonwealth exercises pervasive control over the hiring, training,

promotion, retirement, and funding of police officers.  This pervasive involvement

is clearly unique to the Commonwealth.  In Massachusetts, a municipality has the

option of accepting the state's Civil Service Law, M.G.L. c. 31.  If a municipality

accepts c. 31, the Commonwealth assumes most of the responsibility for entry-

level hiring, promotions, as well as many other matters typically handled by an

employer.  Unlike most other states in the country, Massachusetts has elected

through its Civil Service Statutes to retain extensive control over the careers of

municipal police officers and fire fighters, including the state's funding of the

operations of municipalities and control of over retirement of such police officers.

This control is exhaustively described by Judge Saris in <u>Bradley et al. v. City of</u>

<u>Lynn</u>, 403 F. Supp. 2d, 161 (D. Mass 2005), and <u>Bradley v. City of Lynn</u>, 443 F.

Supp 2d. 145 (D. Mass 2006).

First, in order to become a police officer it is the state that recruits, and sets the minimum standards and qualifications for the position of police officer (App. 166-168). In addition, it is the state that sets the medical standards for all police officers (App. 168) and requires that each potential police officer meet those standards. Id. If a question arises as to whether or not a police officer has met those standards, it is the Commonwealth which determines any appeals regarding such medical standards. See Carlton v. Commonwealth of Massachusetts, 477 Mass. 791 (2006). In addition to setting initial medical standards, it is the Commonwealth that is responsible for setting ongoing medical standards which police officers must adhere to during the course of their employment. See M.G.L. c.31 §61.

Indeed, the Commonwealth's HRD website states that it has been charged with the task of "recruit[ing] and evalut[ing] current and potential employees to insure fair and equal access to careers in public services and to provide qualified candidates to the agencies and municipalities of the Commonwealth". (App. 166) To that end, the Commonwealth expressly claims oversight of the appointment/hiring process. Id. In order to become a police officer in a civil service community, including all towns and cities in this case, an individual interested in such position must apply for and take an entry-level examination created, administered, scored, and promulgated by the Commonwealth. See

M.G.L. c.31 §§5, 16, 21, 28, and 59.  (App. 166-167)  While the Commonwealth

suggests that a municipality may utilize its own alternative examination, that has

never occurred.[4]  It is the Commonwealth that has complete control over the

scoring of such exams.  Once scores are determined by the Commonwealth,

applicants may appeal their scores to the Commonwealth and not to the

municipality and it is the Commonwealth and not the municipality that decides

such appeals over the scoring and over the fairness of the test questions.  See

M.G.L. c.31 §22-24.  (App. 167-168).

It is the Commonwealth that then determines how to rank the candidates on

the eligibility list.  Traditionally, HRD has ranked the candidates by total raw score

with the highest score at the top. (Supl. App. 6,124-133)  It is also the

Commonwealth that determines certain absolute preferences, such as for

individuals who are military veterans or who are the sons or daughters of deceased

police officers who died in the line of duty.  See M.G.L. c.31 §§ 6 and 26.  See also

Quinn v. City of Boston, 325 F. 3d. 18 (1st Cir. 2003) (describing such statutory

preferences).

---

[4] There is no evidence that any civil service municipality has ever used an entry-level test other than the one promulgated by HRD.  With respect to promotions, the Commonwealth can only point to two small towns, Salem and Leominster, where such alternative exams have been utilized in the last hour years and even then, such exam procedures had to be authorized and approved by the Commonwealth.  (App. 102-104).

More recently, when the Commonwealth was faced with this lawsuit, and lost, <u>Bradley v. City of Lynn</u> <u>supra</u>, it retained an expert who apparently informed the Commonwealth that utilizing this rote memory written examination as a rank-order scoring device was scientifically indefensible.  (Supl. App. 6)  The state defendants then, on their own, instituted a new banding formula in which they deemed all scores within an 8 point range to be the same score and did so both for entry-level examinations and for police promotional examination.  (Supl. App. 5-60, App. 168).  The Commonwealth made this decision based on advice they received that there was no appreciable difference between scores within a certain point spread, therefore a use of a rank-order scoring device was improper.  (Supl. App. 6)

In addition, it is the Commonwealth that sets the passing score for every such examination, and recently, the Commonwealth unilaterally changed its practice of having a uniform (pass/fail) cutoff score of 70, lowered the pass/fail score to 62.  The cities and towns have no role in any of these decisions.  (Supl. App. 6)

Even if a police officer candidate passes the entry-level exam or a police officer passes the sergeant's promotional exam, he or she will not be reached for an appointment or promotion unless his or her rank-order score, as determined by the Commonwealth, places them among the top 3 candidates.  <u>See</u> M.G.L. c.31 §7.

Further, if a municipality attempts to bypass the highest ranked candidate without good and sufficient reason, the Commonwealth must review and approve such bypass and the individual is entitled to a hearing before the state's Civil Service Commission on the propriety of such bypass.  See M.G.L. c.31 §27. See also Cotter v. City of Boston, 323 F. Supp. 3d, 160 (D. Mass) 2003.

In addition, as part of the hiring process for all police officers in Massachusetts, it is the Commonwealth which requires that each such candidate take and pass a physical agility test that is designed and administered by the Commonwealth Massachusetts.  See M.G.L. c. 31 §61A.  (Supl. App. 5, 7-16) This timed physical agilities test consists of the actual testing of physical abilities such as running, lifting, etc.  Id.  Each candidate must take and pass the physical agilities test in order to be considered for hire as a police officer.  (Supl. App. 5).

Even after a candidate has been approved for hire, he or she is still subject to the police training at a police academy according to requirements mandated by the Commonwealth of Massachusetts, not by the City or Town.  Thus, the Commonwealth's Criminal Justice Training Council sets all the training requirements for all police officer recruits.  See M.G.L. c. 6 §116.  See also c.41 §96b.  The Massachusetts Criminal Justice Training Council not only sets all training and recruits standards, but it also decides medical standards for persons entering all police academies.  Id.

11

It is also the Commonwealth, and not the cities or towns, that decides the procedures for how layoffs and recalls should occur in the municipal police and fire departments, should such layoffs be necessary.  See M.G.L. c.31 §§42-44. Boston Chapter NAACP v. Beecher, 679 F.2d. 965 (1982).  Further, it is the Commonwealth and not the cities or towns that require that if a fire fighter or police officer is subject to layoff in one city or town because of lack of funds, it is the Commonwealth which places them on a statewide reemployment list and requires that they be rehired in any other city or town before anyone is hired in that city from a new eligibility list.  (Supl. App. 2).

Even such mundane matters as leaves of absences are covered by the Civil Service Law M.G.L. and require approval by the Commonwealth, See M.G.L. c.31 §39.  Moreover, the standards governing discipline of municipal police officers are governed by the state's civil service law, and are adjudicated by the state's Civil Service Commission (See M.G.L. c.31 §§7-15 and 41-43).

Additionally, all large cities and towns in Massachusetts receive a significant amount of their funding to pay for municipal police officers and fire fighters through the state funding of such municipal operations.  (also known as "cherry sheets").  See generally, M.G.L. c.58 1 et seq., c. 59 §18 et seq., and c.70 §1 et seq. Moreover, it is a state program, known as the "Quinn Bill" that governs the

educational pay for police officers, and provides half of the funding for such.  See

M.G.L. c.41 §108L.

In the event that a municipality wants to hire only female or Spanish-

speaking officers, or others with special certifications, such determinations can

only be made by HRD and are strictly governed by HRD procedures.  (Supl. App.

76-77)  See also Brackett v. Civil Service Commission, 477 Mass 233 (2006).

Further, the state, through its Public Employee Retirement Administration

Commission (PERAC), governs the procedures for the retirement of disabled

police officers and fire fighters – and their reinstatement to duty when and if they

are able to do so.  See M.G.L. 32 §8(2).  See also, St. Peter v. PERAC, Superior

Court #02-5669-H (Suffolk Superior 2007) (decision attached to Plaintiff's Brief in

Opposition to the Commonwealth's Motion to Dismiss (Doc. 163, ftn. 6).

This case involves the statewide police sergeants examination administered

by HRD in 2005, 2006, and 2007.[5]  During these years, virtually every civil service

community in Massachusetts (except Leominster and Salem) utilized the statewide

---

[5] The exams are given in October of every year (2005, 2006, and 2007), but the
results are not certified until several months later in the winter of the next year.
The 2005 exam did not yield certified results until the winter of 2006, and the 2007
exam did not yield certified results until the winter of 2008.  The eligibility lists
resulting from these exams continue to for up to 3 years, such that for the Fall,
2007 exam, certified in 2008, the resulting promotional list continues in effect until
2011. (App. 157-164)

police sergeants examination (App. 102-103).  HRD has done nothing to require such communities to use their own examination processes.

The Commonwealth takes full responsibility for devising the statewide police sergeants examination and administering it, and no one else is involved in that process.  (App. 103-107).  Further, it is the Commonwealth that has continued to track the disparate impact that its exams have had on minority officers.  Each year it compiles a disparate impact analysis and has known that the exam has had significant disparate impact on minorities for many years.  (Supl. App. 55, 68, 70).

Once the Commonwealth determines the scores of the candidates, it is the Commonwealth which ranks the candidates on their respective municipal eligibility lists and provides those eligibility lists to the towns.  (App. 128)   The city or town must then pick from among the top three ranked candidates on the list.  Thus, if there are three vacancies for police sergeant, those three must be picked from the top 7 candidates utilizing what the Commonwealth refers to as the "2N+1".  Id.  Thus, even if a municipality wants to hire more minority police officers, it cannot do so because it must hire from the top of the list.  (See HRD Personnel Administration Rules at PAR .09 Appendix at p.76).  If the town does not select the top ranked candidate, the non-selected candidate is permitted to have his non-selection reviewed by the Commonwealth and have a formal hearing

regarding such bypass before the state Civil Service Commission. <u>Cotter v. City of Boston</u> 323 F. 3d. 16, 163 (D. Mass 2003).

## IV.    SUMMARY OF ARGUMENT

This Court should not reach the merits of the Commonwealth's interlocutory appeal because the interlocutory appeal itself is improper.  First, 11th Amendment immunity, which is the basis for this unusual interlocutory appeal is not a bar for seeking prospective injunctive relief, as Plaintiffs seek here.  Thus, the cases are unanimous that an interlocutory appeal claiming 11th Amendment immunity from damages is not permissible where under *Ex Parte Young*, the plaintiffs are seeking such prospective relief against governmental defendants.  (<u>See</u> p. 16-21)  In addition, while the plaintiffs believe that the evidence is overwhelming that the Commonwealth acts as an employer under Title VII given the facts of this case, to the extent that the parties put forth divergent facts to support their position, the question may become a mixed question of fact and law.  The Courts are clear that an interlocutory appeal based on sovereign immunity is not permissible where the question posed is not a pure question of law.  (<u>See</u> p. 23-24).

Even should the Court reach the merits, the defendants' claim that Congress has not waived the 11th Amendment immunity of the Commonwealth under Title VII borders on the frivolous.  Both the 1972 and 1991 Amendments to the Civil Rights Act of 1964, Title VII, make clear that Congress specifically intended

disparate impact – invalid testing techniques claims to be brought against the states and every court that has addressed this issue has agreed. (See p. 24-28.)

While the plaintiffs do not believe it appropriate for this Court to reach the merits of the Commonwealth's claim that it is not an employer under Title VII for the purpose of this case, should this Court reach that claim, the evidence is overwhelming that the lower court properly denied the Commonwealth's Motion for Summary Judgment on this issue. The Commonwealth retains such pervasive and overwhelming control over the employment relationship of municipal police officers as to make it an employer under Title VII. Further, this Court's decision in Car Parts Distribution Center, Inc. v. Auto Wholesalers Association of New England, 37 F.3d. 12 (1st Cir. 1994), is dispositive on the point, since it is clear that the Commonwealth is primarily for recruiting, hiring, and promoting municipal police officers. Moreover, none of the cases which the Commonwealth cites to support its position have remotely similar facts and in those cases, the states were acting more as a licensor/regulator. (See p. 29-44.)

**V.    ARGUMENT**

**A.    THIS COURT SHOULD GRANT PLAINTIFFS MOTION TO DISMISS THIS INTERLOCUTORY APPEAL, BECAUSE 11TH AMENDMENT INTERLOCUTORY APPEALS DO NOT LIE WHERE THE PLAINTIFFS SEEK PROSPECTIVE RELIEF UNDER *EX PARTE YOUNG:***

16

The sole basis for this interlocutory appeal is the Commonwealth's claim that the lower court improperly denied its claim of sovereign immunity under the 11th Amendment and therefore it has an automatic right to this interlocutory appeal under Puerto Rico Aqueduct and Sewer Authority v. Metcalf and Eddy, 506 US 139 (1993). While it is clear from a reading of their brief that the Defendants are really taking issue with the District Court's refusal to grant their Motion for Summary Judgment (which asserted that the Commonwealth cannot be held to be an employer under Title VII under the facts of this case) the Defendants assert that this question of Title VII statutory interpretation becomes an 11th Amendment sovereign immunity issue because Congress did not clearly and unmistakably waive the state's sovereign immunity for such Title VII claims.  However, as demonstrated below, in 1972, Congress specifically amended Title VII to add cities and states as respondents in Title VII cases and the US Supreme Court held in Fitzpatrick v. Bitzer, 427 US 455 (1976), that this amendment was a clear and unmistakable waiver of a state's sovereign immunity and was properly premised upon Congress' Authority under the 14th Amendment.

Yet even if this Court were to accept this dubious premise, the Commonwealth still faces two insurmountable hurdles to bringing this as an interlocutory appeal: 1) the 11th Amendment is not a bar to maintaining claims for prospective and injunctive relief against the Commonwealth, and in this case,

Plaintiffs clearly seek such prospective relief, and 2) the Commonwealth's assertion that it does not exert sufficiently pervasive control over the employment of municipal police officers such that Congress did not intend to waive such immunity in such circumstances, is at best a mixed question of law or fact, which cannot be determined on this record, and the Courts are clear that interlocutory appeals from the denial of sovereign immunity are not properly brought where the issue presented on appeal is not purely one of law.

To get around this first problem – that the 11th Amendment does not bar prospective relief – the Defendants make the following circular argument: First they argue that if they are not an employer under Title VII based upon the facts of this case, then no prospective relief, let alone damages will be available and the case will have to be dismissed. But that argument is not a sovereign immunity argument at all, but rather is simply a question of statutory interpretation under Title VII of the Civil Rights Act of 1964.[6]  If the Commonwealth is correct that it

---

[6] Perhaps the most persuasive demonstration that the Commonwealth's argument is not one of sovereign immunity at all (thereby precluding this interlocutory appeal), but simply a question of the proper interpretation of Title VII, is that in all of the Appeals Court cases which they cite in support of their proposition that they are not an employer, the appeals in all but one was after disposition of the entire case in the court below, not as a result of an attempt to file an interlocutory appeal based upon a strained argument that the issue involved 11th Amendment sovereign immunity.  EEOC v. Illinois, 69 F.3d. 167,171 (7th Cir. 1995); Gulino v. New York State Education Department, 460 F.3d 361 (2nd Cir. 2006); Fields v. Hallsville School District, 906 F.2d. 1017 (5th Cir. 1990).  Indeed, in two of those cases,

is not an employer under the facts of this case for Title VII purposes, then the issue

is not one of sovereign immunity, it is simply a question of liability under Title

VII.  Under the Commonwealth's faulty logic in every Title VII case where it files

a dispositive motion and loses, it could claim an automatic right to interlocutory

appeal, arguing that if it is correct in its motion, it would have 11th Amendment

immunity.  Any state could then take an interlocutory appeal from any

unsuccessful dispositive motion which it files in any Title VII case regardless of

---

Gulino and EEOC v. Illinois supra, the lower courts found that the states of New
York and Illinois respectively were employers with respect to the conduct in
question and ultimately found in favor of the plaintiffs on the merits.  The
Defendant states appealed after final judgment based on their argument that they
were not an employer under Title VII.  But there is no mention in either of these
cases, including the decision of Judge Posner in EEOC v. Illinois, that there was
any issue of sovereign immunity.  Rather the Courts treated the question simply as
one of statutory interpretation.  This is strong evidence that the Commonwealth is
simply trying to play fast and loose when it attempts to convert a question of
statutory interpretation into an interlocutory appeal by casting it as sovereign
immunity.

Even in the principal case in this Cir. relied upon by the Defendants,
Camacho v. Puerto Rico Ports Authority, 369 F.3d 570 (1st Cir. 2004), neither the
Commonwealth of Puerto Rico (which enjoys 11th Amendment immunity) nor this
Court (Justice Selya) raised any issue of sovereign immunity.  Rather, in the
District Court, the magistrate determined that the Plaintiff was a *de facto* employee
of the Commonwealth of Puerto Rico, but then at the request of the
Commonwealth, the Commonwealth moved and the magistrate granted a request
for interlocutory review pursuant to 28 U.S.C. § 1292(d).  Thus, these cases
demonstrate that the question of whether or not the Commonwealth is an employer
for Title VII purposes is not a question of sovereign immunity, which permits an
interlocutory appeal as a matter of right, but simply a question of statutory
interpretation which must go through the normal litigation process.

19

the issue.  Such a process would turn the very limited right of "interlocutory

appeal" based on sovereign immunity into a floodgate.  While the Commonwealth

disguises its statutory argument as one of 11th Amendment sovereign immunity,

but the law is clear that even were it immune from having to pay damages to the

plaintiffs such immunity does not bar an action to "enjoin state officials to conform

their…conduct to the requirements of federal law" (See Garrett v. University of

Alabama, 531 US 352, 368 (2001); Kimmel v. Florida Board of Regents, 508 US

62, 80 (2000); Mullins v. Department of Labor, 2009 WL 1059208 (D. Puerto Rico

2009) (in light of Supreme Court precedent, actions seeking money damages under

the ADEA will not be dismissed to the extent that the action seeks equitable relief).

Further, the law is clear that actions seeking instatement or reinstatement are

considered claims for equitable relief which are not barred by 11th Amendment

immunity.  Thus, in Garrett v. University of Alabama, the Court stated:

> Our holding here that Congress did not validate the abrogate
> states' immunity suit by private individuals for money damages
> under Title I does not mean that persons with disabilities do not
> have federal recourse against discrimination…those standards
> can be enforced by the United States in actions for money
> damages, as well as by private individuals for injunctive relief.

Id. at footnote 9.  See also Neal v. East Tennessee State University, 2008 WL

4065933 (E.D. Tenn 2008).

In the proceedings below, the Commonwealth moved for a stay pending appeal which the District Court granted. In doing so, the Commonwealth relied on Heggarty v. Somerset County, 25 F. 3d. 17,18 (1st Cir. 1994) for the proposition that where the District Court denies qualified immunity, the defendants has an automatic right to an interlocutory appeal. Heggarty was an action solely for monetary damages and this Court stated:

> We also point out that the underlying case is one for monetary damages only and does not request injunctive relief, as to which a defense of qualified immunity is immaterial. c.f. Lugo v. Alvardo, 819 F. 2d. 5 (1st Cir. 1987) concluding that equitable claims stand on a different footing than damage claims…

Id at p.18.

In an effort to get around this problem, the Commonwealth argues two things in its brief: First it argues that "if the Court rules that HRD is not Plaintiffs' employer under Title VII, neither it nor Deitl [the director of Human Resources] would have any obligation under the statute. And in such a case *Ex Parte Young* would not preserve any of the plaintiffs claims for injunctive relief because there would simply be no violation of federal law". (See the Commonwealth's Brief at p. 16). Yet this argument points out the impropriety of the Commonwealth's entire appeal. The Defendants really argues that they're not an employer under the facts of this case for Title VII purposes, and as stated above, this is not a question of sovereign immunity at all, but is simply a question of statutory interpretation under Title VII. If the Commonwealth is right, it will not be held liable under Title VII

21

and if it is wrong, it will be held liable under Title VII. This is a very different question than whether the Commonwealth is immune from a damages award.

Second, the Commonwealth argues that the plaintiffs are in fact not seeking equitable prospective relief, but only seeking damages for past actions and, therefore, the *Ex Parte Young* doctrine does not apply. (See The Commonwealth's Brief at p. 16). But that argument reflects a profound misunderstanding of this case. In this lawsuit, the plaintiffs are primarily seeking prospective and injunctive relief remedying the effects of discriminatory promotional exams created and administered by the Commonwealth over the last several years. (See Plaintiffs' Amended Complaint App. at p.38). They ask the Court to "issue appropriate declaratory and injunctive relief remedying Defendants' past acts of discrimination." Indeed, the remedy that the Plaintiffs seek in this case is similar to the injunctive relief granted by Judge Saris in Bradley v. City of Lynn, 443 F.Supp. 2d. 145 (D. Mass 2006) (consent injunctive order attached to the Plaintiffs' Motion to Dismiss Interlocutory Appeal). See also consent decree discussed in Massachusetts Association of African-American Police Officers v. City of Boston, 973 F.2d. 18,19 (1st Cir. 1992). This type of prospective injunctive relief is also discussed in Castro v. Beecher, 679 F.2d. 956 (1st Cir. 1982).

What the Commonwealth calls past discrimination is really present discrimination. That is because the state defendants completely omit the facts that

the Commonwealth conducted its exams for police sergeants in 2005, 2006, and 2007, it took months until appeals of test questions took place and final scoring was announced.  The actual eligibility lists based upon the October, 2005, 2006, and 2007 exams, did not occur until late winter/early spring of the following year.  So for example, the 2007 exam did not result in established, scored, and ranked eligibility lists until 2008, (App. 128) months after the plaintiffs had already filed suit in 2007.   Most importantly, the effects of these discriminatory eligibility lists continue in many cases for at least three years.  This is because promotions from those eligibility lists continue to be made over the course of three years or until the Commonwealth administers another promotional exam for that municipality.  So, for example, the 2007 promotional exam resulted in the establishment of a 2008 eligibility list for certain cities and towns that in  many cases didn't result in any promotions until vacancies occurred in 2009, and such discriminatory lists continue to be the basis for promotions now and in the future.  Thus in a very real sense, the plaintiffs are seeking prospective relief barring the use of these ongoing, unlawful, discriminatory lists – relief which is truly prospective in nature, not retroactive.  Indeed it is unquestioned that both the 2006 exam, certified in 2007 is still being used for promotions in some cities, and the 2007 exam certified in 2008, is still being used for promotions in every city where it was utilized.  The 2005

exam also challenged here, continued to be used by the City of Boston until a year and a half after this lawsuit was filed in 2009.  (App. 128)

Just as importantly, the plaintiffs, as they did in <u>Bradley v. City of Lynn</u>, <u>supra</u>, will seek prospective relief in the form of remedial opportunities for the Plaintiffs to ensure that future hirings are made so as to cure the extreme disparity in minority promotions across the Commonwealth; once again truly prospective and injunctive relief.  Thus the plaintiffs are seeking much more in the nature of prospective relief than the plaintiffs in such reinstatement cases as <u>Garrett v. University of Alabama</u>, <u>supra</u> and others, where the issue was whether one individual should be reinstated to a position he held.  Even in those cases, the courts held that this is clearly prospective relief covered by the *Ex Parte Young* doctrine, so certainly the relief sought here so qualifies.  Thus, this case clearly fits within the line of cases based on *Ex Parte Young*, where an interlocutory appeal based on 11th Amendment immunity is not permissible (because of it would obviate the need for a trial) since the 11th Amendment does not bar the type of prospective relief as the plaintiffs seek here.

### B. THE CASES ARE CLEAR THAT WHERE THE QUESTION OF SOVEREIGN IMMUNITY TURNS ON ISSUES OF FACT, AND NOT ONES SOLELY OF LAW, AN INTERLOCUTORY APPEAL IS NOT PERMITTED:

As the plaintiffs made clear in their opposition to the Commonwealth's Motion for Summary Judgment, briefed below, the question of who is an employer

for Title VII purposes is at best a mixed question of fact and law, and the plaintiffs

presented overwhelming and persuasive evidence below as to why under the facts

of this case, the Commonwealth is an employer for Title VII purposes and should

be treated as such.  The Plaintiffs also relied in significant part on the findings

made by Judge Saris in <u>Bradley v. City of Lynn</u>, 403 F.Supp.2d 161 (D. Mass

2005).  A review of the Commonwealth's and Plaintiffs' Statement of Material

Facts filed below, (App. 110, 157) make clear that the parties have divergent views

as to the pervasive control which the Commonwealth does or does not exercise

over municipal police officers including hire, promotion, and retirement.  While

Plaintiffs do believe and maintain that this record supports a finding that state

defendants are an employer under Title VII in this case, given that the

Commonwealth's statement of fact suggests otherwise, Plaintiffs assert in the

alternative, that as best for the defendants, this is a mixed question of fact and law.

　　　This Court has made clear that where the question of whether immunity

applies requires factual findings and those findings are disputed, it is not

appropriate to permit an interlocutory appeal to the First Circuit.  <u>See</u> <u>Rivera-

Torres v. Ortiz Valez</u>, 341 F.3d. 86 (1st Cir. 2003).  There, this Court, relying on

the Supreme Court precedent, delineated when such an interlocutory appeal may

be filed.  First, the claim of immunity must "turn on the issue of law" <u>Id</u>. at 95.

Thus, if the question of immunity turns on a "unresolved issue of material fact" it

is not immediately appealable.  Id. at 95.  See also Stella v. Kelley 63 F.3d. 71, 74

(1st Cir. 1995) ("a District Court's…rejection of a qualified immunity defense is

not immediately appealable when it turns on an issue of fact or an issue perceived

as an issue of fact").  Second, the filing of such interlocutory appeal divests the

District Court of control only "over those aspects of the case involved in the

appeal" Id at 96.  As demonstrated above, since the only immunity asserted by the

Commonwealth is one from damages, the injunctive aspects of this case must

proceed unabated.  Further, the defendant municipalities have not joined in this

appeal, so that proceedings against them should not be stayed.  Third, where the

interlocutory appeal is "patently meritless" it does not deprive the District Court of

jurisdiction in the first instance.  See Rivera-Torres v. Ortiz Valez at p. 95-96, see

also US v. Brooks, 145 F. 3d 446, 456 (1st Cir. 1996).

Based on the detailed and extensive evidence plaintiff presented to the

District Court and repeated here, it is clear that to the extent that this Court reaches

the issue of the Commonwealth's status as employer in this case, plaintiffs assert in

the alternative that this is not a pure question of law, and thus not an issue which is

appropriate for interlocutory appeal.[7]  Rather, this Court should have the benefit of

---

[7] Plaintiffs do contend in Section V, D that should this Court reach the question,
the overwhelming evidence demonstrates that the Commonwealth is a Title VII
employer in this case.

26

having a full record to review before making such an important decision based on so many factual underpinnings.

### C. CONGRESS CLEARLY AND UNEQUIVOCALLY INTENDED TO WAIVE THE SOVEREIGN IMMUNITY OF STATES AND MUNICIPALITIES UNDER TITLE VII PURSUANT TO ITS POWERS GRANTED BY THE 14TH AMENDMENT AND CONGRESS SPECIFICALLY INTENDED THAT SUCH WAVIER EXTEND TO DISPARATE IMPACT CLAIMS:

As the Supreme Court explained in 1976 in Fitzpatrick v. Bitzer, 427 US 445, 448-449 (1976), when Title VII was originally passed in 1964, the statute excluded states and municipalities from its purview.  However in 1972, Congress specifically amended Title VII and made clear that Title VII was being extended to cover states, political subdivisions, and local municipalities.  See Equal Employment Opportunity Act of 1972, Pub. L. 922-16, 86 stat. 103; 42 U.S.C. §2000e(f).  The 1972 amendments enlarged the definition of "respondent" to include all government employers. 42 USC §2000e(a) (defining "person" to include state "governments, governmental agencies, and political subdivisions". See generally, Alaska v. EEOC, 564 F.3d. 1062 (9th Cir. 2009); (en banc) Okruhlik v. University of Arkansas, 255 F.3d 615, 623 (8th Cir. 2001).  In Re:  Employment Discrimination Litigation Against the State of Alabama, 198 F.3d. 1305(11th Cir, 1999). See also Fitzpatrick v. Bitzer, supra at 448 -449.

Nineteen years later in 1991, Congress again amended Title VII, this time to make clear that the law authorized disparate impact claims against all respondents. See P.L. 102-166 (November 21st, 1991) 105 stat 1071.  The legislation was specifically designed to overturn the decision of the Supreme Court in Wards Cove Packing Company v. Atonio, 490 US 642 (1989), because Congress was concerned that "that decision had weakened the scope of federal civil rights protections" Id at Section 2. Specifically, Congress intended to "codify the concepts of 'business necessity' and 'job-relatedness' enunciated by the Supreme Court in Griggs v. Duke Power Co, 401 US 424 (1971), and earlier Supreme Court decisions prior to Wards Cove". Id at Section 3.  The present case, involving a challenge of written memorization-based promotional tests, which have been shown to have significant disparate impact on minority officers, and cannot be shown to be job-related, presents the specific type of improper testing mechanisms that Congress was concerned about in an amending Title VII in 1991, and which the Supreme Court found unlawful in Griggs.

In addition, the legislative history of the 1972 Amendments, which specifically added state and local governments as respondents who were subject to suit under Title VII, made clear that one of the prime purposes of this amendment was to permit individuals to bring actions against state and local governments who used discriminatory testing methods which had a disparate impact and acted as a

28

bar to qualified minority candidates obtaining public safety positions.  See H.R.

Rep. 92-238, 4 P.L. 92-261, Equal Employment Opportunity Act of 1972, (June

2nd, 1972).  The House report accompanying the 1972 Amendments refers to well-

documented findings that indicated "widespread discrimination against minorities"

in "state and local government employment" and that the existence of this

discrimination was perpetuated by the presence of both institutional and overt

discriminatory practices, including "**invalid selection techniques**" Id at p. 2152.

The House report also emphasizes that Congress was concerned with the fact that

employment discrimination in state and local governments was even more

"pervasive"…" than in the private sector".  Id.  In addition, The House report notes

that in particular "law enforcement agencies" certain minorities were significantly

underrepresented in "proportion to their demographic distribution" citing studies

that showed specifically the underrepresentation of police officers in law

enforcement agencies.  Id at 2153.

    The House report continued:

> The problem of employment discrimination is particularly acute
> and has the most deterious effect in these governmental
> activities which are most visible to minority
> communities…notably…law enforcement with the result that
> the credibility of the governments' claim to represent all the
> people equally was negated.

Id.

In addition, the House report specifically cites approvingly the seminal disparate impact case at that time, <u>Griggs v. Duke Power Co.</u>, 401 US 424 (1971). <u>Id</u> at 2156.

As stated above, it is hard to fathom the Commonwealth's argument that Congress has not waived the state's 11th Amendment immunity with respect to the claims pursued in this case. Clearly, in 1972, Congress specifically amended Title VII to add state and local governments together as respondents in discrimination cases, and Congressional history specifically cites: 1) the acute shortage of minority officers in law enforcement and 2) the use of selection techniques which, while neutral on their face, operate to significantly impact minority candidates adversely. As if this were not enough, in 1991, Congress again amended Title VII to make clear beyond doubt that the use of employment-selection devices which resulted in disparate impact and could not be shown to be job related were intended to be unlawful under Title VII. Moreover, the fact that the 1972 Amendments added state and local governments at the same time based on similar legislative history indicates that state and local governments sometimes operate in tandem to create discriminatory hiring procedures.[8] Without any references to legislative

---

[8] Although the Commonwealth does not address the question in its Brief, presumably it is arguing that it is not liable and leaves the question open as to whether or not the cities sued in this case would remain liable. The Cities will presumably claim that they have no role in the creation and administration of these

history, the Commonwealth asserts that Congress did not intend to waive the state's sovereign immunity in this type of case – where the state constructs, devises, and scores a clearly discriminatory promotional exam.  But, in fact, the legislative history shows the very opposite.  All of the courts to address the issue have held that Congress intended to waive the state's sovereign immunity, not only for disparate treatment cases, but also for disparate impact cases.  See *In Re: Alabama Employment Discrimination Legislation* cases, <u>supra</u>; <u>Okruhlik v. University of Arkansas</u>, 255 F.3d. 615, 623 (8th Cir. 2001).   And Congress was specifically concerned with testing devices used by state and local governments which prevented the fair consideration and employment of minority law enforcement officers based on the use of such testing selection techniques.

Moreover, nowhere did Congress indicate an intent to treat state governments differently under Title VII with respect to the jurisprudence that had arisen as to who was and who was not an employee.  Thus, should the Court reach the merits of this appeal, it simply cannot find that the Commonwealth enjoys 11th Amendment immunity where the state actively controls the promotional process and is guilty of what would otherwise be blatant employment discrimination based on the use of a clearly discriminatory selection technique.

---

discriminatory tests, nor did they create eligibility lists therefrom or conduct any scoring.

**D. BASED UPON THE COMMONWEALTH'S EXTENSIVE INVOLVEMENT IN POLICE HIRING, PROMOTIONS, TRAINING, RETIREMENT, AND OTHER ASPECTS OF EMPLOYMENT, THE DISTRICT COURT WAS CORRECT IN DENYING THE COMMONWEALTH'S MOTION FOR SUMMARY JUDGMENT:**

As stated above, Plaintiffs do not believe that it is appropriate for this Court to reach the question of "employer" status since under Title VII this would be an improper use of the right of interlocutory appeal which after all is a narrow exception to the final judgment rule. However, should this Court reach this question, it must affirm the District Court.

First, the Commonwealth's argument that it is not an employer for Title VII purposes must be judged in light of its history spanning more than 35 years in which the Commonwealth has been found to be liable under Title VII, and/or was intimately involved with litigation involving hiring and promotional exams which it created, administered , and scored. As far back as 1974, in Boston Chapter NAACP v. Beecher, 371 F.Supp. 507 (D. Mass 1974), the Commonwealth was held liable under Title VII for creating, administering, and scoring state-wide entry-level fire fighter examinations.[9] In these cases, the Commonwealth's then called "Civil Service Division"

_____

[9] The Commonwealth was also held liable for creating statewide police examinations in Castro v. Beecher, 459 F.2d. 725 (1st Cir. 1972).

was found to be liable for the creation of examinations that had significant

disparate impact upon minority candidates.  See Boston Chapter NAACAP,

371 F.Supp. at 515-518.  The Court there issued a decree barring the

"Massachusetts Division of Civil Service and their official agents and

employees…from engaging in any act or practice which has the purpose or

effect of discrimination..." Id at 521.  Significantly, at no time during that

litigation is there any reported decision in which the Commonwealth sought

to escape liability under Title VII on the grounds that it was not an

"employer" under the statute.

Later, in the mid-1980s, there was additional litigation involving the

Commonwealth of Massachusetts and police promotional exams.

Specifically, in Massachusetts Association of African-American Police

Officers v. Boston Police Department, et al., 106 F.R.D 80 (D. Mass 1985),

black police officers filed Title VII complaints against the City and state

officials challenging the validity of the police sergeant's promotional exam.

After several years of negotiations, the parties entered into a consent decree

requiring the parties to utilize a non-discriminatory promotional sergeant's

exam.  The First Circuit reviewed this consent decree in Massachusetts

Association of African-American Police Officers v. Boston Police

Department, 780 F.2d. 5, 6-7 (1st Cir. 1985)[10].  Again, the Defendant in that

case was the "appellee Department of Personnel Administration of the

Commonwealth of Massachusetts" Id.

      In the late 1990s, a group of white Boston police officers who had

earned a score of 84 on the state's police sergeant's examination

"administered by the Commonwealth of Massachusetts Human Resources

Division" brought an action alleging reverse discrimination.  Again, the

Commonwealth was named as a Defendant in that case and it moved to

dismiss, claiming that it was not responsible for the alleged reverse-

discrimination actions taken there.  See Cotter, et al. v. City of Boston and

James Hartnett, Director of Department of Personnel Administration, 73

F.Supp. 2d. 62 (D. Mass 1999).  Judge Young flatly rejected the

Commonwealth's Motion to Dismiss noting wryly that "Hartnett says in

effect **who? me?** and moves to dismiss the white officers claims against him

for failing to state a claim".  Id at 65.  Judge Young rejected this argument

after first exhaustively listing the obligations of HRD under the Civil Service

Law – the same obligations that the Commonwealth continues to have today.

Id at 65.

---

[10] Sadly, the decree then expired and the defendants went right back to the old pen
and paper memorization tests which are challenged here.

As the personnel administrator of the Human Resources
Division, Hartnett is charged with providing eligible lists based
on test scores…when, however, the police department awards
promotional appointment to an individual other than the
qualified person whose name appears highest on the list…the
police department must file with Hartnett a written statement of
reasons for appointing the person whose name was not
highest…Hartnett has the power to accept or reject the reasons
given by the police department for the bypass…Hartnett relied
on this power of rejection when it prevented the police
department's attempt to promote the black police officers to the
exclusion of white candidates with test scores. … Since the
allegations illustrate that Hartnett was aware of and disapproved
of the police department's attempt to promote the black police
officers on the basis of race, his failure of requiring the police
department to justify the eventual promotion of the black
officers to the exclusion of the equally scoring white officers
does not comport with basic merit principles.  Hartnett failed to
assure fair treatment…without regard to race and protect the
white officers from arbitrary and capricious action…

Hartnett had the authority to approve or disapprove
specifications and qualifications submitted by an appointing
authority…Hartnett was required to disapprove and establish
satisfactory qualifications and specifications.  Third, Hartnett
has the authority to evaluate the qualifications of applicants for
civil service positions.  ...  In light of these three general
statutory obligations, Hartnett's attempt to shrug off his
authority to prevent what is alleged to be a known and
admittedly race-biased appointment policy, one that is clearly
violative of basic merit principles – is unacceptable.

Id  at 66-67. Thus the Court denied the Commonwealth's Motion.

In more recent years, there have been other cases reflecting HRD's

continued pervasive responsibility for determining promotions in civil

service police departments.  In William Brackett v. Civil Service

35

Commission, et al., 447 Mass 233 (2006), white police officers challenged

HRD's creation of regulations and policies providing for so-called "special

certifications" permitting the promotion of minority and female candidates

to police positions even where higher-scoring non-minority candidates were

ranked higher on eligibility lists.  The Commonwealth was a party to that

case and argued vigorously that it had the right to authorize such race-based

promotional decisions as long as there was evidence of a significant under-

representation of minorities in supervisory law enforcement positions.  In its

brief to the Supreme Judicial Court, the Commonwealth extolled its

extensive authority to control such promotional issues in civil service

communities.  The same counsel for the Commonwealth as in this case

wrote:

> HRD acted within its statutory authority in adopting Rule
> 10…Civil Service Law **gives HRD broad power to make
> rules governing the appointment and promotion of
> candidates for civil service positions.  M.G.L. c. 31 §§ 3 and
> 4 provide that [the Commonwealth] shall make and amend
> rules which shall regulate the recruitment, selection,
> training, and employment of persons for civil service
> positions.  Rule 10 is within this grant of authority**.

(See Brief of the Appellee, Human Resources Division of the Commonwealth of

Massachusetts in Brackett v. Civil Service Commission, supra found at 2005 WL

3954113 at p. 38-39 (emphasis supplied)).

36

The Commonwealth went on argue in this brief :

> In addition to this general grant of ruling making authority, the legislature specifically instructed HRD to promulgate rules regarding promotional appointments on the basis of merit as determined by examination, performance evaluation, seniority of service, or any combination of factors which fairly test the applicant's ability to perform the duties of the position as determined by the administrator. (See M.G.L. c.31 §3e).  By setting up a procedure to remedy discrimination based on race or gender, Rule 10 accomplishes this goal of fairly testing the applicants' ability.  There is no statutory requirement that HRD restrict consideration of promotion to examination score alone.

Id at p. 41-42.

Finally, as plaintiffs pointed out before, more recently, the Commonwealth has exercised this broad authority by completely changing the method by which hiring and promotional decisions for all police departments are now made.  Thus, in 2007, HRD adopted banding and determined that all individuals that scored within a certain point range on HRD's entry-level examination be considered tied for purposes of hiring.  By doing this, HRD eliminated most bypass appeals.  More recently, in early 2009, HRD purported to exercise its authority to band promotional test scores.  After a court issued an injunction, HRD has not continued with this.[11]

---

[11] Pratt, et al. v. Commonwealth of Massachusetts, Human Resources Division, 09-1254 (Suffolk Superior 2009), decision attached hereto as Exhibit A.

The plaintiffs agree with the Commonwealth that if it simply had "some limited role" in municipal police employment matters, such as setting initial hiring standards (such as age limits) or setting promotional criteria (such as the number of years one had to be in the lower rank), but little other involvement in the employment relationship of civil service police officers, then the Commonwealth might not be liable under Title VII for such "regulatory standards".  But the relationship between the Commonwealth of Massachusetts and municipal police officers, unlike almost all other states, is unique.  The Commonwealth retains pervasive control over the initial hiring, employment, training, funding, promotion, layoff, and retirement of police officers and fire fighters in the Commonwealth. Just as importantly, unlike almost any other state in the country where the hiring and promotion of municipal police is controlled by the locality, not the state, in Massachusetts civil service communities, hiring and promotion is primarily controlled by the state system and not by the locality.[12]  It was this pervasive

---

[12] The only other state that plaintiffs can find that exerts similar pervasive control over police and fire hiring and promotion is the State of New Jersey, and at one time, the State of New York.  In a series of cases challenging the New Jersey civil service examination for police and fire fighters, courts have not hesitated to hold New Jersey liable under Title VII for such discriminatory examinations.  See United States v. State of New Jersey Department of Personnel, 1995 WL 1943013 (D.N.J. 1995)(approving consent decree and long-standing employment discrimination cases involving entry-level law enforcement positions in municipalities throughout the state).  See also Vulcan Pioneers v. New Jersey Department of Civil Service, 832 F.2d. 811 (3rd Cir. 1987) (affirming that New Jersey's promotion selection examination procedures for municipal fire fighters

control that led Judge Saris to find that the Commonwealth was a Title VII

employer with respect to municipal civil service fire fighters and police officers.

Bradley v. City of Lynn, supra at 163. Judge Saris cited the extensive "statutory

and administrative framework" that gives overwhelming responsibility to the

Commonwealth for establishing entry-level fire and police examinations for

Massachusetts municipalities. Id. The Court noted the vast authority given to the

Commonwealth with respect to Massachusetts civil service police officers and fire

fighters for conducting, and determining the form, method, and subject matter of

examination, its authority to establish, maintain, or devise eligibility lists that must

be used in the hiring and promoting of police officers and fire fighters, and its

authority for determining whether or not the municipality could lawfully bypass

the top-ranking candidate. Id at 163. Further the Court noted that HRD

established the mandatory standards, specifications, and qualifications for all

police and fire fighters, including standards that would be used to evaluate the

qualifications of applicants. Citing M.G.L. c.31 §5. The Court noted that

examples of this authority include health and fitness standards, height minimums,

---

violated Title VII). See also United States of America v. State of New Jersey,
4736 F. Supp. 1199 (D.N.J. 1979) (holding specifically that both the state and the
municipality reliable for discriminatory hiring and promotion procedures in fire
departments of various municipalities). United States v. City of Yonkers, 592
F.Supp. 570, 589-591 (S.D.N.Y. 1984) (holding that because state Civil Service
Commission retained control over police examinations it was subject to liability
under Title VII).

educational requirements, and promotions.  Judge Saris also noted that the

Commonwealth of Massachusetts has been directly involved as a defendant in Title

VII litigation over police and fire exams for over 30 years, citing <u>Boston Chapter

NAACP v. Beecher</u>, 371 F.Supp. 507 (D. Mass 1974) and <u>Castro v. Beecher</u>, 365

F. Supp. 655 (D. Mass 1973).

 As in this case, the Commonwealth strenuously argued in <u>Bradley</u> that

because its only role with respect to police officers and fire fighters was in

constructing, devising, and scoring examinations, its function was more akin to

those cases where the state was found not to be a Title VII employer when it acted

in its regulatory and licensing capacity with respect to individuals who engaged in

other occupations.  Citing <u>Camacho v. Puerto Rico Ports Authority</u>, 369 F.3d. 570,

573-574 (1st Cir. 2004); <u>Haddock v. Board of Dental Examiners</u>, 777 F.2d 462 (9th

Cir. 1985); <u>EEOC v. Illinois</u>, 69 F.3d. 167 (7th Cir. 1995); <u>Gulino v. New York

State Education Department</u>, 460 F.3d 361 (2nd Cir. 2006); and <u>Fields v. Hallsville

Independent School District</u>, 906 F.2d. 1017 (5th Cir. 1990).  Yet as the Court

correctly found in <u>Bradley</u>, the fact that a state administers an examination for

licensing neither forecloses nor requires it to be a considered an employer for Title

VII purposes; the question is rather whether the entity also "exercises other control

over the relationship between the employee and the customary employer" 403

F.Supp. 168: Citing <u>Association of Mexican-American Educators v. California</u>,

231 F.3d 572, 581-583 (9th Cir. 2000)(holding the state liable for administering a teacher's certification examination where the state exerted a high degree of control over the operation of local school activities).

Most importantly, Judge Saris correctly determined that her ruling was based upon this Circuit's decision in Car Parts Distribution Center, Inc v. Auto Wholesalers New England, Inc., 37 F.3d. 12,16 (1st Cir. 1994).  In that case, this Court explicitly held that a defendant would be treated as an employer if it "exercised control over an important aspect of the employee's employment," even if it did not control other aspects.  Bradley v. City of Lynn, 403 F. Supp. at 167. Thus, this Court held that the defendant Car Parts was an "employer" with respect to employee health coverage if it existed for the purpose of enabling the employer to delegate its health insurance responsibility to another.  Car Parts, 37 F.3d. at 17. While the Commonwealth is implicitly arguing that Camacho overruled Car Parts, Judge Saris correctly rejected this argument, holding that Camacho was best understood as part of that line of cases finding that when states are engaged in their "licensing authority" they are not an employer  (See discussion below).

Indeed, even a cursory analysis of the cases relied upon by the Commonwealth demonstrate the sharp differences between those cases where the state acted in a regulatory capacity and the current case, where the Commonwealth acts as a *de facto* employer with respect to the important aspects to the hiring and

41

promotion and other employment matters.  In <u>Camacho</u>, this Court held that a state

agency's performance of a mere licensing function is not subject to Title VII

liability. 369 F.3d. at 577-578.  There the Court concluded only that the Port

Authority did not "so extensively control the plaintiff's employment relationship as

to become his *de facto* employer".  <u>Id</u> at 574.  Thus, in <u>Camacho</u>, the Court

emphasized that the Port Authority had no involvement in the hiring, firing, or

terms and conditions of the harbor pilots, except that it had authority to license

such harbor pilots and had general regulatory over the harbor.  Indeed, in

<u>Camacho</u>, the plaintiff was not an employee of anyone, but rather was self-

employed as a harbor pilot and was an "independent contractor" for various ship

companies that needed harboring.  Thus, the plaintiff was not an employee for Title

VII purposes for anyone and there was no employer.  In <u>Fields v. Hallsville</u>

<u>Independent School District</u>, <u>supra</u> and <u>Gulino v. New York State Education</u>

<u>Department</u>, the Courts simply found that where certain teachers had failed a

state's teacher's licensing or certification exam, required of all teachers to prove

their proficiency to be a teacher, this involved the state acting in its regulatory

function and not as an employer.  In those cases, there was no evidence that the

state had any involvement in the hiring or promotion of any of the plaintiffs, but

simply was required by state law to insure that all teachers in the state passed their

licensing exam, demonstrating the proficiency to be a teacher.  The Court in

Gulino specifically distinguished itself from Mexican-American Educators, which reached a different conclusion, based on the fact that New York State did not have the same control over the employment relationship of teachers that California did with its teachers. Id at 370-371. The Court did, however, hold the New York City Board of Education liable as an employer. Id at 380-381. Similarly in Hallsville, the Fifth Circuit merely held that

> Similarly, the teachers have not put forth sufficient evidence of an employment relationship with the state to create a genuine issue of material fact. The only evidence the teachers give with respect to the control ... test is the state's administration of the TECAT exam. There is no evidence in the record that the state played any role in the general hiring…of teachers.

Id at 1020.

Indeed, the other cases cited by the Commonwealth are even further afield. For example, in George v. New Jersey Board of Veterinary Medical Examiners, 794 F.2d. 113 (3rd Cir. 1986) and Haddock v. Board of Dental Examiners, 77 F.2d. 462 (9th Cir. 1985), the plaintiffs were attempting to pass professional examinations necessary to demonstrate competence in their field so they could start their own firms or seek employment with a private entity. Clearly, the state was simply acting in a regulatory capacity, similar to Camacho. Finally, the Commonwealth's citation to EEOC v. State of Illinois, supra and Conroy v. City of Philadelphia, 421 F.Supp.2d 879 (2006) are even more off point. In EEOC v. Illinois, Justice Posner noted that the only basis for the EEOC's claim against the

43

state was that it had failed to actually repeal an old state law, that was clearly

unlawful under the ADEA, requiring the mandatory retirement of teachers at age

70.  The state did not purport to enforce that provision, but rather a local school

district attempted to force the retirement of two teachers who had reached that age.

Finding that the state's connection to this case was so remote, the Court held that

Illinois was not an employer under the facts of this case, but Judge Posner found

that with respect to the key issues of "hiring" "those key powers are in the hands of

the local school district". Id at 171.  In Conroy, a female applicant for a city police

officer position was disqualified when she allegedly did not pass the "sit and

reach" part of the physical abilities test promulgated by the state.  However, the

Court simply found that because in this case that "the state essentially functions as

a licenser –granting certification to individuals to become police officers" but that

the state does not "tell Philadelphia when to hire or fire a police officer" and that

the City of Philadelphia "may add its own eligibility requirements" the state had

very little control over the hiring and promotion of police officers and, therefore,

was not an employer.  Id.

In sum, none of the cases cited by the Commonwealth are remotely close to

the facts of this case – where the Commonwealth is not acting as a "regulator" or

"licensor"; rather, it acts as an employer or employment agency, setting the

minimum medical, health, and educational requirements for employment,

conducting the application process and all testing necessary to determine who to hire, including the entry-level written examination which is then scored and ranked and used as the basis for hiring as well as administering the physical agilities test which is also used to determine hiring, then utilizing the state Criminal Justice Training Counsel to determine training standards for all police officers, to then being responsible for promotional tests including the devising, construction, and scoring of promotional candidates and reviewing any bypasses, including determining whether or not the municipality can engage in special certification hiring and promotional procedures.[13]

In sharp contrast to the cases cited by the Commonwealth, there are a long series of Title VII cases that have held a government entity liable as an employer under Title VII if it participates in the employment relationship in a significant manner and is guilty of discrimination with respect to such participation.  See Baranek v. Kelly, 630 F. Supp. 1107, 1113 (D. Mass 1986)(holding that agency with "the means and authority to control discriminatory employment practices" was an employer under Title VII); Barone v. Hackett, 602 F.Supp. 41, 43 (D.R.I. 1984) (director of state agencies and administrated disability benefits for state employees was liable under Title VII even though agency did not employ

_____

[13] Of course, as plaintiffs have pointed out, the state funds much of a police departments operations and it sets the requirements for the Quinn bill payments, and plays a significant role under the Civil Service Law in determining Leaves of Absences, layoffs and recalls, etc.

plaintiffs); Curran v. Portland Superintending School Committee, 435 F.Supp.

1063, 1072-73 (D. Maine 1977) (although city was not permitted by its charter in

actual management of school system, it was liable as an employer under Title VII

because it limited the school committee's hiring authority through its role in

appropriating funds and setting salaries); Spirit v. Teachers Insurance and Annuity

Association, 691 F.2d 1054, 1063 (2nd Cir. 1982), vacated on other grounds 436

US 1223 (interpreting the terms employer to encompass "any party who

significantly affects access of any individual to employment opportunities").

Bradley v. City of Lynn, supra. United States v. City of Yonkers, 592 F.Supp.570,

590 (SDNY 1994); EEOC v. City of Evanston 854 F.Supp. 534, 538 (N.D. Illinois

1994); Association of Mexican-American Educators v. California supra; Guardians

Association v. Civil Service Commission, 630 F.2d. 79, 104-105 (2nd Cir.

1980)(holding that state was properly held to be an employer pursuant to a Title

VII challenge between municipal police department); Owens v. Rush, 636 F.2d.

283, 287 (10th Cir. 1980); Puntoillo v. New Hampshire Racing Commission, 375

F.Supp 1089, 1091 – 92 (D.N.H. 1974); United States v. State of New Jersey,

supra; Vulcan Pioneers v. New Jersey Department of Civil Service, 832 F.2d. 811

(3rd Cir. 1987).[14]

---

[14] In the proceedings below, the Plaintiffs attached a copy of Robert St. Peter v. Commonwealth of Massachusetts Public Employee Retirement Administration Commission, Superior Court Case No.: 02-5569-H (Suffolk Superior 2007).

The City of Yonkers case is directly on point.  There, the Court held that the

State of New York would remain a defendant in that Title VII case, even though it

was not actually the employee of the plaintiffs, because the state civil service

commission played a pervasive role in the hiring relationship – a role nearly

identical to HRD in the present case. Id at 589.  The Court relied on the fact that

the New York civil service commission at that time designed the exams in

questions, listed the candidates, and decided disciplinary appeals – all

characteristics shared by the Commonwealth of Massachusetts.  Therefore, it

denied the commission's Motion for Summary Judgment stating that the record

"strongly supports the views that the state acted as an employer in connection with

police hiring in Yonkers during the years covered by the Complaint".  Id at 590.

The Plaintiffs intend to prove at trial that the Commonwealth consciously

knew that the pen-and-pencil police sergeant's written exam that they were

responsible for developing, administering, and scoring over the last 20 years has

had a significant unlawful discriminatory impact upon minority candidates, that

they have been keeping statistical records of the passing rates of minorities and

non-minorities, and they were well aware of this serious problem.  See

(Attached to this brief as an appendix).  There the Court borrowed from federal
cases interpreting Title VII and held that the state retirement commission was the
plaintiff's employer under Massachusetts' Anti-Discrimination laws G.L.151B
since it had control over decisions regarding the reinstatement of the plaintiff to
full duty from his disability retirement status.  See Plaintiffs' Memorandum of Law
In Opposition to Defendants' Motion to Dismiss, footnote 6, Docket No. 163.

Supplemental Appendix at 5 - 75.  Indeed, in attempting to switch to a new scoring system involving banding, the Commonwealth admitted its problem (Supl. Appendix 6) and in Brackett v. Civil Service Commission, supra, the Commonwealth admitted that its exams were discriminatory and, therefore, it was justified in authorizing the governmental entities there to promote based on race and gender.  For the Commonwealth here to try and pass the blame for its examination procedure to the civil service municipalities, which have essentially no involvement in this promotional process, is clearly disingenuous.  The Commonwealth should not be permitted to escape its own responsibility by placing it on the backs of the municipalities that it is supposed to serve.

## VI.    CONCLUSION

For the reasons stated above, this Court should affirm the lower court's decision.

Respectfully submitted,

PEDRO LOPEZ, ET AL. on behalf of himself and
on behalf of a class of persons similarly situated,

By their attorneys

_____

HAROLD LICHTEN, ESQ.  1st. Cir. No.: 22114
LEAH BARRAULT, ESQ.   1st. Cir. No.: 1120452
Lichten & Liss-Riordan, P.C.
100 Cambridge Street, 20th Floor
Boston, MA  02114
(617)-994-5800

Dated:   August 31, 2009

## CERTIFICATE OF SERVICE

I hereby certify that on August 31, 2009, I caused a copy of this document to
be served by first class mail on the following counsel of record:

Mark D. Selwyn
Jeffrey S. Gleason                          Rahsaan D. Hall
Vinita Ferrera                              Lawyers' Committee for
Wilmer Hale LLP                              Civil Rights Under Law
60 State Street                             294 Washington Street, Suite 443
Boston, MA 02109                            Boston, MA 02108

James M. Bowers
261 Common Street
Lawrence, MA 01840

Peter J. McQuillan
City of Methuen
Office of City Solicitor
The Searles Building
41 Pleasant Street
Methuen, MA 01844

Iraida J. Alvarez
Attorney General's Office
One Ashburton Place
Boston, MA 02108

Robert L. Quinan, Jr.
Attorney General's Office
One Ashburton Place
Room 2019
Boston, MA 02108

Sookyoung Shin
Office of the Attorney General
Trial Division
One Ashburton Place
18th Floor
Boston, MA 02108

Brian W. Leahey
R. Eric Slagle
City of Lowell Law Department
City Hall
375 Merrimack Street
Lowell, MA 01852

Laurie W. Engdahl
Daniel C. Brown
Collins, Loughran & Peloquin
320 Norwood Park South
Norwood, MA 02062

Robert P. Morris
Mary Jo Harris
Morgan Brown & Joy LLP
200 State Street
11th Floor
Boston, MA 02109

Edward M. Pikula
1350 Main Street, 15th Floor
Springfield, MA 01103

John T. Liebel
City of Springfield
36 Court Street, Suite 210
Springfield, MA 01103

Maurice M Cahillane, Jr.
Egan, Flanagan & Cohen, P.C.
67 Market Street
P.O. Box 9035
Springfield, MA 01102-9035

Williams G. Cullinan
Law Office of William G. Cullinan
1350 Main Street
Springfield, MA 01103

Kevin S. McDermott
MBTA Law Department
10 Park Plaza, 7th Floor
Boston, MA 02116

_____

Harold L. Lichten, Esq.

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)</u>

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12, 240 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Red. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in a 14-point Time New Roman Style.

_____

Harold L. Lichten, 1st Cir. No. 22114

Attorney for PEDRO LOPEZ, ET AL.

<u>ADDENDUM</u>

1.    <u>Pratt, et al. v. The Commonwealth of Massachusetts, et al</u>, (Suffolk Superior Court Civil Action No.:  09-1254)…………………………………1

RECEIVED APR 2 1 2009

## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss                                   SUPERIOR COURT
                                              CIVIL ACTION NO.    09-1254-E

THOMAS PRATT, ROBERT DISARIO, PAUL )
CAMBELL, THE BOSTON POLICE PATROLMEN'S )
ASSOCIATION, INC., and THE MASSACHUSETTS )
COALITION OF POLICE, )
                    Plaintiffs, )

v.

THE COMMONWEALTH OF MASSACHUSETTS )
HUMAN RESOURCES DIVISION and THE )
MASSACHUSETTS CIVIL SERVICE COMMISSION. )
                    Defendants )

NOTICE SENT
04-17-09.
S.G.S. H.&D.
A.H.S.
B.C.D.
P.R.L.&E.
H.L.L.
MASS. A.G.
S.C.
J.E.Z.
(LKT)

MICHAEL JOSEPH DOHOV
CLERK/MAGISTRATE

2009 MAR 27 AM 11: 28

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE

## PLAINTIFFS MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs Thomas Pratt, Robert Disario, Paul Campbell, the Boston Police Patrolmen's

Association, Inc., and the Massachusetts Coalition of Police, AFL-CIO (collectively,

"Plaintiffs") herby move for an injunction ordering Defendant Human Resources Division to not

issue eligibility lists for promotions of police officers in "bands," rather than in the "whole

numbers" 1-100. The , plaintiffs are entitled to the requested relief because HRD's own rules

prohibit such "banding," the plaintiffs will be irreparably harmed if injunctive relief is not

granted, and the public interested will be served by the grant of injunctive relief.

*MOTION* ALLOWED. See Memorandum of Decision and Order of this date.

BH

4/15/09

SEE PAPER #9

# COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

**SUPERIOR COURT**
**CIVIL ACTION NO. 09-1254**

### THOMAS PRATT, et al.

vs.

**PAUL DIETL, in his official capacity as**
**Chief Human Resources Officer of the Commonwealth of Massachusetts**
**and as Executive of the Human Resources Division,**
**and the CIVIL SERVICE COMMISSION**

## MEMORANDUM OF DECISION AND ORDER
## ON THE PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

In this matter, several police officers who took the 2008 Police Promotional Sergeant, Lieutenant and Captain Examinations (Promotional Exams), and unions[1] which represent them, have challenged the decision of the Massachusetts Human Resources Division (HRD) to employ a new method of issuing scores used to establish the eligibility lists for promotions of police officers. Having heard from the parties and having reviewed their written submissions and the applicable statutes and case law, I find that the plaintiffs' request for a preliminary injunction should be **ALLOWED**.

### Factual and Statutory Background

With some minor differences, the parties are in agreement as to the factual and statutory background, at least for purposes of this preliminary injunction matter. The following summary is taken from the Plaintiffs' Memorandum In Support Of Their Motion For Preliminary Injunction, with which the defendants have indicated their agreement for the purposes of the preliminary

---

[1] While there is some question as to whether the unions have standing in this matter, I have allowed two motions to intervene brought by unions as well as individual plaintiffs so that all of the parties could be heard before the issuance of this decision. The defendants have objected to that intervention and may make appropriate motions to dismiss if such are warranted.

1

Add 000002

injunction issues.

### HRD Personnel Administration Rules

The promotion of police officers within all cities and towns electing coverage under the civil service system is administered and overseen by HRD, pursuant to G.L. c. 31. Under the authority granted to it in G.L. c. 31, §3, HRD has established a set of Personnel Administration Rules (PAR)(Attachment C, Verified Complaint). That section empowers the agency to "make and amend rules which shall regulate the recruitment, selection, training and employment of persons for civil service positions." However, there are certain requirements and oversight within the rule-making process. Section 3 provides that "the [civil service] commission shall review such rules and in the event the commission determines that any proposed rule violates the basic merit principles outlined in this chapter, it may, within fifteen days of receipt of such proposed rule, by a three-fifths vote, disapprove such proposed rule." Section 4 of Chapter 31 calls for HRD to undertake an extensive process to enact new rules or to amend existing ones. (See Attachment 1 to Affidavit of Sally McNeely).

### The Civil Service Promotional System

To gain promotion within the civil service system, police officers take examinations designed, administered, and scored by HRD. See G.L. c. 31, §§5(e)(h), 7, 16; PAR.06. In addition to the examination, HRD also includes an "employment and experience" component in establishing the final marks of an examination. G.L. c. 31, §22. Once the grading is complete, HRD establishes eligibility lists for each promotional position in each community, with the candidates rank-ordered by their scores. G.L. c. 31, §25. Under PAR.07(4), "The examination marks shall be presented on eligible lists in whole numbers." Pursuant to this rule, HRD has listed candidates' scores with a whole number grading system of 1-100 for many years.

When a municipality desires to make a promotion, it submits a requisition to HRD, which certifies to it a list of candidates under the "2N+1" formula. See G.L. c. 31, §27; PAR.08. Thus, if a city needs to fill one sergeant slot, it gets back from HRD a list of the three highest-scoring candidates on the eligibility list. For two sergeants, it gets a list with five names under the "2N+1"

2

formula. When there are tie scores, HRD certifies a list with the fewest names needed to meet that formula. If a municipality seeks to fill one sergeant position, and the eligibility list has officers with scores of 91, 87, and three tied at 86, all five names would be certified for the position.

Once it receives the certified list, the municipality may select from among those on the list, but if it selects a candidate who is not the highest on the list, it must submit reasons for doing so to HRD, which must approve them. G.L. c. 31, §27; PAR.08(3). Higher scoring candidates not selected are considered to have been "bypassed" and may appeal to the Civil Service Commission (the Commission) pursuant to G.L. c. 31, §2(b). Those tied with the selected candidate are not considered bypassed by HRD and have no right of appeal to the Commission.

In her Affidavit, Sally McNeely, formerly the Director of the Organizational Development Group of the HRD, explains how the civil service system has functioned. As an example, she notes that Paul Campbell, one of the named plaintiffs in this matter, achieved the highest raw (not banded) score on the Brookline lieutenant promotional examination in October, 2008. If Brookline requisitioned a certification list for one lieutenant vacancy, and the certification was based on raw (not banded) scores, then Campbell's name would appear first. Next would appear another candidate whose raw score was three points lower on a 1 - 100 point scale. Next would appear the names of two candidates who each achieved raw score four points lower than Campbell's score. Under the system in place now, if Brookline chose to appoint one of the officers other than Campbell, it would have to explain in writing its reasons for doing so and the Administrator of the HRD would have to pass on the validity of the reasons for the bypassing of Mr. Campbell. Campbell would have a right to appeal that decision.

### The October 2008 Promotional Exam and the Establishment of Eligibility Lists From It

On October 18, 2008, police officers from many cities and towns throughout the Commonwealth, including the individual plaintiffs, took promotional examinations for the positions of Police Sergeant, Police Lieutenant, and Police Captain. On or about February 13, 2009, HRD began notifying the test-takers of their individual scores. In addition, HRD announced its intention to band scores together when establishing eligibility lists for promotion. Thus, for example, all officers who scored between 85.84 and 92.91 would be placed on a sergeant eligibility list as having

Add-000004

scored in "Band 5" Under the prior practice and under PAR.07(4), such candidates would have had their scores rounded to the nearest whole number and their names placed on eligibility lists which were rank-ordered by those whole number scores.

The HRD supplements the plaintiff's statement of facts, with which it is largely in agreement, with information as to how it determined to utilize the banding of scores. According to HRD, it employed an educational consulting firm, EB Jacobs, which specializes in employment testing, to assist it in developing the October 2008 promotional examination. EB Jacobs recommended to HRD the establishment of score bands for the results of that examination. In an affidavit, Rick Jacobs of EB Jacobs set forth the rationale for the use of score bands and explained how bands widths are established for test scores. According to Mr. Jacobs, "Candidates within the same band should be considered equivalent in terms of their performance on the test. Differences in raw scores within a band should be attributable only to the lack of perfect precision in the measurement of candidate performance associated with a particular testing instrument." (Jacobs Affidavit, ¶15).

In a Memorandum to Commissioner Edward Davis of the Boston Police Department (Exhibit D, State Defendants' Opposition To Plaintiffs' Motion For Preliminary Injunction), Ms. McNeely explains the new scoring policy and its impact on the promotion process:

> An applicant's ranking on the 2008 promotional list will be based on the exam score band he or she achieves. Please be advised that promotional candidates in the same exam band score are considered tied. As such, no bypass will occur unless a promotion is made from a lower band when candidates remain unselected in a higher band.

### Proceedings Before The Civil Service Commission

On or about February 18, 2009, the plaintiffs filed an appeal under G.L. c. 31, §2(b) with the Commission challenging the proposed banding of promotional scores as violating PAR.07(4) and Chapter 31 generally. Later, plaintiffs amended their filing to include a request for an investigation under G.L. c. 31, §2(a). The Commission held a pre-hearing conference on March 3, 2009. On March 13, 2009, the Commission dismissed all appeals and rejected all claims for an investigation.

Add 000005

(See Attachments A and B, Verified Complaint).[2]

With respect to the individual plaintiffs, the Commission dismissed the §2(b) appeal on the grounds that they were not "'persons aggrieved' who have suffered 'actual harm' to their 'employment status' pursuant to G.L. c. 31, §2(b)." It rejected the unions' appeals on standing grounds. The dismissal of the individual appellant's appeals was based on the view that their claims were anticipatory, since none of them had yet to be harmed by the banding of scores on an eligibility list. The Commission declined to conduct any investigation beyond its own survey of some of the pertinent case law which had addressed the issue of banding and stated that further inquiry would not lead it to conclude differently (differently, apparently, from the courts it cited which had found banding to be an appropriate method of scoring civil service eligibility). The Commission further held that the change in the practice of how the eligibility lists were created did not violate either Chapter 31 or the Personnel Administration Rules.

## DISCUSSION

The plaintiffs seek declaratory relief and an injunction prohibiting the HRD from issuing eligibility lists for promotions of police officers in bands rather than in the format which has been in use for decades. They assert that the use of bands violates HRD's own rules, which rules have not been altered or amended in accordance with the procedure required by G.L. c. 31, §4. Arguing that they have standing to bring their claims under G.L. c. 231A, the declaratory judgment statute, and as an appeal of the actions and decisions of the HRD and the Commission, the plaintiffs assert that they are likely to succeed on the merits of their claims. Further, they argue that the risk of harm to them is of sufficient magnitude that the entry of the requested injunctive relief is mandated.

The defendants counter that the plaintiffs cannot establish the prerequisites for the entry of injunctive relief and, indeed, that they have no standing to maintain this action as they have not suffered any actual harm at this juncture.

### Standing

General Laws c. 231A, § 1 authorizes the Superior Court to issue a binding declaration with respect to rights, duties, status and other legal relations. The law enables a person to terminate a

---

[2]The Commission's decisions were by a 3-2 vote, with the dissenting commissioners issuing a minority opinion (See Attachment B, Verified Complaint).

Add 000006

controversy or remove uncertainties which may arise either before or after a violation or breach of such right or duty in any case in which an actual controversy has arisen. The plaintiffs assert that under G.L. c. 231A, §2 they may bring a declaratory judgment action in the Superior Court "to enjoin and to obtain a determination of the legality of the administrative practices and procedures of any . . . state agency or official which practices or procedures are alleged to be in violation of the . . . laws of the commonwealth, or are in violation of rules or regulations promulgated under the authority of such laws, which violation has been consistently repeated . . ."

The prerequisites to the bringing of a declaratory judgment action are (1) an actual controversy; (2) standing; (3) joinder of all necessary parties; and (4) the exhaustion of available administrative remedies. *Sch. Comm. of Hudson v. Bd. of Educ.*, 448 Mass. 565, 579 (2007); *Marion v. Massachusetts Hous. Fin. Agency*, 68 Mass. App. Ct. 208, 210 (2007).

Declaratory relief under G. L. c. 231A is available only when an actual controversy has arisen. See G. L. c. 231A, § 1; *Bello v. S. Shore Hosp.*, 384 Mass. 770, 778 (1981). General Laws c. 231A cannot be used to resolve hypothetical or moot questions, to seek judicial rendering of an advisory opinion as a guide to future action, or to entertain mere differences of opinion or speculative contentions. Nonetheless, G. L. c. 231A, § 1 provides that the plaintiff need not suffer actual harm before he or she seeks declaratory relief. The action may be brought "either before or after a breach or violation" has occurred. *Id.* The action may, therefore, be prospective or anticipatory in nature seeking to prevent the threatened harm or injury from taking place. See *Sch. Comm. of Cambridge v. Superintendent of Schs.*, 320 Mass. 516, 518 (1946).

An actual controversy within the context of G. L. c. 231A, § 1, is:

"a real dispute caused by the assertion by one party of a legal relation, status or right in which he has a definite interest, and the denial of such assertion by another party also having a definite interest in the subject matter, where the circumstances attending the dispute plainly indicate that unless the matter is adjusted such antagonistic claims will almost immediately and inevitably lead to litigation."

*Bunker Hill Distrib., Inc. v. Dist. Attorney for Suffolk County*, 376 Mass. 142, 144 (1978), quoting *Sch. Comm. of Cambridge*, 320 Mass. at 518.

Here, there is an actual controversy because the above three tests are met. First, HRD asserts that its decision to band the promotional scores is within its discretion, while the plaintiffs maintain

6

Add 000007

008/012

that such a change in procedure requires adherence to the process set forth in G. L. c. 31, § 4. Second, both parties clearly have interests in the case. Third, given that the HRD intends to issue promotional lists with banded scores and that the plaintiffs are currently awaiting placement on those lists, it is plain that some plaintiffs will claim to be harmed by the new procedure and, in turn, litigate the matter, unless declaratory relief is granted.

In addition to demonstrating an actual controversy, a plaintiff must have standing to maintain a declaratory judgment action. The standing requirement should be liberally construed, although there are limits on the matters that can be heard in an action for declaratory judgment. *Massachusetts Ass'n of Indep. Ins. Agents and Brokers, Inc. v. Comm'r of Ins.*, 373 Mass. 290, 293 (1977). In declaratory lawsuits attacking the validity of statutes or regulations, "[a] party has standing when it can allege an injury within the area of concern of the statute or regulatory scheme under which the injurious action has occurred." *Id.; Enos v. Sec'y of Envtl. Affairs*, 432 Mass. 132, 135 (2000). See *Bonan v. Boston*, 398 Mass. 315, 320 (1986) (standing requires "a definite interest in the matters in contention in the sense that [a plaintiff's] rights will be significantly affected by a resolution of the contested point"). In other words, to have standing, a plaintiff's interest must be within the "zone of interests" protected by the statute or regulatory scheme. *Prof'l Fire Fighters of Massachusetts v. Commonwealth*, 72 Mass. App. Ct. 66, 74 (2008). Standing is usually not present unless the government agency owes a duty directly to the plaintiff, which was violated and resulted in legally cognizable injuries. *Enos*, 432 Mass. at 136.

In determining whether standing exists, the court should examine the language of the statute at issue, the nature of the administrative scheme, any adverse effects that might occur if standing is recognized, and the availability of other more definite remedies to the plaintiffs. *Id.* at 135-136. Then, the court should ask whether the plaintiff has identified an interest created for them and a reasonably definite injury to that interest caused by a breach of duty by the agency. See *Prof'l Fire Fighters of Massachusetts*, 72 Mass. App. Ct. at 75.

The general purpose of the civil service system is to "guard against political considerations, favoritism, and bias in governmental employee decisions." *Boston Police Dept. v. Collins*, 48 Mass. App. Ct. 408, 412 (2000). The centerpiece of the statutory scheme is hiring and promotion based on "basic merit principles" as defined in G. L. c. 31, § 1. General Laws c. 31, § 3 authorizes the Division to make and amend rules which govern the recruitment, selection, training and employment

Add 000008

of persons for civil service positions. General Laws c. 31, § 4, one of the provisions at issue in this case, sets forth a process which the Division must undertake to enact a new rule or to amend an existing rule. In general, this process requires the Division to provide notice of the proposed rule change and to conduct a public hearing relative to the proposed rule change. See G. L. c. 31, § 4.

Here, the plaintiffs are contesting the lawfulness of the Division's decision to band scores when establishing eligibility lists for promotions, a rule which was amended without adhering to the requirements set forth in G. L. c. 31, § 4. The plaintiffs assert that their interests will be harmed by the banded scores because the bypass procedure will no longer provide some protection for higher scoring candidates and because cities or towns will no longer have to justify their appointments of lower scoring candidates, unless chosen from a lower band. The plaintiffs also contend that the banded scores will expand the candidate pool, thus increasing the potential that promotions will be based on favoritism and bias, rather than merit. These harms are squarely within the zone of interests protected by G. L. c. 31. In addition, by creating a promotional system that provides fewer safeguards against favoritism and bias, the Division has potentially violated its duty to the plaintiffs. Accordingly, I am persuaded that the plaintiffs have standing to maintain an action under G. L. c. 231A to challenge the banded promotional eligibility lists.

### Likelihood of Success

The plaintiffs contend that the banding of scores violates the HRD's own regulation which mandates that examination marks shall be presented on eligibility lists in whole numbers. Having locked the whole number scoring method into its regulatory scheme, say the plaintiffs, the HRD cannot now change that method without complying with the provisions of G.L. c. 31, §4 which establishes a procedure for such amendments of rules. According to the plaintiffs, the 1–100 scoring system is "enshrined" in the regulations and a change such as is contemplated by the banding of scores requires that the rule-making process be followed. Since it did not follow that process, the HRD is in violation of the applicable statute, say the plaintiffs, and they have a very substantial likelihood of success on the merits.

The HRD argues that the plaintiffs have not established a likelihood of success on the merits. Pointing to *Ash v. Police Com'r of Boston*, 11 Mass.App.Ct. 650 (1981), the HRD argues that the Administrator, as the "skilled professional authorized by G.L. c. 31 to decide technical matters such as the scoring and interpretation of examinations," *Id.* at 652, has appropriately decided that the

8.

Add-000009

banding of scores for the 2008 police promotional examinations is the best method for reporting the scores and preparing the eligibility lists from which promotions may be made. The HRD argues that the banded scores will be reported in whole numbers and, thus, it is in compliance with the applicable provisions of its own rules. Further, the HRD argues that its rationale for the change is reasonable and, thus, under the reasoning of the *Ash* decision, the plaintiffs cannot prevail. The HRD points to the widespread judicial and expert acceptance of the practice of banding and argues that the plaintiffs may well benefit from the banding of the scores.

The practice of banding scores represents a significant departure from the way scores have been reported in the past. While the proposed banding will be reported as whole number bands, the scoring is very different than what appears[3] to have been intended by the requirement that scores be reported in whole numbers. The scoring bands are a significant change in the manner of scoring and establishing the eligibility lists and that change should have been put in place using the procedure established by the Legislature for making a significant change in the rules. G.L. c. 31, §4.

In addition, the new score bands will impact the bypass and appeal procedures established by the statute and the regulations enacted pursuant thereto. As noted in Ms. McNeely's Memorandum to Commissioner Davis, all officers within a score band will be viewed as being tied and thus no bypass will occur unless a promotion is made from a lower band when candidates remain unselected from a higher band. That is also a significant change from the practice which has been in place for decades. Using the example which Ms. McNeely used in her affidavit, the new scoring system would conceivably[4] have a significant impact on Paul Campbell. Under the current system, as the highest scoring candidate on the October 2008 Brookline lieutenant promotional examination, Paul Campbell's name would appear first, followed by a candidate who scored three points lower than Campbell, followed by two other candidates who each scored four points lower than Campbell. If Brookline were to appoint one of the candidates other than Campbell, it would have to submit a written explanation for the bypass of Campbell to the Administrator of the HRD, who would pass on the validity of those reasons. If the decision was adverse to Campbell, he could appeal to the

---

[3] I say "appears" as none of the parties has presented information concerning the timing, the history, or the rationale for PAR.07(4).

[4] I use the word "conceivably" since the actual scores are not used in Ms. McNeely's affidavit.

Add-000010

Commission.

Under the proposed score bands, Campbell could conceivably be banded together with these three candidates whom he had outscored, along with any other candidates who scored within the same band width. All of those candidates would be deemed to be tied and the bypass procedure would not be implicated by the selection of any of the candidates within the same band. Brookline would not be required to justify its selection of a lower scoring candidate and the higher scoring candidate would not be entitled to appeal a ruling adverse to him or her. That is a significant alteration in the promotion process which has been established by statute and by rules of the HRD.

The proposed banding may well prove to be a better and fairer approach to assessing candidates for promotion within the civil service framework and Massachusetts may well join the numbers of other jurisdictions which have adopted the banding approach; however, such a significant alteration in the manner in which scores are reported and in which eligibility lists are established should have put through the review process set out by the Legislature in c. 31, §4.

Given that the HRD banding method was established without the requisite review process called for by the statute, the plaintiffs have a reasonable likelihood of success on the merits of their claims.

### Irreparable Harm

For the reasons discussed above in the *Standing* section, I believe that the plaintiffs have demonstrated a sufficient risk of harm to meet the harm requirement for the issuance of injunctive relief. In addition, as argued by the plaintiffs, where "a suit is brought either by the government or a citizen acting as a private attorney general to enforce a statute or a declared policy of the Legislature, irreparable harm is not required." *LeClair v. Town of Norwell*, 430 Mass. 328, 331 (1999). In such a situation, I must then evaluate "whether there is a likelihood of success on the merits of a plaintiff's claims and then determine whether 'the requested order promotes the public interest, or, alternatively, that the equitable relief will not adversely affect the public.'" *Id.* at 331-332, quoting *Commonwealth v. Mass. CRINC*, 392 Mass. 79, 89 (1984).

In this case, I find that the plaintiffs have established that they have a reasonable likelihood of success on the merits of their claims. Further, a determination of the issues raised by the plaintiffs will promote the public's interest in "guard[ing] against political considerations, favoritism, and bias

10

Add 000011

in governmental hiring and promotion . . . and ensuring that the system operates on 'basic merit principles,' as defined in G.L. c. 31, §1, absent properly documented and supported bases for departing from such principles in particular cases." *MAMLEO v. Abban*, 434 Mass. 256, 259 (2001). Finally, I do not find that there will be harm to the public caused by the issuance of the injunctive relief sought by the plaintiffs. While the defendants assert that any delay in the implementation of the new scoring method will impact communities which are attempting to fill vacancies on their police forces, I do not so find. There is nothing which prevents the HRD from issuing eligibility lists in the same fashion that it has done so for years.

### Conclusion

For these reasons, I find that a preliminary injunction should enter enjoining the defendants from issuing eligibility lists for the promotion of police officers in score bands rather than in the manner in which it has been doing so until a final resolution of this matter on its merits.

### ORDER

Until a final resolution of this matter on its merits, the defendants are preliminarily enjoined from issuing eligibility lists for promotions of police officers in score bands rather than in the manner in which such score have been reported up to the time of this proposed change.

Dated: April 15, 2009

Bruce R. Henry
Associate Justice

11